## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRONOVA BIOPHARMA NORGE AS, | ) | **REDACTED PUBLIC VERSION** |
| Plaintiff, | ) | |
| v. | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | Civil Action No. 09-286-SLR |
| Defendant. | ) | |

| | | |
|---|---|---|
| PRONOVA BIOPHARMA NORGE AS, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 09-304-SLR |
| APOTEX CORP. and APOTEX INC., | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| PRONOVA BIOPHARMA NORGE AS, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 09-305-SLR |
| PAR PHARMACEUTICAL INC., and | ) | |
| PAR PHARMACEUTICAL COMPANIES, INC., | ) | |
| Defendants. | ) | |

## PROPOSED JOINT PRETRIAL ORDER
## VOLUME I

{00495920;v1}

ASHBY & GEDDES
Steven J. Balick (#2114)
Tiffany Geyer Lydon (#3950)
Caroline Hong (#5189)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
tlydon@ashby-geddes.com
chong@ashby-geddes.com

*Attorneys for Plaintiff*
*Pronova Biopharma Norge AS*

*Of Counsel:*

James B. Monroe
Michael J. Flibbert
Jennifer H. Roscetti
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

Robert C. Stanley
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
3500 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, Georgia 30308
(404) 653-6400

YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
John W. Shaw (#3362)
Karen L. Pascale (#2903)
Pilar G. Kraman (#5199)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com
kpascale@ycst.com
pkraman@ycst.com

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

*Of Counsel:*

Frederick H. Rein
Annemarie Hassett
Gregory T. Sandidge
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

J. Anthony Downs
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

{00495920;v1}

PHILLIPS GOLDMAN & SPENCE, P.A.
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, Delaware 19806
(302) 655-4200
jcp@pgslaw.com
mch@pgslaw.com

*Attorneys for Defendants*
*Apotex Inc. & Apotex Corp.*

*Of Counsel:*

Paul J. Molino
John D. Polivick
RAKOCZY MOLINO MAZZOCHI
    SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301


RICHARDS, LAYTON & FINGER, P.A.
Frederick L. Cottrell, III (#2555)
Steven J. Fineman (#4025)
Stephen M. Ferguson (#5167)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
fineman@rlf.com
ferguson@rlf.com

*Attorneys for Defendants*
*Par Pharmaceutical, Inc. and*
*Par Pharmaceutical Companies, Inc.*

*Of Counsel:*

Daniel G. Brown
Omar Jabri
J. Andrea Park
WILSON SONSINI GOODRICH
& ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
(212) 999-5800

{00495920;v1}

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRONOVA BIOPHARMA NORGE AS, | ) | **REDACTED PUBLIC VERSION** |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 09-286-SLR |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| Defendant. | ) | |
| | ) | |
| PRONOVA BIOPHARMA NORGE AS, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 09-304-SLR |
| APOTEX CORP. and APOTEX INC., | ) | |
| Defendants. | ) | |
| | ) | |
| PRONOVA BIOPHARMA NORGE AS, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 09-305-SLR |
| PAR PHARMACEUTICAL INC., and | ) | |
| PAR PHARMACEUTICAL COMPANIES, INC., | ) | |
| Defendants. | ) | |

## PROPOSED JOINT PRETRIAL ORDER

Plaintiff Pronova BioPharma Norge AS ("Pronova") and Defendants Teva Pharmaceuticals USA, Inc. ("Teva"), Apotex Corp., Apotex Inc. (collectively "Apotex"), Par Pharmaceutical Inc., and Par Pharmaceutical Companies, Inc. (collectively "Par"), by their undersigned counsel, submit this Proposed Joint Pretrial Order pursuant to Delaware Local Rule 16.3. A combined claim construction hearing and Pretrial Conference is scheduled for March 15, 2011, at 3:30 pm. Trial is scheduled to begin on March 28, 2011.

{00495861;v1}

## I.     NATURE OF THE ACTION

1.     This is a civil action for patent infringement of Pronova's U.S. Patent No. 5,502,077 ("the '077 Patent") and U.S. Patent No. 5,656,667 ("the '667 Patent").[1]

2.     Apotex, Par, and Teva each filed an Abbreviated New Drug Application ("ANDA") with the United States Food and Drug Administration ("FDA") directed to their respective proposed drug products, each identified as omega-3-acid ethyl esters capsules.[2]

3.     Through Apotex's ANDA No. 90-973, Par's ANDA No. 91-018, and Teva's ANDA No. 91-028, the Defendants have each sought approval from the FDA to sell in the United States their omega-3-acid ethyl esters capsules prior to the expiration of Pronova's '077 and '667 Patents.

4.     By letters dated March 9, March 17, and March 20, 2009, Teva, Par, and Apotex, respectively, sent notices to Pronova of their ANDA filings, and included Paragraph IV Certifications with allegations of non-infringement, invalidity, and/or unenforceability directed to the '077 and '667 Patents. Within forty-five days of receiving each notice letter, Pronova filed suit against Teva (Civil Action No. 09-286-SLR), Apotex (Civil Action No. 09-304-SLR), and Par (Civil Action No. 09-305-SLR), asserting infringement of the '077 and '667 Patents (collectively, the "Patents in Suit").

---

[1] Pronova submits that this is an action under 35 U.S.C. § 271, and in particular under 35 U.S.C. § 271(e)(2) of the Hatch-Waxman Act. Defendants submit that this is an action under 35 U.S.C. § 271(e)(2)(A).
[2] Pronova submits that, under the trade name Lovaza®, Pronova's United States marketing partner GlaxoSmithKline ("GSK") sells prescription only gel capsules that contain omega-3-acid ethyl esters as the active drug component.

5.      In its Second Amended Complaint against Teva (C.A. No. 09-286, D.I. 73), against Apotex (C.A. No. 09-304, D.I. 75-1), and against Par (C.A. No. 09-305, D.I. 78),[3] Pronova alleges that, under 35 U.S.C. § 271(e)(2)(A), the Defendants' submissions of their ANDAs to the FDA constituted acts of infringement of the Patents in Suit.  Pronova also alleges that, if approved and marketed, the Defendants will infringe the Patents in Suit unless this Court orders that the effective date of any FDA approval of the Defendants' ANDAs shall be no earlier than the latest expiration date of the Patents in Suit, or such later date as the Court may determine.

6.      In response to Pronova's Second Amended Complaint, Teva filed an Answer and Affirmative Defenses (C.A. No. 09-286, D.I. 96), Apotex filed an Answer, Defenses, and Counterclaims (C.A. No. 09-304, D.I. 165), and Par filed an Answer and Counterclaims (C.A. No. 09-305, D.I. 99).  In those responsive pleadings, the Defendants denied infringement of the Patents in Suit, alleged that the claims of the Patents in Suit are invalid, and that the Patents in Suit are unenforceable.

7.      Pronova has filed an Answer to Apotex's counterclaims (C.A. No. 09-304, D.I. 169) and an Answer to Par's counterclaims (C.A. 09-305, D.I. 139), denying that Apotex's and Par's proposed products do not infringe the Patents in Suit, denying that the claims of the Patents in Suit are invalid, and denying that the Patents in Suit are unenforceable.

---

[3] Pronova's Second Amended Complaints also contained allegations of infringement under 35 U.S.C. § 271(g) of U.S. Patent Nos. 7,768,930 and 7,718,698 as to each of the Defendants.  In an Order dated September 30, 2010 (C.A. No. 09-286, D.I. 159), the Court bifurcated the parties' litigation as to those patents, and the separate trial on those matters is currently scheduled to begin on January 3, 2012 (*see* C.A. No. 09-286, D.I. 170 (so ordered on December 7, 2010)).

## II.   BASES FOR FEDERAL JURISDICTION

8.    This action arises under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.*, including 35 U.S.C. § 271(e)(2)(A).[4]

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.  No party contests subject matter jurisdiction.

10.    The Court has personal jurisdiction over the parties.

11.    Venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).  No party contests venue.

## III.   STATEMENT OF ADMITTED FACTS

12.    The parties admit the facts set forth in the attached Exhibit A.  These admitted facts require no proof at trial.

## IV.   STATEMENT OF ISSUES OF FACT REMAINING TO BE LITIGATED

13.    Plaintiff's statement of issues of fact that remain to be litigated is attached as Exhibit B.

14.    Defendants' statement of issues of fact that remain to be litigated is attached as Exhibit C.

---

[4] Apotex objects to the addition of any new claims of infringement that were not properly raised in Pronova's pleadings.  For example, Pronova only asserted a cause of action under 35 U.S.C. § 271(e)(2)(A) in its Complaints.  Pronova did not assert any infringement allegations under §§ 271(b) or (c), at any time in this litigation prior to the Pretrial Order.  Pronova disagrees with Apotex's objection and believes that issues of indirect infringement under 35 U.S.C. § 271(b) and (c) are properly at issue, at least because the nature of Pronova's method patent claims in the Hatch-Waxman context necessarily implicates these issues, and because Apotex raised them as affirmative defenses in its Answer and Defenses to Pronova's Second Amended Complaint.  *See* D.I. 165 at 9 (fifth and sixth defenses).

15.   If any statement in a party's statement of issues of fact that remain to be litigated should properly be considered an issue of law, then such statement shall be considered to be part of the party's statement of issues of law that remain to be litigated.

**V.   STATEMENT OF ISSUES OF LAW REMAINING TO BE LITIGATED**

16.   Plaintiff's statement of issues of law that remain to be litigated is attached as Exhibit D.

17.   Defendants' statement of issues of law that remain to be litigated is attached as Exhibit E.

18.   If any statement in a party's statement of issues of law that remain to be litigated should properly be considered an issue of fact, then such statement shall be considered to be part of the party's statement of issues of fact that remain to be litigated.

**VI.   THE PARTIES' TRIAL EXHIBITS**

19.   Plaintiff's list of premarked trial exhibits that it intends to offer at trial, including Defendants' grounds for any objections thereto, is attached as Exhibit F.

20.   Defendants' list of premarked trial exhibits that they intend to offer at trial, including Plaintiff's grounds for any objections thereto, is attached as Exhibit G.

21.   Subject to the Court's approval, the parties reserve the right to supplement their exhibit lists during the period prior to the commencement of trial.  Except for exhibits which are to be used solely for impeachment, only the exhibits that have been identified on the parties' exhibit lists and provided to the opposing party by 8:00 pm EST on March 23, 2011, may be introduced at trial.

22.   The parties' exhibit lists identify concisely the basis for the other party's objection, if any, to each listed exhibit, with citations to the Federal Rules of Evidence.  Exhibits to which no objection has been made shall be admitted if offered and if the Court so allows.

23.     The parties, having agreed to remove certain objections for certain documents or classes of documents, will continue to negotiate such stipulations regarding objections and will provide the Court with updated exhibit lists noting any further evidentiary stipulations at a time closer to trial, as directed by the Court.   The parties will also identify duplicate exhibits and will provide the Court with a joint exhibit list at a time closer to trial, as directed by the Court.

24.     Each party's stipulation as to the authenticity of articles is conditioned upon the offering party's inclusion of a cover page or other bibliographical information of the publication.

25.     A party may use any document or thing listed on the other party's exhibit list as if it had been included on its own, subject to evidentiary objections and provided that the party has complied with the notice provisions of paragraph 32.

26.     Neither party will remove a document once it has been added to the party's exhibit list without agreement from the other party.

27.     The listing of a document on a party's list is not an admission that such document is relevant or admissible when offered by the opposing party for the purpose that the opposing party wishes to admit the document.

28.     The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding the listed document or any other listed document.

29.     Any exhibit, once admitted, may be used equally by each party for any proper purpose.

30.     Except for exhibits that are to be used solely for impeachment, a party may not introduce at trial any exhibit not appearing on its list or not appearing on the other party's list, pursuant to paragraph 22, unless the Court determines that the interests of justice so warrant.

31.    Demonstrative trial exhibits need not be listed on the parties' exhibit lists.

32.    Each party will also provide by e-mail to opposing counsel all trial exhibits a party intends to use in direct examination of a witness and the identity of the witness with whom they will be used, by 7:00 pm EST two calendar days before they will be used at trial.

33.    The party receiving identification of trial exhibits intended for use in direct examination of a witness shall inform the party identifying the exhibits of any objections by 7:00 pm EST one calendar day before their proposed use at trial, and the parties shall meet and confer as soon as possible thereafter to resolve such objections.

34.    Exhibits to be used or offered into evidence solely for cross examination need not be included on the parties' lists of trial exhibits or disclosed in advance of being used or offered at trial.

## VII.    WITNESSES TO BE CALLED IN PERSON OR BY DEPOSITION

35.    Plaintiff's list of witnesses that it may call to testify at trial live or by deposition is attached as Exhibit H.[5]

36.    Defendants' list of witnesses that they may call to testify at trial live or by deposition is attached as Exhibit I.

37.    Witnesses whose testimony is expected to be by means of a deposition are so designated on the parties' witness lists.

38.    Impeachment witnesses are not listed on the parties' witness lists.

---

[5] Pronova submits that its witness list is not a commitment that any of the witnesses listed are available or will appear for trial.  To the extent that a witness's circumstances change, or a witness otherwise becomes unavailable for trial, Pronova reserves the right to call that witness by deposition.  Defendants submit that Pronova must identify by March 15 whether or not it will call Dr. Dahl to testify live.

39.     The parties expect to present some or all of the witnesses identified in their respective witness lists, or to call the witnesses identified in their respective lists if the need arises, either live or by deposition (written transcript and/or video) as indicated.

40.     The parties reserve the right to call:  (1) one or more additional witnesses whose testimony is necessary to establish authenticity or admissibility of any trial exhibit, if the admissibility of the exhibit is challenged by an opposing party; (2) additional witnesses to respond to any issues raised by the Court's pretrial or trial rulings; (3) any witness live for impeachment purposes to the extent permitted by applicable rules; and (4) any witness who appears on the other party's witness list.

41.     No fact or expert witness called by a party shall be permitted to testify at trial unless identified on that party's witness list, unless the Court determines that the interests of justice so warrant.

42.     A party will identify by email to the opposing party the witnesses it intends to call by 7:00 pm EST two calendar days before such witnesses will be called to testify.  If the witness is designated to be called to testify by deposition, at the same time the calling party will identify the particular designated deposition testimony (by page and line) to be used at trial.  By 7:00 pm EST the next calendar day, the other party will identify any specific pages and lines from that deposition testimony to counter-designate.  The parties shall meet and confer to resolve any objections to such deposition testimony.  If objections to disputed testimony are not resolved by the parties, they will be presented to the Court as appropriate before trial resumes on the day of their anticipated use.

43.     Each party will give notice by e-mail to the opposing party by 7:00 pm EST two calendar days before it expects to complete its presentation of evidence.  By 12:00 pm EST the

following calendar day, the opposing party will identify by e-mail the witness(es) that it intends to call on the first day of its case-in-chief or rebuttal.

44.    Along with their respective witness lists, the parties have provided the pages and/or lines of any portion of a deposition that may be offered by that party.  Separately provided are the opposing party's objections, counter-designations, objections to counter-designations, and counter-counter-designations.  The parties shall provide any objections to counter-designations and any counter-counter-designations by 8:00 pm EST on Friday, March 11.  Except by agreement of the parties or by leave of Court, no other deposition designations shall be introduced at trial.

45.    If applicable, a party's designation of a page and line from a particular transcript shall be automatically deemed to include any errata indicated for that page and line in the attached errata sheets.

46.    When deposition designations are introduced, all counter-designations will also be introduced in the sequence in which the testimony was originally given.  Objections and colloquy may be omitted where appropriate, as agreed upon by the parties.  To the extent that deposition designations are read or played at trial, each party will be charged only for the time taken to read or play its own designations or counter-designations, and will not be charged with the time necessary to read or play the other side's designations or counter-designations.

## VIII.  BRIEF STATEMENTS OF INTENDED PROOFS

47.    A brief statement of what Plaintiff intends to prove in support of its claims is attached as Exhibit J.

48.    A brief statement of what Defendants intend to prove in support of their defenses and counterclaims is attached as Exhibit K.

## IX.    DESIRED AMENDMENTS TO THE PLEADINGS

49.    No party desires any amendments of the pleadings.

## X.    CERTIFICATION OF ATTEMPTED RESOLUTION OF CONTROVERSY

50.    The parties certify that they have engaged in good faith efforts to explore the resolution of this controversy by settlement.  No agreement has been reached.

## XI.    OTHER MATTERS

51.    A list and brief description of miscellaneous issues that Plaintiff deems appropriate to discuss at the pretrial conference, including any response to any miscellaneous issues raised by Defendants, is set forth in Exhibit L.

52.    A list and brief description of miscellaneous issues that Defendants deem appropriate to discuss at the pretrial conference, including any response to any miscellaneous issues raised by Plaintiff, is set forth in Exhibit M.

53.    The Court has entered a Stipulated Protective Order (*see, e.g.,* C.A. 09-286, D.I. 41) to safeguard the confidentiality of certain of the parties' business and technical information, as well as that of third parties.  Nonetheless, the presentation of evidence at trial shall take place in open court, unless a party specifically requests, and the Court agrees, that the Court be closed to the public during presentation of certain portions of the evidence.  The parties have stipulated that each party may have up to two corporate representatives attend the entire trial, including any closed, confidential portions of the trial.  The corporate representatives attending trial need not previously have been listed under the Stipulated Protective Order; however, unless the corporate representative is listed under the Stipulated Protective Order, the corporate representative may not have access to the other party's confidential information except for that presented at trial.  The corporate representatives will agree to maintain in confidence the confidential information of the opposing party and all third parties that is presented during any

closed, confidential portion of the trial, and to use such information only in connection with this litigation and not for any other purpose, including competitive decision-making, communications with the FDA, and/or patent applications or prosecution relating to omega-3-fatty acid ethyl esters.

## XII.   ORDER TO CONTROL THE COURSE OF ACTIONS

54.     This Order shall control the subsequent course of the actions, unless modified by Court to prevent manifest injustice.

Dated: March 8, 2011

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____

Steven J. Balick (#2114)
Tiffany Geyer Lydon (#3950)
Caroline Hong (#5189)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
tlydon@ashby-geddes.com
chong@ashby-geddes.com

*Attorneys for Plaintiff*
*Pronova Biopharma Norge AS*

*Of Counsel:*

James B. Monroe
Michael J. Flibbert
Jennifer H. Roscetti
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

Robert C. Stanley
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
3500 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, Georgia 30308
(404) 653-6400

YOUNG CONAWAY STARGATT
   & TAYLOR, LLP

*Of Counsel:*

*/s/ Karen L. Pascale*
_____

John W. Shaw (#3362)
Karen L. Pascale (#2903)
Pilar G. Kraman (#5199)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com
kpascale@ycst.com
pkraman@ycst.com

Frederick H. Rein
Annemarie Hassett
Gregory T. Sandidge
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

J. Anthony Downs
GOODWINPROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*


PHILLIPS GOLDMAN & SPENCE, P.A.

*Of Counsel:*

*/s/ Megan C. Haney*
_____

John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, Delaware 19806
(302) 655-4200
jcp@pgslaw.com
mch@pgslaw.com

Paul J. Molino
John D. Polivick
RAKOCZY MOLINO MAZZOCHI
   SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301

*Attorneys for Defendants*
*Apotex Inc. & Apotex Corp.*

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Stephen M. Ferguson*

_____
Frederick L. Cottrell, III (#2555)
Steven J. Fineman (#4025)
Stephen M. Ferguson (#5167)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
fineman@rlf.com
ferguson@rlf.com

*Attorneys for Defendants*
*Par Pharmaceutical, Inc. and*
*Par Pharmaceutical Companies, Inc.*

*Of Counsel:*

Daniel G. Brown
Omar Jabri
J. Andrea Park
WILSON SONSINI GOODRICH
& ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
(212) 999-5800

SO ORDERED this _____ day of March, 2011.

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

Admitted Facts

Pronova and Its Patents

1. Pronova is a Norwegian corporation with its corporate headquarters at Vollsveien 6, 1336 Lysaker, Baerum, Norway.

2. U.S. Patent No. 5,502,077 ("the '077 Patent"), which is entitled "Fatty Acid Composition," was issued by the U.S. Patent and Trademark Office ("PTO") on March 26, 1996.

3. The '077 Patent lists Harald Breivik, Bernt Borretzen, Knut H. Dahl, Hans E. Krokan, and Kaare H. Bonaa as inventors.

4. The '077 Patent issued from Application No. 07/902,500 ("the '500 Application") filed June 23, 1992.

5. The '500 Application is a continuation of Application No. 07/389,902 ("the '902 Application") filed on August 4, 1989, which claims priority to United Kingdom Application No. 8819110 filed August 11, 1988.

6. Pronova is the current owner by assignment of the '077 Patent.

7. U.S. Patent No. 5,656,667 ("the '667 Patent"), which is entitled "Fatty Acid Composition," was issued by the PTO on August 12, 1997.

8. The '667 Patent lists Harald Breivik, Bernt Børretzen, Knut Helkås Dahl, Hans Einar Krokan, and Kaare Harald Bønaa as inventors.

9. The '077 Patent and the '667 Patent share the same listed inventors.

10. The '667 Patent issued from Application No. 07/471,200 ("the '200 Application") filed June 6, 1995.

11. The '200 Application is a continuation of the '500 Application.

12.     Pronova is the current owner by assignment of the '667 Patent.


<u>The '902 Application File History</u>

13.     The filing of the '902 Application on August 4, 1989, included the application itself, 15 original claims, a declaration signed by each of the inventors (Breivik, Børretzen, Bønaa, Dahl, and Krokan).

14.     On March 22, 1990, the PTO issued a first (non-final) office action in the '902 Application that rejected claims 1-11 and 13-15 as obvious under 35 U.S.C. § 103 over Rubin in view of England or Sutherland, and claim 12 as obvious over Sutherland in view of Stout et al.

15.     On July 23, 1990, Applicant filed an Amendment in the '902 Application, as well as a declaration by named inventors Dr. Dahl and Dr. Bønaa ("the July 1990 Declaration").

16.     The July 1990 Declaration contained a declaration as to certain content that was signed by inventor Dahl on July 16, 1990 ("First Dahl Declaration"), and a declaration as to other content that was signed by Inventor Bønaa on July 18, 1990.

17.     On August 1, 1990, Applicant filed a Supplemental Amendment in the '902 Application.

18.     On August 1, 1990, Applicant filed an IDS in the '902 Application, submitting another Great Britain search report and, among other documents, De Bernardi and an English translation thereof, along with comments on the composition described in De Bernardi.

19.     On August 31, 1990, the PTO issued a second (final) office action in the '902 Application that rejected claims 1-10 and 15-18 as obvious under 35 U.S.C. § 103 over Rubin in view of England or Sutherland, and objected to the remaining claims as otherwise allowable except that they were dependent from rejected claims.

20.     On November 29, 1990, Applicant filed an Amendment after Final Rejection in the '902 Application, canceling some claims and adding two new claims.

21.     According to the November 1990 Amendment After Final Rejection, Applicant's representative had a telephone interview with the Examiner on November 9, 1990, in which the Applicant's representative indicated that he had some proposed claim amendments for the Examiner's consideration, which were subsequently hand delivered to the Examiner on November 13, 1990; then, on November 27, 1990, the Applicant's representative contacted the Examiner, who indicated that the proposed amendments to the claims were acceptable.

22.     On December 13, 1990, the PTO issued an Advisory Action in the '902 Application, stating that the rejection over the prior art was maintained and all of the claims were rejected.

23.     On December 18, 1990, Applicant filed an Amendment and Request for Reconsideration in the '902 Application.

24.     On December 31, 1990, Applicant filed a Petition for Extension of Time ("EOT") and Notice of Appeal in the '902 Application.

25. On January 7, 1991, the Examiner withdrew the August 1990 final rejections, and issued a third (non-final) office action in the '902 Application that included various claim rejections under 35 U.S.C. §§ 102, 103, and 112.

26. On April 18, 1991, according to an Interview Summary filed in the '902 Application, Applicant's representatives Michael Davis and Elizabeth Dahl, as well as two of the inventors (Dr. Bønaa and Mr. Børretzen), had an in-person interview with the Examiner and his supervisor.

27. On June 7, 1991, Applicant filed an Amendment with a two-month EOT in the '902 Application, noting the concurrent filing of four new declarations (two from Dr. Bønaa, one from Dr. Dahl ("Second Dahl Declaration") and one from Per Lund-Johansen), and also indicating that three publications (Blonk, Luley, and Reis) were being made of record.

28. The Second Dahl Declaration was signed on April 11, 1991, and discusses C. Luley et al., "Bioavailability of Omega-3 Fatty Acids: Ethylester Preparations Are as Suitable as Triglyceride Preparations," 15 Akt. Erniihr.-Med. 123-125 (1990).

29. On June 26, 1991, the PTO issued a fourth (final) office action in the '902 Application that included various claim rejections under 35 U.S.C. § 102/103, 103, and 112.

30. On December 24, 1991, Applicant filed an Amendment After Final Rejection, three-month EOT, IDS, a declaration by Dr. Tone Schanche in the '902 Application, and a Notice of Appeal.

31.    On January 8, 1992, the PTO issued a second Advisory Action in the '902 Application, withdrawing certain, but not all, § 103 and § 112 rejections, and maintaining a rejection for obviousness over Sutherland.

32.    On February 24, 1992, Applicant filed a Supplemental Response After Final Rejection in the '902 Application, along with a declaration from Mats Håvik and a declaration from Dr. Christian Drevon.

33.    On March 6, 1992, the PTO issued a third Advisory Action in the '902 Application.

34.    The '902 application was abandoned after the filing of the '500 Application.


The '500 Application / '077 Patent File History

35.    On June 23, 1992, Applicant filed a file-wrapper continuation application, which became the '500 Application, along with an EOT and an IDS.

36.    On October 27, 1992, Applicant filed an IDS in the '500 Application, discussing the art of record used as the basis for prior claim rejections and noting information the Applicant had since received regarding the composition disclosed in one of those references (De Bernardi).

37.    The '500 Application contains a first Search Report by the Examiner dated November 12, 1992, on which International Patent Application Publication No. WO 87/03899 was cited.

38.    The '500 Application contains a second Search Report by the Examiner dated November 13, 1992, on which a Technical Note for "Separation of Omega-3 Fatty

Acids from Fish Oils" by the National Oceanic and Atmospheric Administration ("NOAA") was cited.

39.    On November 29, 1992, the PTO issued a first (non-final) office action in the '500 Application that included various claim rejections under 35 U.S.C. §§ 102 and 103.

40.    On January 27, 1993, Applicant's representative John Behringer had an in-person interview with the Examiner for the '500 Application.

41.    On March 30, 1993, Applicant's representative conducted a telephone interview with the Examiner for the '500 Application.

42.    On March 31, 1993, Applicant faxed to the '500 Application Examiner graphs showing total cholesterol levels in patients given compositions comprising 62.5%, 80%, or 85% concentrations of EPA and DHA.

43.    On April 12, 1993, Applicant's representative had a telephone interview with the '500 Application Examiner.

44.    On May 7, 1993, Applicant filed an Amendment After Office Action and an EOT in the '500 Application and replacing the then-pending claims with new claims and enclosing a second declaration from Dr. Tone Schanche.

45.    On June 4, 1993, the PTO issued a second (final) office action in the '500 Application, stating that the March 31, 1993, submission was not responsive and maintaining all the rejections.

46.    On July 6, 1993, Applicant filed a response in the '500 Application to the June 1993 office action, noting the May 1993 submissions.

47. On July 15, 1993, Applicant's representative John Behringer sent a letter to the Examiner of the '500 Application, requesting an interview with him and the inventors' assignee's in-house representative.

48. On July 29, 1993, the PTO issued a communication in the '500 Application, vacating the June 1993 office action in view of Applicant's July 1993 response.

49. On August 6, 1993, the PTO suspended *ex parte* examination of the '500 Application for a period of four months.

50. On October 26, 1993, Applicant filed an IDS in the '500 Application.

51. On February 15, 1994, the PTO issued a third (non-final) office action in the '500 Application that rejected all claims on various grounds under 35 U.S.C. §§ 102 and 103.

52. On March 31, 1994, Applicant filed an IDS in the '500 Application.

53. On August 15, 1994, Applicant filed an Amendment and a three-month EOT in the '500 Application.

54. The August 1994 Amendment states that a declaration by inventor Breivik was being filed, but that declaration does not appear in the file history for the '500 Application; instead, it is present in the file history for the later '200 Application that issued as the '667 Patent.

55. On November 14, 1994, the PTO issued a fourth (final) office action in the '500 Application that rejected all claims on various grounds under 35 U.S.C. §§ 102/103.

56. On May 3, 1995, Applicant's representative had an interview with the Examiner of the '500 Application and his supervisor.

57.   On May 15, 1995, Applicant filed a Notice of Appeal with a three-month EOT in the '500 Application.

58.   On May 31, 1995, Applicant filed a Request for Reconsideration After Final Rejection in the '500 Application, and submitted a Rule 131 Declaration signed by the inventors (Bønaa, Børretzen, Breivik, Dahl, and Krokan).

59.   The May 1995 Request for Reconsideration refers to "enclosed declarations by the inventors and those involved in the Oregon study"; the declarations of the inventors appear in the file history for the '500 Application, but the declarations of those involved in the Oregon study (Dr. William Connor and Lauren Hatcher) instead appear in the file history for the later '200 Application that issued as the '667 Patent.

60.   The May 1995 Request for Reconsideration also refers to a declaration having been filed by Dr. Jeanne Joseph on September 6, 1994, but that declaration does not appear in the file history for the '500 Application; instead, it is present in the file history for the '200 Application that issued as the '667 Patent.

61.   On July 17, 1995, the PTO issued an Advisory Action in the '500 Application, stating that certain claims were deemed allowable.

62.   On September 11, 1995, Applicant filed an Amendment cancelling all but the allowed claims, along with a two-month EOT in the '500 Application.

63.   On November 17, 1995, the PTO issued a Notice of Allowance in the '500 Application.

64.   On December 5, 1995, Applicant paid the issue fee in the '500 Application.

65.   On March 26, 1996, the '500 Application issued as the '077 Patent.

The '200 Application / '667 Patent File History

66.    On June 6, 1995, Applicant filed a second continuation application (including a declaration and power of attorney, and an assignment) claiming the benefit of the '902 Application, which was given U.S. Application No. 08/471,200 ("the '200 Application").

67.    On July 14, 1995, the PTO issued a Notice to File Missing Parts in the '200 Application.

68.    On November 14, 1995, Applicant filed a response in the '200 Application to the July 1995 Notice along with an EOT.

69.    On January 11, 1996, Applicant filed an IDS in the '200 Application and an Amendment canceling the original claims, adding new claims, and submitting copies of declarations from the '500 Application.

70.    On April 12, 1996, Applicant submitted a complete set of the January 1996 exhibits in the '200 Application, in response to a telephone call from the Examiner to Applicant's representative indicating that the exhibits were separated from the January 1996 filing.

71.    On July 12, 1996, the PTO issued a first (non-final) office action in the '200 Application, which included a requirement for restriction, noted that in a telephone call with Applicant's representative on April 15, 1996, Applicant had provisionally elected certain claims, and noted the allowance of certain claims including the provisionally elected claims.

72.     On August 27, 1996, Applicant filed an Amendment in the '200 Application, correcting portions of the specification, amending certain claims and canceling the non-elected claims.

73.     On September 16, 1996, the PTO issued a Notice of Allowance in the '200 Application.

74.     On September 23, 1996, Applicant paid the issue fee in the '200 Application.

75.     On February 28, 1997, Applicant made a status inquiry into the '200 Application.

76.     On March 3, 1997, Applicant made a further status inquiry into the '200 Application.

77.     On August 12, 1997, the '200 Application issued as the '667 Patent.


Extension and Disclaimer of the '667 Patent Term

78.     On January 7, 2005, Applicant submitted an Application for Extension of Patent Term Pursuant to 35 U.S.C. § 156 in the '077 and '667 Patents.

79.     On January 21, 2005, the PTO Office of Regulatory Policy sent a letter to Applicant, asking for Applicant's assistance on certain topics.

80.     On January 6, 2006, the FDA submitted a letter in regard to the January 2005 Application, indicating that the total length of the regulatory review period for Omacor® was 3,712 days.

81.     On January 24, 2007, the PTO issued a Notice of Final Determination and Requirement for Election, indicating that the '667 Patent was eligible for patent term extension of 1,476 days under 35 U.S.C. § 156, and noting that if the

extension was to be applied to the '667 Patent, Applicant would be required to file an election of the '667 Patent within one month of the date of the Notice.

82.   On February 13, 2007, Applicant filed a Response to Requirement for Election with the PTO, electing the '667 Patent.

83.   On April 12, 2007, the PTO mailed Applicant a certificate issued on April 3, 2007, that extended the term of the '667 Patent for a period of 1,476 days.

84.    On January 5, 2009, Pronova filed a Terminal Disclaimer, disclaiming the terminal part of the statutory term of the '667 Patent that would extend beyond the expiration date of the '077 Patent, excepting the patent term extension.


The '331 Application / '594 Patent File History

85.   On June 4, 1996, Applicant filed a divisional application of the '200 Application, including a declaration and power of attorney, as well as an assignment and a Preliminary Amendment and Information Disclosure Statement, which was given U.S. Application No. 08/660,331 ("the '331 Application").

86.   On August 27, 1996, Applicant submitted a Supplemental Preliminary Amendment, adding claims that had been withdrawn from further consideration due to the July 1996 Restriction Requirement in the '200 Application.

87.   On February 24, 1997, the PTO issued a first (non-final) office action in the '331 Application, which included a rejection of certain claims under 35 U.S.C. § 103(a).

88.   On May 21, 1997, Applicant filed an Amendment in the '331 Application.

89.   On June 9, 1997, the PTO issued a Notice of Allowance in the '331 Application.

90.   On August 7, 1997, Applicant paid the issue fee in the '331 Application.

91.   On December 16, 1997, the '331 Application issued as the '594 Patent.

Lovaza® and Its Labeling

92.   Glaxo Smith Kline ("GSK") is the holder of New Drug Application No. 21-654 for Lovaza® capsules.

93.   The label for Lovaza® states that "LOVAZA is indicated as an adjunct to diet to reduce triglyceride (TG) levels in adult patients with severe ($\geq$500 mg/dL) hypertriglyceridemia."

Teva and the Teva ANDA Product

94.   Teva Pharmaceuticals USA, Inc. ("Teva") is a corporation organized under the laws of the State of Delaware, and has its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454-1090.

95.   Teva assembled and caused to be submitted to the U.S. Food and Drug Administration ("FDA"), pursuant to 21 U.S.C. § 355(j), Abbreviated New Drug Application ("ANDA") No. 91-028, directed to a proposed drug product identified as omega-3-acid ethyl esters capsules (the "Teva ANDA product").

97.     Teva has applied to the FDA for approval to sell the omega-3-acid ethyl esters

capsules that are the subject of ANDA No. 91-028.


Par and the Par ANDA Product

98.     Par Pharmaceutical, Inc. is a corporation organized under the laws of the State of

Delaware, and its principal place of business is located at One Ram Ridge Road,

Spring Valley, New York 10977.

99.     Par Pharmaceutical Companies, Inc. is a corporation organized under the laws of

the State of Delaware, and its principal place of business is located at 300 Tice

Boulevard, Woodcliff Lake, New Jersey 07677.

100.    Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical

Companies, Inc. (collectively, "Par").



102.    Par has applied to the FDA for approval to sell its omega-3-acid ethyl esters

capsules.

Apotex and Its Generic Lovaza® Product

103.    Apotex Corp. is a corporation organized under the laws of the State of Delaware,
        with a place of business located at 2400 North Commerce Parkway, Suite 400,
        Weston, Florida 33326.

104.    Apotex Inc. is a corporation organized and existing under the laws of Canada,
        with a place of business located at 150 Signet Drive, Weston, Toronto, Ontario,
        Canada M9L 1T9.



# EXHIBIT B

<u>Pronova's Statement of Issues of Fact that Remain to Be Litigated</u>

In conjunction with the issues discussed in Pronova's Brief Statement of Intended Proofs (Exhibit J), the parties' Statement of Admitted Facts (Exhibit A), and Pronova's Statement of Issues of Law that Remain to Be Litigated (Exhibit D), Pronova presents the following issues of law that it contends remain to be litigated, along with citations to authorities.

<u>Pronova and Its Patents</u>

1.      The '077 and the '667 Patents share essentially the same specification.

2.      Pronova has the right to sue for infringement of the '077 Patent.

3.      Pronova has the right to sue for infringement of the '667 Patent.

4.      The '077 and '667 Patents properly and appropriately claim priority to Great Britain Application No. 8819110.1 filed August 11, 1988, such that references dated after August 11, 1988, are not prior art under 35 U.S.C. § 102 as to the compositions recited in the Asserted Claims.

<u>The '902 Application File History</u>

5.      On November 14, 1989, Applicant provided the PTO with a certified copy of Great Britain Application No. 8819110.1 and filed an Information Disclosure Statement ("IDS") citing documents from a Great Britain search report from that Great Britain application.

6.  On November 14, 1989, Applicant, as part of the '902 Application, provided the PTO with a proper claim of priority to Great Britain Application No. 8819110.1 filed August 11, 1988.

7.  Study I in the July 1990 Declaration, conducted by Inventor Dahl, related to the bioavailability of the compositions recited in the pending claims, in ethyl ester form, as compared to a TG30 preparation containing approximately 18% EPA and 30% DHA in the form of a triglyceride.

8.  Study II in the July 1990 Declaration, conducted by Inventor Kaare Bønaa, related to the effect of the claimed compositions as compared to corn oil in patients with mild hypertension.

The '500 Application File History

9.  On October 26, 1993, Applicant filed an IDS in the '500 Application, which included discussions of certain enclosed publications, stated that additional test results were being submitted, corrected data submitted in the May 1993 submissions, and included a third declaration from Dr. Tone Schanche.

10. The Amendment filed May 7, 1993, in the '500 Application replaced the then-pending claims with new claims substantially identical to the claims that issued in the '077 Patent.

The '200 Application / '667 Patent File History

11. The January 1996 IDS in the '200 Application included documents cited in the '902 and '500 Applications, as well as submitted copies of the following

declarations from the '500 Application:  Declaration of Dr. Tone Schanche, Rule 131 Declaration of Dr. Connor et al., Rule 131 Declaration of Dr. Breivik et al., Rule 132 Declaration of Dr. Nordøy, Rule 132 Declaration of Dr. Joseph, Rule 132 Declaration of Dr. Ackman, and Rule 132 Declaration of Dr. Breivik

12.   On October 26, 1993, Applicant filed an IDS in the '500 Application, which included discussions of certain enclosed publications, stated that additional test results were being submitted, corrected data submitted in the May 1993 submissions, and included a third declaration from Dr. Tone Schanche.

### Lovaza® and Its Labeling

13.   Pronova conducted clinical trials in order to gain approval for Lovaza® capsules.

14.   The generic name for Lovaza® is omega-3-acid ethyl esters capsules.

15.   The active ingredient in Lovaza® is omega-3-acid ethyl esters.

16.   The label for Pronova's Lovaza® product states that "[t]he daily dose of LOVAZA is 4 grams per day.  The daily dose may be taken as a single 4-gram dose (4 capsules) or as two 2-gram doses (2 capsules given twice daily)."

17.   The label for Pronova's Lovaza® product states that "LOVAZA, a lipid-regulated agent, is supplied as a liquid-filled gel capsule for oral administration."

18.   The label for Pronova's Lovaza® product states that "Each 1-gram capsule of LOVAZA contains at least 900 mg of the ethyl esters of omega-3 fatty acids sourced from fish oils.  These are predominately a combination of ethyl esters of eicosapentaenoic acid (EPA   approximately 465 mg) and docosahexaenoic acid (DHA   approximately 375 mg)."

19.   The label for Pronova's Lovaza® product states that "LOVAZA capsules also contain the following inactive ingredients:  4 mg α-tocopherol (in a carrier of soybean oil), and gelatin, glycerol, and purified water (components of the capsule shell)."

20.   The label for Pronova's Lovaza® product states that "[t]he mechanism of action of LOVAZA is not completely understood."

21.   The label for Pronova's Lovaza® product states that "[t]he effects of LOVAZA 4 grams per day were assessed in 2 randomized, placebo-controlled, double-blind, parallel-group studies of 84 adult patients (42 on LOVAZA, 42 on placebo) with very high triglyceride levels. . . . LOVAZA 4 grams per day reduced median TG, VLDL-C, and non-HDL-C levels and increased median HDL-C from baseline relative to placebo."


Teva and Its Generic Lovaza® Product

22.   Under 21 U.S.C. § 355(j), Teva submitted to the U.S. Food and Drug Administration ("FDA") an Abbreviated New Drug Application ("ANDA"), which was assigned No. 91-028, to obtain approval for the commercial manufacture, use, and sale of omega-3-acid ethyl esters capsules.

23.   Teva filed ANDA No. 91-028 to obtain approval from the FDA to market omega-3-acid ethyl esters capsules in the United States before the expiration of the '077 and '667 Patents.



28.    Teva knew of the '077 and '667 Patents when it developed the omega-3-acid ethyl esters capsules that are the subject of ANDA No. 91-028.



30.    Teva filed ANDA No. 91-028 with the FDA seeking approval to market a generic version of Lovaza®.























<u>Par and Its Generic Lovaza® Product</u>

103.    Par sells generic pharmaceuticals in the United States.

104.    The acts of Par Pharmaceutical, Inc. alleged in Pronova's complaint were done at the direction of, with the authorization of, and/or with the cooperation, participation, and assistance of, at least in part for the benefit of, Par Pharmaceutical Companies, Inc.

105.    The acts of Par Pharmaceutical Companies, Inc. alleged in Pronova's complaint were done at the direction of, with the authorization of, and/or with the cooperation, participation, and assistance of, at least in part for the benefit of, Par Pharmaceutical, Inc.











172.   Par knows or should know that its proposed labeling will actively instruct health care professionals and/or patients to administer Par's omega-3-acid ethyl esters products that are the subject of ANDA No. 91-018 in methods that directly infringe Pronova's Asserted Method Claims.



175.   Par knows or should know that the proposed labeling submitted as part of its ANDA No. 91-018 will instruct and cause health care professionals and patients to administer and use Par's omega-3-acid ethyl esters capsules in a manner that infringes the Asserted Method Claims of Pronova's '077 and '667 Patents.

176.   Par intends for its proposed labeling submitted as part of its ANDA No. 91-018 to instruct and cause health care professionals and patients to administer and use Par's omega-3-acid ethyl esters capsules in a manner that infringes the Asserted Claims of Pronova's '077 and '667 Patents.

177.   Upon FDA approval of Par's ANDA No. 91-028, Par will actively aid and abet the infringement of others by offering to sell, selling, distributing, and/or importing Par's omega-3-acid ethyl esters capsules to doctors and patients in the

United States that use those products to practice Pronova's Asserted Method Claims in the '077 and '667 Patents.

178. Par's omega-3-acid ethyl esters capsules that are the subject of its ANDA No. 91-018 are especially made or especially adapted for use in infringement of the Asserted Method Claims of Pronova's '077 and '667 Patents.

179. Par's omega-3-acid ethyl esters capsules that are the subject of its ANDA No. 91-018 are not a staple article or commodity of commerce suitable for substantial non-infringing use.

<u>Apotex and Its Generic Lovaza® Product</u>

180. Apotex Corp. is a wholly-owned subsidiary of Apotex, Inc. (collectively, "Apotex").

181. Apotex sells generic pharmaceuticals in the United States.























Validity / Public Use



269.   Norsk Hydro did not make a public use in the United States prior to August 1988.







Validity / Obviousness

289.   A person of ordinary skill in the art, with regards to the Asserted Claims of Pronova's Patents in Suit, would have had the capability of understanding the scientific principles applicable to the subject matter of the '077 and '667 Patents, including the identity of the disclosed and claimed compositions, processes for preparing said compositions, methods for analyzing and characterizing said compositions, and pharmacological testing and properties described therein.

290.   A person of ordinary skill in the art, with regards to the Asserted Method Claims of Pronova's Patents in Suit, would have, or could consult with someone having, at least a professional degree in medicine or pharmacy, or a graduate degree in pharmacology or the pharmaceutical sciences.  Such a person would have, or could consult with someone having, several years experience in the design or interpretation of medical studies involving patients or volunteers.

291.   One of ordinary skill in the art in August 1988 would have recognized that certain literature reports of fatty acid compositions in weight percent were measured using less accurate area percent methods.

292. One of ordinary skill in the art in August 1988 would have recognized that values of fatty acid concentrations reported from an area percent calculation would be lower than when analyzed by a true weight percent method.

293. One of ordinary skill in the art in August 1988, wanting to develop a pharmaceutical treatment for hypertriglyceridemia, or a method for elevating HDL cholesterol levels using a pharmaceutical composition, would not have started with a fish oil or fish oil-derived dietary supplement; rather, one of ordinary skill in the art in August 1988 would have started with already existing pharmaceutical products that were available during that time.

294. One of ordinary skill in the art in August 1988 knew that niacin had beneficial effects on several lipid parameters, but also had undesirable side effects.

295. One of ordinary skill in the art in August 1988 knew that fibrates and statins, among other compounds, were being actively researched for their potential effects on various lipid parameters.

296. One of ordinary skill in the art in August 1988 understood that subjects taking omega-3 fatty acid nutritional supplements generally experienced an increase in LDL-C, or "bad cholesterol."

297. One of ordinary skill in the art in August 1988 did not know which omega-3 fatty acids contained in fatty fish or fish oil supplements caused observed decreases in triglyceride levels, as well as observed increases in LDL-C.

298. One of ordinary skill in the art in August 1988 was not aware of any compliance problems with patients taking numerous capsules per day of fish oil supplements.

299.  One of ordinary skill in the art in August 1988 did not fully understand the mechanism(s) of action by which certain omega-3 fatty acids exert a therapeutic effect.

300.  Whether a pharmaceutical mixed fatty acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1 would be therapeutically effective in the treatment or prophylaxis of hypertriglyceridemia was unpredictable to one of ordinary skill in the art in August 1988.

301.  Whether a pharmaceutical mixed fatty acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1 would be therapeutically effective to elevate HDL cholesterol levels was unpredictable to one of ordinary skill in the art in August 1988.

302.  After it was launched in 2005, Lovaza® was met with initial skepticism regarding whether or not it would be more therapeutically effective than omega-3 fish oil health supplements.

303.  Lovaza® satisfied a long-felt need for a pharmaceutical composition that would treat hypertriglyceridemia, and elevate HDL cholesterol levels, without unwanted and undesirable side effects.

304.  Lovaza® has been a commercial success, driven by the unique formulation and therapeutic aspects recited in Pronova's Asserted Claims.

305.  As demonstrated during prosecution of the Patents in Suit, the claimed compositions demonstrate unexpected results over the prior art.

306.    The level of unexpected results demonstrated during prosecution of the Patents in Suit is commensurate in scope with the Asserted Claims.

307.    The Dahl Abstract is not prior art to Pronova's Patents in Suit.

308.    The Dahl Abstract would not have provided to one of ordinary skill in the art in August 1988 a reasonable expectation that a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1 would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

309.    De Bernardi would not have provided to one of ordinary skill in the art in August 1988 a reasonable expectation that a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1 would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

310.    International PCT Application Publication No. 87/03899 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

311.    The Joseph Workshop paper would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that

such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

312.    Kryznowek would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

313.    Wille et al. would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

314.    Azhgikhin et al. would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

315.    Haagsma would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from

1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

316.   Bronsgeest-Schoute would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

317.   Sanders 1983 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

318.   Simons would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

319.   Phillipson 1985 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition

comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

320.   Harris 1989 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

321.   Dictionnaire Vidal would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

322.   Kane 1988 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

323.  Kane 1981 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

324.  The 1987 and 1988 NIH Notices would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

325.  The Rizvi Book Chapter would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

326.  Nilsson et al. would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition

would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

327. Norwegian Patent No. 157302 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

328. EP 0271747 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

329. Elmadfa et al. would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

330. Bimbo 1987 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of

EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

331.  Norris would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

332.  Saynor would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

333.  Simons 1990 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

334.  Harris 1983 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition

comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

335.  Holub would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

336.  Sanders 1981 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

337.  Phillipson 1981 would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

338.   30% EPA/DHA compositions (such as MaxEPA) would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

339.   50% EPA/DHA compositions (such as SuperEPA) would not have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

340.   None of the alleged prior art references relied upon by the Defendants, either alone or in any combination, would have provided motivation to one of ordinary skill in the art in August 1988 to make a pharmaceutical mixed-fatty-acids composition comprising at least 80% by weight of EPA and DHA in a weight ratio of EPA:DHA of from 1:2 to 2:1, or a reasonable expectation that such a composition would be useful for the treatment or prophylaxis of hypertriglyceridemia or to elevate HDL cholesterol levels.

Validity / Double Patenting

341. U.S. Patent No. 5,698,594 ("the '594 Patent"), which is entitled "Treatment and Prevention of Risk Factors for Cardiovascular Diseases," was issued by the PTO on December 16, 1997.

342. The '594 Patent lists Harald Breivik, Bernt Børretzen, Knut Helkås Dahl, Hans Einar Krokan, and Kaare Harold Bønaa as inventors.

343. The '594 Patent issued from Application No. 07/660,331 ("the '331 Application") filed June 4, 1996.

344. The '331 Application is a divisional of the '200 Application.

345. The '331 Application was filed pursuant to a restriction requirement issued by the PTO in the '200 Application.

346. The '331 Application was filed after June 8, 1995.

347. The '331 Application was filed after the '500 Application.

348. The '500 Application was filed before June 8, 1995.

349. The '200 Application was filed before June 8, 1995.

350. The '594 Patent issued after both the '077 Patent and the '667 Patent.

351. The '594 Patent expired on August 4, 2009.

352. No claim of the '594 Patent is an obvious variant of any claim of the '667 Patent.

353. No claim of the '667 Patent is an obvious variant of any claim of the '594 Patent.

354. No claim of the '594 Patent is an obvious variant of any claim of the '077 Patent.

355. No claim of the '077 Patent is an obvious variant of any claim of the '594 Patent.

Validity / Written Description

356.   Table 8 of Pronova's '667 Patent shows that, in the group of all patients receiving the test substance, HDL cholesterol levels were elevated from 1.35 to 1.41 mmol/liter, with a statistical significance of $p < 0.01$.

357.   Pronova's '667 Patent states:  "As appears from Table 8 the test composition according to the present application . . . raises HDL cholesterol significantly in the whole population."

358.   The specification of Pronova's '667 Patent conveys to one of ordinary skill in the art that the inventors were in possession, in August 1989, of the subject matter recited in claims 1-13 of the '667 Patent.

359.   The specification of Pronova's Patents in Suit conveys to one of ordinary skill in the art that the inventors were in possession, in August 1989, of the subject matter recited in claims 3-9 and 12 of the '077 Patent, and claims 3-11, 16-22, 31-33, 38-40, and 49-52 of the '667 Patent.


Validity / Enablement

360.   One of ordinary skill in the art, in August 1989, considering the specifications of the Patents in Suit and drawing upon his or her own knowledge, would readily be able to make compositions falling within the parameters recited in claims 16-22, 31-33, 38-40, and 49-52 of the '667 Patent without undue experimentation.

361.   One of ordinary skill in the art, in August 1989, considering the specifications of the Patents in Suit and drawing upon his or her own knowledge, would readily be able to make compositions falling with the parameters recited in claims 3-9 and

12 of the '077 Patent and claims 3-11 of the '667 Patent that would be useful for practicing those claimed methods without undue experimentation.

Validity / Dependency

362. One of ordinary skill in the art, in August 1989, considering the specifications of the Patents in Suit and drawing upon his or her own knowledge, would understand the term "fatty acids" as used in Pronova's Asserted Independent Claims to be a genus that would include the narrower sub-genus of fatty acids "in esterified form."

363. One of ordinary skill in the art, in August 1989, considering the specifications of the Patents in Suit and drawing upon his or her own knowledge, would readily understand the term "fatty acids" as used in Pronova's Asserted Independent Claims to be a genus that would include the narrower sub-genus of fatty acids "in ethyl ester form."

364. Claims 8, 9, and 12 of the '077 Patent specify a further limitation of the subject matter claimed in claim 1 of the '077 Patent.

365. Claims 10 and 11 of the '667 Patent specify a further limitation of the subject matter claimed in claim 1 of the '667 Patent.

366. Claims 26 and 54 of the '667 Patent specify, in whole or in part, a further limitation of the subject matter claimed in claim 14 of the '667 Patent.

367. Claims 33 and 34 of the '667 Patent specify a further limitation of the subject matter claimed in claim 28 of the '667 Patent.

368.    Claims 50 and 51 of the '667 Patent specify a further limitation of the subject

matter claimed in claim 49 of the '667 Patent.

Validity / Definiteness

369.    The term "fatty acids" as used in Pronova's Asserted Claims is amenable to

proper construction.

370.    One of ordinary skill in the art, considering at least the claims, specifications, and

prosecution histories of the Patents in Suit, and drawing upon his or her own

knowledge, would understand the meaning of the term "fatty acids" as used in

Pronova's Asserted Claims.

371.    Persons of ordinary skill in the art would be able to determine what compounds

fall within the scope of "fatty acids," as that term is properly construed and used

in Pronova's Asserted Claims.

Enforceability

372.    No one from Norsk Hydro or Pronova associated with the filing and prosecution

of the Patents in Suit made an affirmative misrepresentative of a material fact to

the PTO.

373.    No one from Norsk Hydro or Pronova associated with the filing and prosecution

of the Patents in Suit failed to disclose material information to the PTO.

374.    No one from Norsk Hydro or Pronova associated with the filing and prosecution

of the Patents in Suit submitted false material information to the PTO.

375.    No one from Norsk Hydro or Pronova associated with the filing and prosecution

of the Patents in Suit had any specific intent to deceive the PTO.