## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PRONOVA BIOPHARMA NORGE AS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TEVA PHARMACEUTICALS USA, INC., )<br>APOTEX CORP., APOTEX INC., )<br>PAR PHARMACEUTICAL, INC. and )<br>PAR PHARMACEUTICAL COMPANIES, INC., )<br>)<br>Defendants. ) | **Contains Confidential Information<br>Subject to Protective Order**<br><br>C.A. No. 09-286-SLR-MPT<br>(CONSOLIDATED)<br><br>REDACTED-PUBLIC VERSION |

### DEFENDANTS' OPENING POST-TRIAL BRIEF

John W. Shaw (#3362)
Karen L. Pascale(#2903)
Pilar G. Kraman (#5199)
**YOUNG CONAWAY STARGATT & TAYLOR LLP**
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600

David M. Hashmall
Frederick H. Rein
Annemarie Hassett
Gregory T. Sandidge
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 813-8800

J. Anthony Downs
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, Massachusetts  02109
Telephone: (617) 570-1000

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

Frederick L. Cottrell, III (#2555)
Steven J. Fineman (#4025)
Stephen M. Ferguson (#5167)
**RICHARDS LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone: (302) 651-7700

Daniel G. Brown
Mitchell E. Epner
Jennifer R. Saionz
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Telephone: (212) 999-5800

*Attorneys for Defendants*
*Par Pharmaceutical, Inc. and*
*Par Pharmaceutical Companies, Inc.*

**[SECOND CORRECTED VERSION**
**October 17, 2011]**

June 30, 2011

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iv

I.      INTRODUCTION ....................................................................................................1

II.     NATURE AND STAGE OF THE PROCEEDINGS ...........................................3

III.    SUMMARY OF ARGUMENT ...............................................................................4

IV.     FACTUAL BACKGROUND ..................................................................................4

        A.      The Asserted Patents and Claims.................................................................4

        B.      Technology ......................................................................................................5

        C.      Level of Ordinary Skill in the Art...............................................................6

        D.      Skilled Artisans Knew That EPA and DHA Reduced Triglyceride Levels............6

                1.      Prior Art Clinical Studies Show That EPA and DHA Lower
                        Triglycerides ......................................................................................6

                2.      The Inventors Tracked the Hypertriglyceridemia Prior Art .......................9

        E.      Skilled Artisans Knew How to Prepare Highly Concentrated EPA and DHA
                Omega-3 Compositions ...............................................................................10

                1.      Prior Art Techniques to Concentrate Fish Oil Mixtures...........................10

                2.      Prior Art Compositions Contained 70-88% EPA + DHA ........................12

V.      INVALIDITY ARGUMENT.................................................................................18

        A.      Legal Standard For Invalidity ...................................................................18

        B.      The Asserted Claims Are Invalid as Obvious Under 35 U.S.C. § 103 .................18

                1.      The Law of Obviousness .................................................................18

        C.      Claim 9 of the '077 Patent Is Invalid as Obvious Under 35 U.S.C. § 103 ...........20

                1.      Claim 9 of the '077 Patent as It Depends on Claims 6 or 7 Includes
                        the Claimed Method..........................................................................20

                2.      Claim 9 of the '077 Patent Is Not Entitled to the Filing Date of the
                        UK Foreign Priority Application Filed on August 11, 1988 Under 35
                        U.S.C. § 119......................................................................................20

                3.      The Method Element of Claim 9 Is Obvious.............................................20

        D.      The Asserted Compositions Are Obvious Over the Prior Art ..............................23

                1.      The Composition Elements of the Asserted Claims .................................23

                2.      The Testimony of Dr. Ganem and Dr. Rizvi That the Claimed
                        Compositions Are Obvious Was Unrebutted at Trial ..............................24

3.   A POSA Would Have Reasonably Expected These Compositions to Contain Minor Components that Were Present in the Starting Materials ................................................................................28

4.   The Prior Art Enabled a POSA to Prepare the Claimed Compositions.....29

5.   The Asserted Compositions Claims Are *Prima Face* Obvious ................31

E.   The Asserted Claims Are Invalid as Anticipated...................................................33

1.   The Law of Anticipation................................................................33

2.   The Law of Prior Public Use ........................................................33

3.   The Skrinska Materials — Batch No. 222 Products, Documentation, and Capsules, and Their Subsequent Uses — Render the Asserted Composition Claims Invalid Under 35 U.S.C. § 102(b)............................34

F.   Claim 9 of the '077 Patent and Claims 44 and 50 of the '667 Patent Are Invalid for Improper Dependency Under § 112 ¶4........................................43

G.   Claim 20 of the '667 Patent Is Invalid for Indefiniteness of "Fatty Acid"............44

VI.   Inequitable Conduct Argument.........................................................................44

A.   Inventor Dahl Conducts 1987-88 Study Comparing Norsk Hydro's K85 Product to Prior Art TG 30 Product......................................................44

1.   The Comparison Study Had Five Groups.................................................44

2.   The Comparison Study Evaluated Both Efficacy and Absorption for K85 and TG30.................................................................................45

3.   TG30 Showed Superior Efficacy to K85 for Lowering Triglycerides. .....46

4.   Dahl Repeatedly Concluded that the Comparison Study Demonstrated that EPA and DHA Were Absorbed with the Same Efficacy from K85 and TG30 ..................................................46

B.   Inventor Dahl Submitted a False July 1990 Declaration Reporting Only Selected Data from the Comparison Study, and Representing that the Study Demonstrated K85 Had Superior Bioavailability and Efficacy Compared to TG 30, While Omitting All Contradictory Data Claim ...........................48

C.   Inventors Dahl and Krokan, Along with Co-Authors, Prepared a Draft 1993 Publication Reporting the Complete Bioavailability and Triglyceride-Lowering Efficacy Data from the 1988 Comparison Study ...............................49

D.   The Legal Standard for Inequitable Conduct.....................................................50

E.   The '077 and '667 Patents Are Unenforceable Due to Inequitable Conduct By Inventor Dahl and Norsk Hydro ........................................................52

1.   Materiality Under the "Egregious Acts of Affirmative Misconduct" Test...................................................................................52

2.   Defendants Have Established "But For Materiality"...............................53

F. Dahl's and Pronova's Actions Overwhelmingly Show Intent to Deceive the Patent Office .........................................................................................................53

 1. Dahl Knew the July 1990 Declaration Was False .....................................54

 2. There Is No Plausible Scientific Explanation For Dahl's Misconduct ......55

 3. Dahl's Trial Testimony Confirms His Intent to Deceive..........................55

VII. CONCLUSION...............................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
499 F.3d 1293 (Fed. Cir. 2007)...................................................................22, 23

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
229 F.3d 1120 (Fed. Cir. 2000)..........................................................................28

*Brown v. 3M*,
265 F.3d 1349 (Fed. Cir. 2001)..........................................................................33

*Clock Spring, L.P. v. Wrapmaster, Inc.*,
560 F.3d 1317 (Fed. Cir. 2009).......................................................................3, 42

*Cooper Cameron Corp. v. Kvaerner Oilfield Prod., Inc.*,
291 F.3d 1317 (Fed. Cir. 2002)..........................................................................28

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006)..........................................................................19

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
471 F.3d 1369 (Fed. Cir. 2006)..........................................................................33

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*,
424 F.3d 1276 (Fed. Cir. 2005)..........................................................................41

*Eolas Techs. Inc. v. Microsoft Corp.*,
399 F.3d 1325 (Fed. Cir. 2005)..........................................................................34

*eSpeed, Inc. v. Brokertec USA, L.L.C.*,
480 F.3d 1129 (Fed. Cir. 2007).....................................................................51, 54

*Haynes Int'l, Inc. v. Jessop Steel Co.*,
8 F.3d 1573 (Fed. Cir. 1993)..............................................................................32

*In re Cruciferous Sprout Litig.*,
301 F.3d 1343 (Fed. Cir. 2002)..........................................................................33

*In re Geisler*,
116 F.3d 1465 (Fed. Cir. 1997)..........................................................................33

*In re Gosteli*,
872 F.2d 1008 (Fed. Cir. 1989)..........................................................................20

*In re Klopfenstein*,
380 F.3d 1345 (Fed. Cir. 2004).....................................................................27, 28

*In re Mayne,*
    104 F.3d 1339 (Fed. Cir. 1997)...................................................................................19

*In re O'Farrell,*
    853 F.2d 894 (Fed. Cir. 1988)....................................................................................28

*In re Peterson,*
    315 F.3d 1325 (Fed. Cir. 2003)...................................................................................32

*In re Rouffet,*
    149 F.3d 1350 (Fed. Cir. 1998)...................................................................................18

*Invitrogen Corp. v. Biocrest Mfg. L.P.,*
    424 F.3d 1374 (Fed. Cir. 2005)...................................................................................33

*Iron Grip Barbell, Co. v. USA Sports, Inc.,*
    392 F.3d 1317 (Fed. Cir. 2004)...................................................................................32

*McNeil-PPC, Inc. v. L. Perrigo Co.,*
    337 F.3d 1362 (Fed. Cir. 2003)...................................................................................19

*Medichem, S.A. v. Rolabo, S.L.,*
    437 F.3d 1157 (Fed. Cir. 2006)...................................................................................18

*Microsoft Corp. v. i4i L.P.,*
    131 S. Ct. 2238 (2011)...........................................................................................18, 19

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.,*
    558 F.3d 1341 (Fed. Cir. 2009)...................................................................................19

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.,*
    298 F.3d 1290 (Fed. Cir. 2002)...................................................................................34

*Newell Cos. v. Kenney Mfg. Co.,*
    864 F.2d 757 (Fed. Cir. 1988)....................................................................................19

*Ormco Corp. v. Align Tech., Inc.,*
    463 F.3d 1299 (Fed. Cir. 2006)...............................................................................18, 32

*Pfaff v. Wells Electronics, Inc.,*
    525 U.S. 55 (2005).....................................................................................................41

*Pfizer Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007)...............................................................................19, 28

*Richardson-Vicks Inc. v. Upjohn Co.,*
    122 F.3d 1476 (Fed. Cir. 1997)...................................................................................19

*Ricoh Co. Ltd.v. Quanta Computer Inc.*,
   550 F.2d 1325 (Fed. Cir. 2008)...........................................................................................32

**STATUTES**

35 U.S.C. § 102(b) ........................................................................................... passim

35 U.S.C. § 103.............................................................................................4, 18, 20

35 U.S.C. § 112..................................................................................................4, 43

35 U.S.C. § 119....................................................................................................20

**OTHER AUTHORITIES**

37 C.F.R. § 1.131 ..................................................................................................38

**TABLE OF ABBREVIATIONS & DEFINITIONS**

| | |
|---|---|
| ω-3 fatty acids | See Omega-3 fatty acids |
| '077 patent | U.S. Patent No. 5,502,077 |
| '667 patent | U.S. Patent No. 5,656,667 |
| Antiatherogenic effect | Preventing the formation of abnormal fatty deposits in artery walls |
| AOCS | The American Oil Chemist Society |
| Asserted composition claims | Claims 20, 44 and 50 (and their respective dependencies) of the '677 patent and the compositional elements of Claim 9 of the '077 patent |
| Asserted method claim | The method element of Claim 9 of the '077 patent |
| Belgirate Abstract | Dahl et al., "Compared Absorption of Marine Fatty Acids in Humans after Two Weeks Oral Intake of A Triglyceride or an Ethylester Concentrate (1988), an abstract Dahl authored and presented at a NATO workshop held in Belgirate, Italy in June of 1988 (DTX-137A).  See also Dahl Abstract |
| Breivik PCT | Int'l Patent Application Serial No. PCT/NO86/00077 published as Int'l Publication No. WO 87/03899 (DTX-177) |
| Bronsgeest-Schoute | Bronsgeest-Schoute et al., "The effect of various intakes of omega-3 fatty acids on the blood lipid composition in healthy human subjects," Am. J. Clin. Nutr. 34: 1752-57 (1981) (DTX-1567) |
| BTM program | The Biomedical Test Materials program of the National Marine Fisheries Service |
| Chromatography | A set of methods for separating mixtures |
| Comparison Study | The study conducted by Dahl and Krokan in human volunteers during late 1987 and early 1988 to test the K85 product in comparison to a prior art product TG30 that was widely available in the market |

| | |
|---|---|
| Dahl Abstract | Dahl et al., "Compared Absorption of Marine Fatty Acids in Humans after Two Weeks Oral Intake of A Triglyceride or an Ethylester Concentrate" (1988), an abstract Dahl authored and presented at a NATO workshop held in Belgirate, Italy in June of 1988 (DTX-137A).  See also Belgirate Abstract |
| De Bernardi | De Bernardi et al., "Study of perinatal and postnatal toxicity in rats after oral administration of a new drug containing eicosapentaenoic acid and docosahexaenoic acid at 85%" Acta Toxicol. Ther., 8:339-352 (1987) (DTX-1429) |
| DHA | Docosahexaenoic acid, C22:6.  When a distinction is made between free fatty acids, triglycerides and ethyl esters, DHA denotes the free fatty acid species |
| Dictionnaire Vidal | The Dictionnaire Vidal 1988 entry for MaxEPA® (DTX-1431) |
| Distillation | A method of fractionation that is based on the relative differences in volatility or boiling point of the compounds. |
| EE | Ethyl ester |
| EPA EE or DHA EE | The respective ethyl ester species of EPA or DHA |
| EPA TG or DHA TG | The respective triglyceride species of EPA or DHA |
| EPA | Eicosapentaenoic acid, C20:5.  When a distinction is made between free fatty acids, triglycerides and ethyl esters, EPA denotes the free fatty acid species |
| February 1988 NIH Notice | The NIH Guide for Grants and Contracts, Vol. 17, No. 5, February 12, 1988 (DTX-1447) |
| Haagsma | Haagsma et al., "Preparation of an w3 Fatty Acid Concentrate from Cod Liver Oil," J. Am. Oil Chem. Soc'y, 59:  117-118 (1982) (DTX-1434) |
| Harris | Harris, "Fish oils and plasma lipid and lipoprotein metabolism in humans: a critical review," J. Lipid Res. 30: 785-807 (1989) (DTX-1436) |
| Hazelton K85 Study | The study conducted in 1987 in Hazelton, UK where K85 was administered to three test groups of healthy volunteers, eight volunteers per group, who received 4 gram, 8 gram or 14 gram daily doses of K85, respectively, for two weeks each |
| Hyperlipidemia | Several disorders of lipid metabolism that cause high levels of triglycerides or cholesterol in blood serum |

| | |
|---|---|
| Hypertriglyceridemia | A disorder of lipid metabolism that results in a high level of triglycerides in the blood serum |
| Hypolipidemic effect | Lowering of lipid concentrations in blood serum |
| Joseph | Joseph, "The U.S. National Marine Fisheries Service Strategy for Production of Biomedical Test Materials: Quality and Stability. AOCS Workshop: Marine Lipids and EPA." Hilo, HI. 11-14 May 1986, handouts distributed by Jeanne Joseph of the NMFS (PTX-547) |
| July 1990 Declaration | Dahl's Declaration submitted to the PTO on July 23, 1990 (DTX-9) |
| K80 | A product containing 85% or greater EPA EE + DHA EE |
| K85 | A product containing 85% or greater EPA EE + DHA EE |
| Krokan Article | Krokan et al. "The enteral bioavailability of eicosapentaenoic acid and docosahexaenoic acid is as good from ethyl esters as from glyceryl esters in spite of lower hydrolytic rates by pancreatic lipase in vitro," Biochim Biophys Acta. 1168:59-67 (1993) (DTX-217) |
| Krzynowek | Krzynowek et al., "Purification of Omega-3 Fatty Acids from Fish Oils Using HPLC – An Overview" in Proceedings Twelfth Annual Conference of the Tropical and Subtropical Fisheries Technological Society of the Americas, 74-77 (1988) (DTX-699) |
| May 1987 NIH Notice | The NIH Guide for Grants and Contracts, Vol. 16, No. 8, May 29, 1987 (DTX-1446) |
| MaxEPA | An omega-3 composition comprising approximately 18% EPA TG + 12% DHA TG |
| Minor components | The long-chain C20, C21, or C22 fatty acids other than EPA or DHA |
| Molecular distillation | A form of vacuum distillation at very low pressure where a thin film of liquid is heated under high vacuum and the distilling surface is very close to the condensing surface |
| NIH | The National Institutes of Health. |
| Nilsson | Nilsson et al. "Fractionation of menhaden oil ethyl esters using supercritical fluid $CO_2$," J. Am. Oil Chem. Soc'y, 65:109-117 (1988), DTX-1448. |

| | |
|---|---|
| NMFS | The National Marine Fisheries Service |
| NOAA | The National Oceanic and Atmospheric Administration of the Department of Commerce |
| Norsk Hydro | Predecessor company to Pronova |
| Omacor | A trade name, along with Lovaza®, for K85 |
| Omega-3 fatty acids | Polyunsaturated unsaturated fatty acids having a terminal double bond that is 3-carbons away from the methyl end of the fatty acid chain |
| Phillipson | Phillipson et al., "Reduction of Plasma Lipids Lipoproteins, and Apoproteins by Dietary Fish Oils in Patients with Hypertriglyceridemia," New Engl. J. Med. 312:1210-1216 (1985) (DTX-1449) |
| POSA | A person of ordinary skill in the art.  See also Skilled artisan |
| PTO | The United States Patent and Trademark Office |
| PUFAs | Polyunsaturated unsaturated fatty acids |
| Rome Abstract | An abstract by Dahl et al., "Intake of Eicosapentaenoic Acid as Triglyceride or Ethylester" presented at the 8th International Symposium on Atherosclerosis in Rome, Italy (DTX-95; DTX-101) |
| Rote Liste | The Rote Liste entry for Eicosapen® (DTX-1453) |
| Sanders | Sanders et al., "The influence of different types of omega-3 polyunsaturated fatty acids on blood lipids and platelet function in healthy volunteers," Clin. Sci. 64: 91-99 (1983) (DTX-1456) |
| September 1988 Report | The internal report authored by Dahl "Absorption of different forms of Ω-3 fatty acids in man: Comparison between and ethylester (K85) and a triglyceride (TG30)" dated September 21, 1988 (DTX-141) |
| SFE | See Supercritical fluid extraction |
| Simons | Simons, et al., "On the effects of dietary n-3 fatty acids (Maxepa) on plasma lipids and lipoproteins in patients with hyperlipidaemia," Atherosclerosis, 54: 75-88 (1985) (DTX-1458) |
| Skilled artisan | A person of ordinary skill in the art.  See also POSA |

| | |
|---|---|
| Skrinska | Batch 222 sent in September 1987 by Norsk Hydro to Dr. Victor Skrinska in the United States and 500-100 capsules sent to Dr. Victor Skrinska encapsulating K80 (DTX-81A; DTX-82; DTX-83; DTX-84; DTX-85; DTX-86) |
| Supercritical fluid extraction | A method of separation based on solubility in supercritical carbon dioxide which, in the case of PUFAs, depends primarily on the chain lengths of each PUFA |
| TG | Triglyceride |
| TG30 | An omega-3 composition comprising approximately 18% EPA TG + 12% DHA TG |
| Urea adduction | See Urea fractionation |
| Urea fractionation | A method of separation based on differences in molecular shapes and carbon chain length.  Also called urea adduction |
| Vacuum distillation | A form of distillation under reduced pressure permitting evaporation of the compounds at correspondingly lower temperatures |

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

## I.   **INTRODUCTION**

The evidence at trial clearly and convincingly demonstrates that the asserted claims of the '077 and '667 patents are invalid as obvious, anticipated by prior public use, and depending on the court's claim construction of the term "fatty acids," either indefinite or improperly dependent.  Moreover, the patents in suit are unenforceable for inequitable conduct because a named inventor submitted a knowingly false declaration to the PTO during patent prosecution.

The asserted patent claims all specify "pharmaceutical compositions" containing EPA and DHA—two known compounds found naturally in fish oil—at a concentration of 80% by weight or higher.  One of the asserted claims, '077 claim 9, specifies a method of using the pharmaceutical composition to treat hypertriglyceridemia.

But Pronova did not invent using EPA and DHA to treat hypertriglyceridemia, nor did it invent pharmaceutical compositions containing more than (">") 80% by weight of those two compounds.  Nor did it invent any new method of making a concentrated EPA/DHA product. The prior art taught overwhelmingly that compositions containing EPA and DHA were an effective treatment for hypertriglyceridemia.  Defendants' expert Dr. Sacks testified at trial that the extensive prior art "fully established" that EPA and DHA are an effective treatment for hypertriglyceridemia and provided "the best efficacy to safety ratio for the treatment of hypertriglyceridemia of any other therapy . . . available at the time."  [D.I. 203 at 570:7-21] Pronova did not respond.  The only named inventor to testify at trial admitted that the use of concentrated EPA and DHA to reduce triglyceride levels was not novel.  [D.I. 202 at 383:2-8 ("I was absolutely not the first person.")]

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

Compositions containing >80% EPA and DHA also were not novel.  Defendants' experts Dr. Ganem and Dr. Rizvi detailed the extensive art showing compositions having a combined concentration of EPA and DHA >80% by weight.  [D.I. 204 at 734:10-735:14; 764:20-766:17; 887:21-888:15]  Plaintiffs again did not respond.  Some of the asserted claims specify additional elements: EPA and DHA present as ethyl esters, ratios of EPA to DHA, or the presence of small amounts of other omega-3 compounds found in fish oil (the "minor components").  Drs. Ganem and Rizvi presented unrebutted testimony that these elements were explicitly described in the prior art references, or would have been understood to be present due to the processes for concentration known in the prior art.  They specifically testified that by following the prior art to make highly concentrated EPA and DHA, the POSA would have expected the concentrate to meet the claimed limitations regarding the minor components.

Pronova did not invent any novel method for making concentrated EPA and DHA compositions.  The exact method that the patents describe as the preferred method was explicitly described in the prior art.  In particular, Defendants presented testimony that the preferred method described in the patents was described and used by the NMFS, and that Pronova's inventors appear to have derived their preferred process from the NMFS.  [D.I. 204 at 778:23-787:19, 794:5-796:10]  Pronova again did not respond.  Defendants further put forward expert testimony that a POSA (i) would have been motivated to make the compositions as specified in the claims, and (ii) was able to make those compositions by using prior art techniques.  [D.I. 204 at 906:4-923:15]  Pronova again did not introduce responsive evidence.  Moreover, Pronova itself injected its supposed invention into the prior art by publicly using it in the U.S. more than a year before it filed its patent application.  It is undisputed that in September 1987, Norsk Hydro sent Dr. Skrinska in Cleveland samples of Norsk Hydro's "K80" product that anticipates the

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

asserted composition claims.  [DTX-84; DTX-85; DTX-86]  Dr. Skrinska used the K80 material

in the United States at that time without any confidentiality or use restriction.  Norsk Hydro also

sent 1000 capsules of "K85" to Dr. Arne Nordøy in February 1988, which Dr. Nordøy used in

clinical tests in Oregon before the statutory bar date.  The uses by Dr. Skrinska and Dr. Nordøy

are invalidating public uses under 35 U.S.C. §102(b).  *See Clock Spring, L.P. v. Wrapmaster,*

*Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009).

Further, as discussed below, the Court's claim construction for the term "fatty acids" will

invalidate one asserted claim, claim 20, under Pronova's construction and the remaining three

asserted claims under Defendants' construction for improper dependency.

Finally, the '077 and '667 patents are also unenforceable for inequitable conduct.  Dahl,

aided by Pronova attorneys, submitted a knowingly false declaration in response to a March

1990 Office Action rejecting the claims as obvious.  In support of a "showing of unexpected

superior results achieved in accordance with the present invention as compared to the prior art,"

Dahl intentionally made false statements regarding the design of the reported study and omitted

data that conflicted with Dahl's declaration that K85 exhibited enhanced bioavailability relative

to TG30.  Dahl's false sworn statements in the declaration were directly contradicted by Dahl's

public and internal communications regarding this study.

## II.   <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

On April 23 and 29, 2009, Pronova filed suit against Teva and Par, respectively, alleging

infringement of the '077 and '667 Patents.  From March 29, 2011 through April 6, 2011, a bench

trial was held before this Court.  Defendants submit this post-trial brief in support of their

arguments that the asserted claims are invalid and the patents in suit are unenforceable.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

### III.   SUMMARY OF ARGUMENT

1.      Each of the asserted claims is invalid for obviousness, pursuant to 35 U.S.C. § 103, based on prior art, and an understanding of that prior art, much of which was not before the Examiner.

2.      Each of the asserted claims is invalid for anticipation, pursuant to 35 U.S.C. § 102(b), based on the prior public use of the claimed invention.

3.      Each of the asserted claims is invalid for failure to satisfy the requirements of 35 U.S.C. § 112.

4.      The patents in suit are unenforceable because of the inequitable conduct of Dahl, assisted by Pronova, in knowingly submitting an unquestionably false declaration to the PTO and omitting data that would have revealed the truth to the PTO.

### IV.   FACTUAL BACKGROUND

#### A.   The Asserted Patents and Claims

Pronova has asserted claim 9 of the '077 patent, as it depends on claims 6 or 7, which ultimately depend from claim 1.  This claim recites a "method for the treatment or prophylaxis of hypertriglyceridemia in a human patient" using the claimed composition (*i.e.*, > 80% EPA EE + DHA EE  in a 2:1 to 1:2 ratio).  [PTX-1]  The asserted claims of the '667 patent recite pharmaceutical compositions that contain, among other things, concentrated amounts of EPA and DHA in a specified ratio.  Both patents resulted from a U.S. application filed August 4, 1989.

The specification of the '077 patent shows that the claimed compositions result from removing unwanted components in fish oil to concentrate the desired EPA and DHA.  [PTX-1 at tbl.2 (comparing the starting material with the final composition)]  The specification also

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

identifies a process to make the claimed compositions, referencing a European Patent

Application that corresponds to a prior art reference, DTX-177 (the "Breivik PCT").  [PTX-1 at

col. 3, ll. 13-16 ("Compositions according to present application may be produced according to

the method of our European Patent Application No.86906964.1."); DTX-175; D.I. 204 at

758:12-759:14]

    **B.**    <u>**Technology**</u>

    **Lipids**:  Compounds such as EPA and DHA belong to the genus of compounds known as

lipids and can exist as free fatty acids, ethyl esters, or triglycerides, among others.  [D.I. 204 at

723:25-725:11]  Fatty acids that contain carbon-carbon double bonds are called unsaturated fatty

acids.  [D.I. 200 at 53:15-22]

    The unsaturated fatty acids of interest here are referred to in three different ways.  Their

chemical names may be reduced to acronyms (eicosapentaenoic acid = EPA; docosahexaenoic

acid = DHA).  They are also described as "omega-3 fatty acids" or "ω-3," which designates them

as polyunsaturated unsaturated fatty acids ("PUFAs") having a terminal double bond that is 3-

carbons away from the methyl end of the fatty acid chain.  [D.I. 200 at 53:23-54:8]  An

alternative name denotes the number of carbons and the number of double bonds using a simple

alphanumeric representation.  For example, EPA, which contains 20 carbons and 5 double bonds,

can be represented as C20:5.  Likewise, DHA, which contains 22 carbons and 6 double bonds,

can be denoted as C22:6.  [D.I. 200 at 57:17-58:18]

    **Lipid Disorders:**  High blood plasma levels of triglycerides are strongly associated with

a risk of heart attack.  [D.I. 203 at 545:25-546:10]  For that reason, clinical practice guidelines

recommend lowering triglyceride levels when they are elevated.  [D.I. 203 at 545:25-546:10]

Very high triglyceride levels can cause pancreatitis, an inflammatory condition of the pancreas

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

that can be fatal if uncorrected.  [D.I. 203 at 546:14-23]  Hyperlipidemia is the medical term for several disorders of lipid metabolism that cause high levels of triglycerides or cholesterol.  The standard classifications of hyperlipidemia denote the various patterns of blood lipid elevation, with Types IIb, IV and V involving high triglycerides.  [D.I. 203 at 547:2-23]

### C.       Level of Ordinary Skill in the Art

The relevant fields of art generally include medicinal chemistry, oil processing chemistry, pharmaceutical science and lipid disorders.  For the treatment of hypertriglyceridemia claimed in the '077 patent, the POSA would be a medical doctor with training or experience in the management of lipid disorders.  [D.I. 203 at 544:3-10]  A POSA pertaining to the asserted composition claims is a medical doctor, oil processing chemist, analytical chemist, lipid biochemist, a pharmaceutical chemist or a person working in a comparable field with either an advanced degree (such as a Ph.D.) or a commensurate number of years of experience, involved in the research and development in the pharmaceutical or related field.  [D.I. 204 at 723:6-24]

### D.       Skilled Artisans Knew That EPA and DHA Reduced Triglyceride Levels

Prior to August 1988, and certainly before August 4, 1989, skilled persons knew that EPA and DHA were the active agents in fish oil responsible for clinically-observed reductions in blood lipid levels.

#### 1.       Prior Art Clinical Studies Show That EPA and DHA Lower Triglycerides

Clinical research in the 1970s and 1980s led practitioners to the conclusion that the omega-3 fatty acids obtained from fish oils were responsible for lowering lipid concentrations in the serum ("hypolipidemic effect").  [ D.I. 204 at 548:13-551:24; DTX-1426; DTX-1443; DTX-1456; DTX-1457; DTX-1458; DTX-1449]  Practitioners identified EPA and DHA as the active

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

agents in fish oil.  [DTX-1456; D.I. 203 at 548:13-551:24, 555:20-557:20]  By August 11, 1988

and certainly by August 4, 1989, the prior art taught skilled artisans that:

- EPA and DHA lowered triglycerides in subjects who have normal, moderately elevated or severely elevated blood triglycerides [DTX-1456; DTX-1458; DTX-1449; DTX-1436; DTX-1431];

- EPA and DHA exhibit a dose-response effect on blood triglycerides [DTX-1456; DTX-1458; DTX-1449; DTX-1436]; and

- EPA and DHA have an enhanced effect in patients with severe hypertriglyceridemia [DTX-1456; DTX-1449; DTX-1436]

**Sanders (DTX-1456):**  The 1983 Sanders publication disclosed that healthy volunteers

who were given the prior art composition MaxEPA® (containing approximately 18% EPA-TG

and 12% DHA-TG) experienced a significant reduction in triglyceride levels.  In a second

experiment, Sanders disclosed that the triglyceride-lowering effect increased as the EPA/DHA

dose increased, i.e., a dose-response effect.  [DTX-1456 at 94; D.I. 203 at 548:13-551:24;

560:20-561:24]

**Simons (DTX-1458):**  The 1985 Simons publication disclosed a definitive dose-response

effect of MaxEPA® on lowering triglycerides in patients who have high or very high triglyceride

levels.  [D.I. 203 at 548:13-551:24, 562:3-13; DTX-1458 at 78-79, tbl.1, 81 tbl.2, 80-82]

**Phillipson (DTX-1449)**:  The 1985 Phillipson publication in the *New England Journal of

Medicine* reported that fish oils containing relatively high concentrations of EPA and DHA had a

"therapeutic benefit in patients with hypertriglyceridemia."  [DTX-1449 at 1216]  All subjects

experienced a reduction in triglyceride levels.  [DTX-1449 at 1216, tbl. 4 (65% reduction of

triglycerides for patients with mixed lipidemia), fig. 2 & tbl.7 (80% reduction of triglycerides for

patients with hypertriglyceridemia);  D.I. 203 at 548:13-551:24, 562:16-563:14 ("a major

astonishing degree of triglyceride reduction" that "attracted a lot of attention because nothing

hitherto was known that would lower triglycerides to this extent")]

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

**Harris (DTX-1436, 1571)**:  In July 1989, Professor William Harris, a recognized expert on omega-3 fatty acids, published a review article in the *Journal of Lipid Research* that summarized the state of the art shortly before the '077 and '667 patent applications were filed. The publication summarized the results of 45 separate clinical studies on the effects of fish oil compositions on blood lipids, reporting that triglyceride levels were reduced in each of those 45 studies.  [DTX-1436; D.I. 203 at 548:13-551:24, 556:15-557:7, 563:19-564:11; DTX-1571; D.I. 203 at 564:25-568:10 ("systematic review" of "every single scientific clinical trial in the literature on the effect of fish oils on triglyceride levels")]  Most of the studies in the review had been published prior to August 1988. [DTX-1436 at 802-807]

The studies in the Harris review reflected the consensus view in the art that EPA and DHA were the "active agents in fish oil."  [DTX-1436 at 786; D.I. 203 at 556:6-557:20]  In every one of the 45 studies, administration of EPA and DHA "lower[s] plasma triglyceride levels in virtually all patients," with the greatest reduction in patients with hypertriglyceridemia. [DTX-1436 at 801; D.I. 203 at 548:13-551:24, 563:19-564:11]  Table 1 of Harris [DTX-1571] displays the study data for each of the 45 prior-art studies.  As noted by Dr. Sacks, "in every single study, there was a reduction in triglycerides," and the "triglycerides were reduced regardless of where the omega-3s came from." [D.I. 203 at 566:6-13]  The triglyceride-reducing-effect was produced by MaxEPA®, fatty acid ethyl esters, herring, mackerel, trout, EPA ethyl ester, cod liver oil, and other fish oil sources of EPA and DHA.  [D.I. 203 at 566:6-13]  As Dr. Sacks testified, "really what is striking about this is the huge magnitude of triglyceride reductions reduced by a whole range of omega-3 fatty acid products." [D.I. 203 at 568:6-10]  In the Type IIb hypertriglyceridemic patients, a mean dose of 6.4 g per day lowered triglycerides by 38%.  [DTX-1571; D.I. 203 at 566:24-567:20]  In the Type IV or V

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

hypertriglyceridemic patients, a mean dose of 8 g per day lowered triglycerides by 52%.  [DTX-1571; D.I. 203 at 567:21-568:10]  Harris concluded that "[t]here are currently no hypotriglyceridemic drugs that have a better risk:benefit ratio than n-3 FAs."  [DTX-1436 at 801]

**Dictionnaire Vidal and Rote Liste:**  MaxEPA® was used in many prior art clinical studies, including Sanders, Simons, Phillipson, and several studies in the Harris review  [DTX-1436; DTX-1456; DTX-1457; DTX-1458; D.I. 203 at 560:24-561:24]  The *Dictionnaire Vidal 1988* entry for MaxEPA® disclosed that "[c]linical trials have shown that MaxEPA taken daily significantly reduced plasma triglyceride concentrations."  [DTX-1431; D.I. 203 at 568:19-569:17]  MaxEPA® was approved as a pharmaceutical in Europe for the treatment of hypertriglyceridemia before the filing date of the '077 patent.  [DTX-1431 at INDICATIONS; D.I. 203 at 568:19-568:21; D.I. 202 at 341:24-342:3]  The same formulation with the same indication appears in the *Rote Liste 1987* as EICOSAPEN®.  [DTX-1453 at INDICATIONS]  By August 1989, omega-3 compositions containing EPA and DHA were one of three drug classes practitioners used to treat hypertriglyceridemia.  [D.I. 203 at 548:2-12]

None of Sanders  (DTX-1456), Simons (DTX-1458), Phillipson (DTX-1449), Harris (DTX-1436), Dictionnaire Vidal (DTX-1431), or Rote Liste (DTX-1453) were before the PTO during prosecution of the patents in suit.

## 2.    The Inventors Tracked the Hypertriglyceridemia Prior Art

The named inventors scoured the literature concerning the effect of EPA and DHA compositions to treat hypertriglyceridemia.  Dahl wrote a September 1986 report summarizing the then-published clinical studies on fish oil preparation and concluded that "the general trend observed" was that "omega-3 fish oil compositions lowered triglyceride levels…."  [DTX-1190;

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

D.I. 202 at 336:18-338:17, 339:14-340:6, 341:24-342:10, 342:25-343:11]  In October 1987, Dr.

Krokan reported that at a major conference on omega-3 fatty acids held at M.I.T. the "[m]**ain**

**impression**" was that "ω-3 fatty acids have been put forward by leading clinicians as the "drug

of choice" for hypertriglyceridemia.  [DTX-122 (emphasis in original); *see* DTX-127 at

PRV0009489315 ("most reports agree that fish oil concentrates decrease the level of

triglycerides in plasma")]

      E.    **Skilled Artisans Knew How to Prepare Highly Concentrated EPA and DHA Omega-3 Compositions**

      1.    Prior Art Techniques to Concentrate Fish Oil Mixtures

As Dr. Ganem and Dr. Rizvi testified, essentially without  rebuttal, by August 1988,

practitioners were using well-known techniques of separation ("fractionation") to concentrate

EPA, DHA and other omega-3 fatty acids.  Employing these methods, skilled artisans were able

to produce compositions containing >80% EPA + DHA.  [D.I. 204 at 764:20-766:17, 887:21-

888:15]  These known methods are summarized below.

    **Distillation:**  Distillation is a method of fractionation based on the relative differences in

volatility or boiling point of the compounds.  The different components of the mixture will

vaporize at different temperatures, thus enabling the separation of components of the mixture,

depending primarily on the chain lengths of the molecules present in the oil. [D.I. 204 at 762:14-

763:10]  Distillation under reduced pressure ("vacuum distillation") permits evaporation of the

compounds at lower temperatures.  [D.I. 204 at 762:14-763:10]  One form of vacuum distillation,

"molecular distillation," had been used for decades prior to 1988 to concentrate EPA and DHA

from fish oils.  [PTX-9 (citing U.S. Patent No. 3,158,541 (1964)); PTX-1099]

    PUFAs with very similar chain lengths have similar volatilities and thus are not readily

separated from each other by distillation.  For example, when distilling a mixture of fatty acid

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

ethyl esters to evaporate EPA EE and DHA EE, which have 20 and 22 carbon atoms, respectively, other long-chained PUFAs in the original mixture having 20, 21 and 22 carbon atoms would also evaporate with the EPA and DHA ethyl esters and end up in the same fraction with them after distillation.  [D.I. 204 at 766:18-768:22]

**Urea Fractionation**:  This method of separation is based on differences in molecular shape.  Urea fractionation was a commonly used and well understood method for fractionating fish oils before August 1988.  [D.I. 204 at 764:20-766:17, 887:21-888:15]   Urea fractionation was extensively used on a large scale to concentrate EPA and DHA in fish oil because it was a low cost, simple method.  [DTX-133 at 70; DTX-1434; DTX-133 at 69; DTX-177 at 4; PTX-547 at PAR00030521; D.I. 204 at 759:20-761:25]

Urea fractionation separates kinked molecules, such as PUFAs, from linear molecules, such as saturated fats.  The compound urea forms complexes with straight-chain organic compounds, surrounding and encapsulating them.  [D.I. 204 at 759:20-761:25]  When fatty acids are immersed in a solution of urea, a crystalline complex is formed trapping the saturated and monounsaturated fatty acids.  These crystals can then be removed, leaving behind a solution of predominantly PUFAs.  [D.I. 204 at 759:20-761:25, 889:18-890:15]  As both Dr. Ganem and Dr. Rizvi testified, other long-chained PUFAs, such as the minor components, that were present in the original mixture would be preserved in the same fraction with the EPA and DHA after urea treatment.  [D.I. 204 at 759:20-761:19, 889:13-17]

**Supercritical Fluid Extraction**:  Prior art practitioners also employed SFE to separate the desired fatty acids in fish oil to achieve high concentration of EPA and DHA.  [DTX-938R at 92-93; DTX-177 at 9; DTX-1448 at 109]  SFE separates fractions based primarily on the chain lengths of the molecules present.  [D.I. 204 at 890:25-893:3]  For this reason, when performing

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

SFE on a mixture of fatty acids to separate EPA and DHA, which have 20 and 22 carbon atoms,

respectively, other similar long-chained PUFAs in the original mixture, such as the minor

components, are extracted with the EPA and DHA.  [D.I. 204 at 898:5-17]

2.    Prior Art Compositions Contained 70-88% EPA + DHA

By August 1988 the prior art disclosed compositions containing at least 80% by weight

EPA and DHA and having an EPA:DHA ratio from 1:1 to 2:1 ratio.  The prior art to the asserted

composition claims includes the following:

**The NMFS Program**:  Beginning in the mid-1980s, the U.S. government, through the

NMFS, manufactured an omega-3 fish oil composition containing at least 70% by weight of EPA

EE + DHA EE in a 1:1 to 2:1 ratio and provided it to researchers and labs who applied for

samples of the composition to study or to use in clinical studies as a pharmaceutical.  [D.I. 202 at

361:11-17; D.I. 204 at 771:3-20]  These compositions were disclosed in at least Joseph,

Krzynowek, the NIH Notices and Nilsson prior art publications described below.

**Joseph (PTX-547):**  In May 1986, Dr. Jeanne Joseph of the NMFS presented a workshop

and distributed handouts at the AOCS conference in Hawaii ("Joseph").  This reference discloses

a highly concentrated omega-3 EE composition which the NMFS had prepared and later publicly

distributed.  The mixed omega-3 EE concentrate product disclosed in Joseph contained 73%

EPA EE + DHA EE (48% EPA EE, 25% DHA EE) and an EPA:DHA ratio of 1.92:1.  [PTX-547

at PAR000030521; D.I. 204 at 772:19-773:13]

As noted in Joseph, the NMFS was then developing a BTM Program.  [PTX-547; D.I.

204 at 772:19-773:13]  The BTM Program distributed to researchers and laboratories highly-

concentrated fish oil compositions including the 73% EPA EE + DHA EE product reported in

Joseph.  [PTX-547 at PAR000030521; D.I. 204 at 772:19-773:13]  Named inventor Breivik

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

received and discussed a copy of Joseph from the author at the May 1986 conference.  [DTX-1400 at PRV000856481, fn.11]

**NIH Guides (DTX-1446, 1447):**  The NMFS and the NIH announced the availability of BTM concentrates in the May 1987 edition of the NIH Guide for Grants and Contracts.  [DTX-1446; D.I. 204 at 774:5-775:23]  The May 1987 NIH Guide noted the "growing body of evidence that beneficial effects may be derived from components which exist in seafood or fish oils such as the omega-3 polyunsaturated fatty acids (PUFA)."  [DTX-1446 at 1; D.I. 204 at 774:5-775:23]  The Guide announced that several U.S. Government agencies were cooperating to distribute the concentrates through the NMFS.   The NMFS began shipping the concentrates in early 1988.  [DTX-1447; D.I. 204 at 774:5-775:23]

The February 1988 NIH Guide announced the process by which the BTM Program test material was made ("The n-3 ester concentrate is prepared from **vacuum-deodorized** menhaden oil using **transesterification, urea adduction and short-path distillation**; the concentrate **contains approximately 80 percent n-3 ethyl esters**, 3 percent C18 (other than n-3), 6 percent C16 and the remainder as other esters") and that it was "available with antioxidant additions." [DTX-1446; D.I. 204 at 774:5-775:23]  It further disclosed that this process consistently produced a product with greater than 80% omega-3 ethyl esters.

Norsk Hydro closely tracked the activities of the NMFS, including visits by inventor Harald Breivik to the NMFS's laboratory in Charleston, South Carolina.  [DTX-131 at 1-2; DTX-1400 ("The work going on at NMFS is publicly available."); DTX-162 ("NMFS is a public institution (financed by the U.S. Department of Commerce), and has so far as I understand full oppportunity to tell what they are working on."); DTX-471; D.I. 204 at 777:21-778:22, 782:8-

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

783:1]  Though Breivik made detailed notes of the NMFS process and product, he and Norsk Hydro provided no information about the NMFS BTM Program to the PTO.

**Krzynowek (DTX-699):**  The 1988 Krzynowek publication discloses a composition obtained from the NMFS that consisted of 88% EPA EE + DHA EE (57% by weight of EPA, 31% by weight of DHA) with a 1.8:1 weight ratio of EPA:DHA.  [DTX-699 at 75 (tbl. 2); D.I. 204 at 734:10-24, 775:25-777:1, 923:4-15]

**Nilsson (DTX-1448):**  Nilsson describes the use of the SFE process on various "feedstocks," one of which ("PUFA2") had been obtained from the NMFS.  [DTX-1448 at 114, 116; D.I. 204 at 777:4-20]  Nilsson discloses that "PUFA2" contained approximately 70.8% by weight of EPA EE + DHA EE (48.6% EPA, 22.2% DHA).  [DTX-1448 at tbl. 1; D.I. 204 at 777:4-20]  Nilsson also states that "PUFA2" contained 1.3% by weight of 21:5 omega-3 (HPA) and 1.4% by weight of C 20:4 omega-6, i.e., the non-EPA, non-DHA minor components. Nilsson observed that molecular distillation is an effective tool to prepare concentrated compositions of EPA + DHA.  [DTX-1448 at 114, 116; D.I. 204 at 777:4-20]

**De Bernardi (DTX-1429):**  In 1987, De Bernardi published a study of pre-natal and post-natal effects in pregnant rats of the oral administration of a new drug containing an EPA + DHA concentration of 85% by weight.  [DTX-1429]  The pharmaceutical composition in De Bernardi's study—AGP/103—was prepared by an Italian pharmaceutical company and comprised EPA + DHA in a 1.12:1 weight ratio. [DTX-1429 at 340; D.I. 204 at 750:9-751:12] Each capsule used in the study contained a pharmaceutical composition of 450 mg EPA, 400 mg DHA and 3 mg tocopherol.  [D.I. 204 at 750:9-751:12]  De Bernardi found that the pharmaceutical composition was non-toxic.  [DTX-1429; D.I. 204 at 750:9-751:12, 915:20-916:6]

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

**Bronsgeest-Schoute & Haagsma (DTX-1567; DTX-1434)**:  The 1981 Bronsgeest-Schoute reference [DTX-1567] and the 1982 Haagsma reference [DTX-1434] both disclosed pharmaceutical compositions consisting of 72.2% by weight of EPA + DHA (27.6% by weight EPA, 44.6% by weight of DHA), with a 1:1.61 weight ratio of EPA:DHA.  [DTX-1567 at 1754 (tbl.2); DTX-1434 at 118 (tbl.1); D.I. 204 at 906:4-19, 906:20-907:4]  These pharmaceutical compositions also contained the following minor components: (i) 6.3% by weight of "other" 20, 21 or 22-carbon fatty acids; (ii) 3.5% long chain omega-3 fatty acids other than EPA and DHA that have 20, 21 or 22-carbon atoms; and (iii) 1.2% by weight of C 22:5 omega-3 fatty acid.  [DTX-1567 at 1754 (tbl.2); DTX-1434 at 118 (tbl.1); D.I. 204 at 906:4-19, 906:20-907:4]

Norsk Hydro and the patent inventors were aware of both Bronsgeest-Schoute and Haagsma, [DTX-156 at PRV01123621_T]  but did not disclose them to the PTO, and they were not before the PTO during prosecution.  [PTX-9]

**K80 Provided to Dr. Skrinska:**  In September 1987, Norsk Hydro sent Batch 222 to Dr. Victor Skrinska in the United States.  Batch 222 was a sample of Pronova's K80 product, which Pronova made available to Dr. Skrinska and others without a confidentiality agreement.  [DTX-81A; DTX-82; DTX-83; DTX-84; DTX-85; DTX-86]  The Skrinska material comprised 86.5% total EPA + DHA (53.2% EPA EE, 33.3% DHA EE) and 95.8% total omega-3 fatty acid EE. The weight ratio of EPA:DHA was 1.6:1.  It comprised 92.4% by weight of long chain omega-3 fatty acid EE.  Batch 222 also contained 3.2% C 18:4 omega-3; 1.6% C 20:4 omega-6; 1.7% C 21:5 omega-3; 3.2% C 22:5 omega-3; and Vitamin E (tocopherol) (5 mg/kg ester), an antioxidant.  The composition comprised 5.9% long chain omega-3 fatty acid EE other than EPA and DHA.  [DTX-86; D.I. 204 at 734:10-735:14; 744:16-748:19]

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

The contents of the Skrinska material are well documented because Norsk Hydro provided a certificate of analysis of Batch 222 [DTX-86] and Dr. Skrinska tested the material at his U.S. laboratory and confirmed its contents.  [D.I. 202 at 483:24-484:16]  Dr. Skrinska and some of his colleagues subsequently ingested the material in a preliminary study relating to an NIH grant.  [D.I. 203 at 504:22-506:8]  Dr. Skrinska's testimony about these uses is further corroborated by Norsk Hydro's extensive contemporaneous disclosures as part of its marketing "road show" detailed *infra*, Section III, E.d. (3)-(4).  The information concerning the Skrinska material and the road show were not before the PTO during prosecution of the '077 and '667 patents. [PTX-9]

**K85 Provided to Dr. Nordøy**:  In January 1988, Dahl sent 1000 capsules of Norsk Hydro's omega-3 EPA EE + DHA EE concentrate K85 (1.0 g content per capsule) to Dr. Arne Nordøy in Portland, Oregon.  [DTX-150 at 1-2;  D.I. 202 at 394:1-23]  Dahl testified that the encapsulated K85 was the formula that is claimed in the patent.   [D.I. 202 at 394:22-395:1]  In a PTO declaration Dahl stated under oath that "the invention was communicated to Dr. Arne Nordøy" by means of the capsules that Dr. Nordøy received in Oregon on February 1, 1988. [DTX-138, ¶¶ 2-3]  Dr. Nordøy administered the K85 material to clinical study participants in Oregon at least as early as March 1, 1988, before the statutory bar date.  [DTX-138, ¶¶ 4-5; D.I. 202 at 404:6-12, 404:19-406:8]

There is no evidence of any confidentiality agreement that required Dr. Nordøy to keep confidential his use of the K85, the composition of the K85, or the results of his study.  Dahl admitted on cross examination that the confidentiality agreement that is included in Dahl's letter to Dr. Nordøy [DTX-150] did not apply to the K85 capsules that he supplied to Dr. Nordøy, but instead applied only to information contained in an article that Dahl had also sent to Dr. Nordøy.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

[DTX-151; D.I. 202 at 399:21-400:21]  He also testified on cross-examination that he has "no evidence" of any other confidentiality agreement with Dr. Nordøy, and has "no clear memory about this."  [D.I. 202 at 403:6-404:5]

**The Dahl Abstract**:  Dahl, a named inventor on the patents in suit, presented an abstract at the NATO Advanced Workshop in June 1988, in Belgirate, Italy entitled "Compared absorption of marine fatty acids in humans after two weeks oral intake of a triglyceride or an ethylester concentrate."  [DTX-137A; D.I. 204 at 748:25-749:23]  The Dahl Abstract discloses a study administering a composition of 85% EPA EE + DHA EE (55% EPA EE, 30% DHA EE), having a 1.83:1 ratio of EPA:DHA, identified as "K85".  [DTX-137A; D.I. 204 at 734:10-735:14, 748:25-749:23]  The workshop was attended by many people from industry and research.  [D.I. 202 at 433:4-434:6; D.I. 203 at 585:18-586:1 ("this is a major conference")]  The abstract was later published in a book that recorded the NATO meeting proceedings.  [DTX-1572; D.I. 202 at 437:21-439:25]  Norsk Hydro and the patent inventors were aware of the Dahl Abstract, but did not disclose it to the PTO during the prosecution of the '077 and '667 patents. [D.I. 202 at 433:7-434:14]

**The Breivik PCT:**  On November 21, 1986, Norsk Hydro filed an International Patent Application, PCT/NO86/00077.  [DTX-177]  The Breivik PCT published on July 2, 1987.  The Breivik PCT disclosed a process to make a product (P) containing "20-35% EPA, 35-50% EPA and 15-25% of other polyunsaturated ω3-fatty acid compounds."  [DTX-177 at 8]  This product (P) therefore contains up to 85% EPA and DHA plus the minor components.  [D.I. 204 at 754:2-755:1]  The Breivik PCT teaches that compositions containing >90% EPA + DHA may be obtained by further subjecting the product (P) to SFE and/or preparative liquid chromatography. [DTX-177 at 9; D.I. 204 at 754:2-755:15]

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

## V.   INVALIDITY ARGUMENT

### A.   Legal Standard For Invalidity

A defendant must persuade the factfinder of its invalidity defense by clear and convincing evidence.  *Microsoft Corp. v. i4i L.P.*, 131 S. Ct. 2238 (2011).  The Supreme Court in *Microsoft* confirmed

> the same commonsense principle that the Federal Circuit has recognized throughout its existence—namely, that new evidence supporting an invalidity defense may "carry more weight" in an infringement action than evidence previously considered by the PTO, *American Hoist*, 725 F.2d, at 1360.

*Id*. at *10.  "Simply put, if the PTO did not have all material facts before it, its considered judgment may lose significant force."   *Id*. at *11 (citing *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 427 (2007)).

Here, the PTO did not have all material facts because many highly relevant prior art references discussed above were not before the examiner.

### B.   The Asserted Claims Are Invalid as Obvious Under 35 U.S.C. § 103

#### 1.   The Law of Obviousness

A claimed invention is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious."  35 U.S.C. § 103(a); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1307-08 (Fed. Cir. 2006); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006).  Obviousness is determined from the point of view of a hypothetical person of ordinary skill in the art to which the patent pertains, who is presumed to have access to all prior art references in the field of the invention.  *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).  The person of ordinary skill in the art is also presumed to have ordinary creativity and common sense. *KSR*, 550 U.S. at 420.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

The factual inquiries underlying the legal determination of obviousness include the following four factors: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claimed invention and the prior art; and (4) the relevant secondary considerations if any, of non-obviousness. *See Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356 (Fed. Cir. 2006); *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1368 (Fed. Cir. 2003).   The first three *Graham* factors establish a *prima facie* case of obviousness.  *In re Mayne*, 104 F.3d 1339, 1341-42 (Fed. Cir. 1997).   In evaluating obviousness, a court should consider whether the invention is more than a predictable use of prior art elements according to their established functions, and whether it does more than yield predictable results.  *See KSR*, 550 U.S. at 417; *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1352 (Fed. Cir. 2009).   When the prior art provides the means of making the invention and predicts the results, and the patentee merely verifies the expectation through "routine testing," the claims are obvious.  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367 (Fed. Cir. 2007).   Although relevant secondary considerations must be considered if present, they do not control when there is an otherwise strong case of obviousness.  *Id.* at 1372; *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997).

Obviousness is a legal conclusion that is based on these factual inquiries.  *McNeill-PPC*, 337 F.3d at 1368; *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 767 (Fed. Cir. 1988).  The clear and convincing evidence standard does not apply to the ultimate legal conclusion of obviousness itself, but only to the disputed facts underlying the conclusion of obviousness. *Microsoft Corp.*, 131 S. Ct. at 2253 (Breyer, J., concurring).

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

C.     **Claim 9 of the '077 Patent Is Invalid as Obvious Under 35 U.S.C. § 103**

      1.     Claim 9 of the '077 Patent as It Depends on Claims 6 or 7 Includes the Claimed Method

The asserted method claim 9 of the '077 patent recites a "method for the treatment or prophylaxis of hypertriglyceridemia in a human patient" using the claimed composition (*i.e.*, >80% EPA EE + DHA EE in a 2:1 to 1:2 ratio).  The claimed method was obvious to a skilled artisan by August 4, 1989.  The obviousness of the compositional elements of claim 9 is demonstrated in Section V.D.

      2.     Claim 9 of the '077 Patent Is Not Entitled to the Filing Date of the UK Foreign Priority Application Filed on August 11, 1988 Under 35 U.S.C. § 119

Claim 9 of the '077 patent is not entitled to the August 11, 1988 filing date of UK Application No. 88191101.1, to which the applicants claimed priority during prosecution. [DTX-6]  Claims in an application are entitled to a foreign priority date only if the foreign application supports the claims in the manner required by section 112, ¶ 1.  *See In re Gosteli*, 872 F.2d 1008, 1011 (Fed. Cir. 1989).  Dr. Sacks' unrebutted testimony establishes that the UK application does not contain any disclosure of the invention claimed in claim 9—a method of lowering triglycerides using the claimed composition—but instead discloses only alleged effects on blood pressure.  [D.I. 203 at 558:11-559:6]  Accordingly, claim 9 of the '077 patent is not entitled to claim priority to the U.K. application.  The effective priority date for claim 9 is therefore the U.S. filing date of August 4, 1989.

      3.     The Method Element of Claim 9 Is Obvious

At trial, Dr. Sacks—a leading expert in the clinical management of lipid disorders, including hypertriglyceridemia and the design and analysis of clinical study data—testified that no differences exist between the prior art and the method for the treatment or prophylaxis of

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

hypertriglyceridemia recited in claim 9 of the '077 patent.  [D.I. 203 at 526:15-538:3 and DTX-1563]  Pronova did not offer an expert at trial to rebut Dr. Sacks' testimony.

> a.   No Differences Exist Between the Recited Method for the Treatment of Hypertriglyceridemia and the Prior Art

As discussed *supra* at Section IV.D, long before the effective U.S. filing date of the '077 patent, it was well-accepted in the scientific community, as exemplified by the teachings of Sanders (DTX-1456), Simons (DTX-1458), Phillipson (DTX-1449), Harris (DTX-1436), Dictionnaire Vidal (DTX-1431), and Rote Liste (DTX-1453), that EPA and DHA lowered triglycerides in patients with hypertriglyceridemia.  Dr. Sacks testified at trial that, based on these prior art disclosures, use of omega-3 fatty acids for treatment of hypertriglyceridemia was "fully, very, very well established."  [D.I. 203 at 560:15-19, 570:7-21]  Dr. Sacks opined that a skilled artisan in 1988 or 1989 would have expected that the triglyceride-lowering effect of EPA and DHA would occur in a dose-dependent manner in preparations having higher concentrations of EPA and DHA than those reported in the prior art publications.   [D.I. 203 at 570:22-571:9]

> b.   The Prior Art Motivated a Skilled Artisan to Use Highly Concentrated EPA and DHA Compositions to Treat Hypertriglyceridemia

A POSA as of August 4, 1989 or August 4, 1988 would have been motivated to use highly concentrated EPA/DHA compositions having >80% EPA + DHA to treat hypertriglyceridemia.  [D.I. 203 at 571:17-21, 541:23-542:24]

One motivation was that compositions having >80% EPA + DHA were already known in the art, as exemplified by the Breivik PCT (DTX-177), De Bernardi (DTX-1429), and Kryznowek (DTX-699).  [D.I. 203 at 572:22-573:7]  As Dr. Sacks explained, a POSA would have expected these compositions to have the same or similar effects on triglycerides as was reported in the numerous prior art studies.  [D.I. 203 at 572:22-573:7]  De Bernardi confirmed the safety of the highly concentrated pharmaceutical compositions.  [DTX-1429 at 342]  Further

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

motivation included (1) the dose-response effect of EPA and DHA on triglyceride reduction, (2) the desire to take fewer capsules of fish oil, improving patient compliance, and (3) reducing the intake of fat and calories per day, as shown in the prior art.  [D.I. 203 at 573:8-574:9; DTX-1434 at 117 (fish oil "concentrate" was preferred to "keep the daily amount of fatty acid ingested as low as possible"; DTX-1567 at 1573 (use concentrated fish oil preparations to "avoid" increasing "total fat intake"); DTX-938R at 90; D.I. 204 at 883:2-885:16]  As Dr. Sacks testified, "the higher concentrations would provide an effective dose in fewer number of capsules or less fat to eat-less, fewer calories."  [D.I. 203 at 574:4-9]

Anthony Bimbo, a retained Pronova expert who did not appear at trial, wrote in 1987 that "a recent trend has been toward higher concentrations of the n-3 fatty acids.  The theory is that more is better, and so we have seen 30% concentrates, then 50% concentrates, and now 80% concentrates."  [DTX-1276 at 714; D.I. 204 at 788:2-790:2]

> c.    Defendants Have Shown that Claim 9 Is Obvious by Clear and Convincing Evidence

As shown above, the method element of claim 9 is not inventive.  As shown below, the pharmaceutical compositions recited in claim 9 of the '077 patent and claims 20, 44 and 50 of the '667 patent are also invalid as obvious.  Thus, claim 9 in its entirety is invalid as obvious.

In the closely-analogous case *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1300 (Fed. Cir. 2007), the key question was whether a purified stereoisomer of the compound ramipril, in a form substantially free of other isomers, would have been obvious over the prior art.  The Federal Circuit held that the purified isomer was obvious because "one expects a concentrated or purified ingredient to retain the same properties it exhibited in a mixture, and for those properties to be amplified when the ingredient is concentrated or purified; isolation of interesting compounds is a mainstay of the chemist's art.  If it is known how to perform such an

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

isolation, doing so 'is likely the product not of innovation but of ordinary skill and common sense.'"  *Id.* at 1302 (quoting *KSR*, 127 S.Ct at 1742).

Having addressed the "purified" composition claims, the court then turned to claim 5 of the patent in suit, which addressed a "method for reducing blood pressure" by administering the compound of claim 1.  The Federal Circuit found the method claim obvious: "The added limitations of claims 4 and 5 appear almost verbatim in virtually all prior art patents … [t]he prior art thus reveals that it was well understood by ordinarily skilled artisans that ACE inhibitors were to be used in the manner these claims describe."  *Id.* at 1303.

The court's reasoning in *Aventis* directly applies here.  The method limitation in claim 9 of the '077 patent—a method for treating hypertriglyceridemia—appears in numerous prior art references.  The inescapable conclusion is that Norsk Hydro did not invent using the asserted EPA + DHA compositions for lowering triglycerides.  The compositions and their use were already well known in the art.

### D.   The Asserted Compositions Are Obvious Over the Prior Art

#### 1.   The Composition Elements of the Asserted Claims

The compositional elements of claim 9 require that the mixture contain at least 80% by weight EPA and DHA in a 1:2 to 2:1 ratio, 40-60% EPA and 25-45% DHA, and include minimal amounts of specified other fatty acids having 20, 21, or 22 carbon atoms (the "minor components").  The asserted claims  of the '667 patent – claim 20 (as it depends upon claim 18), claim 44 (as it depends upon claim 31), and claim 50 – are generally directed to the same compositional elements with slight variations directed to the presence of other long-chain C20, C21, or C22 fatty acids, whether a fatty acid or ethyl ester, the presence of an antioxidant, and whether or not the mixture is in an oral dosage form, as shown in the chart below:

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

| | '077 Patent Composition of Claim 9 | '667 Patent Claim 20 | '667 Patent Claim 44 | '667 Patent Claim 50 |
|---|---|---|---|---|
| EPA + DHA at least 80% by weight | ● | ● | ● | ● |
| Ratio (at least 1:2 to 2:1 or 1:1 to 2:1) | ● | ● | ● | ● |
| 40-60% EPA, 25-45% DHA | ● | ● | ● | ● |
| At least 3% other C20, C21 or C22 ω-3 | ● | N/A | ● | N/A |
| At least 4.5% other C20, C21 or C22 ω-3 | N/A | N/A | N/A | N/A |
| At least 1% C21:5 (HPA) | ● | ● | N/A | N/A |
| From 1%-4% C21:5 ω-3 (HPA) | N/A | N/A | N/A | ● |
| At least 1% C22:5 ω-3 (DPA) | N/A | ● | N/A | N/A |
| At least 1% C20:4 ω-6 (AA) | N/A | ● | N/A | N/A |
| At least 85%, 90% long chain ω-3 | ● | ● | ● | ● |
| Ethyl Ester | ● | N/A | ● | ● |
| Oral Dosage Form | ● | N/A | N/A | ● |
| Antioxidant (Tocopherol) | N/A | N/A | N/A | ● |

2.      The Testimony of Dr. Ganem and Dr. Rizvi That the Claimed
        Compositions Are Obvious Was Unrebutted at Trial

As Dr. Ganem and Dr. Rizvi opined at trial, the asserted compositions were not novel

when the '077 and '677 patents were filed.  *See supra* Section IV.E.  The prior art disclosed at

least five concentrated fish oil compositions containing 80% or higher (" ≥80%") EPA + DHA,

including EE species, in a 1:2 to 2:1 ratio of EPA:DHA, having the minor components, and

including compositions with antioxidant and in an oral dosage form.  [D.I. 204 at 734:10-735:14]

In addition, at least five other prior art references disclosed concentrates containing between 70–

80% EPA + DHA.  The unrebutted trial record is that this prior art both (1) disclosed the claimed

compositions to a POSA and (2) provided a POSA with everything necessary to make the

claimed compositions:  (i) starting material from the NMFS; (ii) target percentages of ≥ 80%

EPA + DHA from Krzynowek, De Bernardi, Skrinska or Dahl; (iii) motivation to make very

concentrated compositions; (iv) the techniques to prepare such compositions; and (v) a

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

reasonable expectation that the resulting concentrate would meet all of the claim limitations, including the limitations relating to the minor components.

    a.    The Differences Between the Asserted Compositions and the Prior Art Are Insignificant

Defendants introduced unrebutted testimony that the differences between the prior art and the asserted claims were insignificant.  [DTX-1573; D.I. 204 at 739:9-743:22, 744:5-748:19]

    (1)    The NMFS Disclosed Compositions Ranging From 73-88% EPA EE + DHA EE and Having the Required Ratios

The public disclosures by the NMFS and the test material available through its BTM Program render the 80% or higher EPA EE + DHA EE composition element obvious.  The Krzynowek composition (DTX-699) disclosed by the NMFS exceeded 80% EPA EE + DHA EE. [D.I. 204 at 771:21-772:18]  The compositions in Joseph (PTX-547) and Nilsson (DTX-1448) contained EPA EE + DHA EE in the range of 70-73%.  [D.I. 204 at 771:21-772:18]  Pronova inventor Breivik concluded after visiting the NMFS that the product contained about 75-77% EPA + DHA.  [DTX-1400 at PRV 00856481; D.I. 204 at 785:8-787: 19]  The February 1988 NIH Notice announced the process by which the test material was being made.  [DTX-1446; D.I. 204 at 774:5-775:23]  The February 1988 NIH Notice disclosed that this process could consistently produce a product with >80% omega-3 ethyl esters.  The NMFS compositions thus either met all of the composition claim limitations or required at most further concentration by a few percent.

A skilled artisan could have readily obtained and concentrated the Joseph 73% composition, the PUFA2 70.8% composition described in Nilsson, or the 75-77% composition Breivik described, because the BTM Program distributed these compositions to researchers and laboratories beginning in early 1988.  [PTX-547; D.I. 204 at 772:19-778:22]  These could be readily concentrated to an 80% or higher EPA EE + DHA EE.  Having done so, or starting

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

instead with the 88% Krzynowek composition, no creative leaps were required for that skilled

artisan to add tocopherol and prepare an oral dosage form, such as capsules.

Further, the NMFS compositions contained EPA/DHA in the recited rations of 1:2 to 2:1.

For example, the Krzynowek composition had a 1.8:1 weight ratio of EPA:DHA.  [DTX-699 at

75 (tbl.2); D.I. 204 at 734:10-24, 923:4-15]  The ratio in Joseph was 1.92:1.  [PTX-547 at

PAR000030521; D.I. 204 at 772:19-773:13]  Pronova was aware that the NMFS product had this

ratio and subsequently altered its process to achieve the same ratio.  [DTX-1400 at

PRV00856475_T;  DTX-164 at PRV01101706]

    (2)    <u>No Difference Exists Between the Asserted Composition Claims
and Batch 222 of K80 Received and Tested By Skrinska</u>

As discussed below, the Skrinska materials anticipate the composition claims as a public

use under §102(b), *see infra* Section V.E.3.  For the same reason, the Skrinska materials also

render the claims obvious.

    (3)    <u>The Pharmaceutical Composition in De Bernardi Exceeded 80%
EPA + DHA</u>

The pharmaceutical composition disclosed by De Bernardi comprised EPA + DHA in a

1.12:1 weight ratio of EPA:DHA (85% total EPA + DHA; 45% by weight EPA and 40% by

weight DHA).  [DTX-1429 at 340; D.I. 204 at 750:4-751:12]  Each capsule contained a

pharmaceutical composition of 450 mg EPA, 400 mg DHA and 3 mg tocopherol alcohol, and

thus met the limitations of the asserted claims with regard to the levels and ratios of EPA and

DHA, administration of a daily dose between 1-10 grams, an oral dosage form, and an

antioxidant.  [D.I. 204 at 750:9-751:12]  De Bernardi implicitly disclosed to a POSA that the

remaining 15% of the composition included the minor components in the amounts recited in the

asserted claims.  [D.I. 204 at 751:3-12]  De Bernardi, in combination with the NMFS

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

compositions disclosing ethyl esters and the knowledge in the art that minor components are retained in the concentrate, renders obvious the asserted composition claims.

> (4)    The Dahl Abstract Discloses an 85% EPA EE + DHA EE
> Pharmaceutical Composition in an Oral Dosage Form

The Dahl Abstract disclosed a 55% EPA EE and 30% DHA EE composition in a 1.83:1 ratio of EPA:DHA, identified as "K85". Dr. Ganem testified, without rebuttal, that the Dahl Abstract disclosed all of the claimed limitations of the asserted claims with regard to the levels and ratios of EPA and DHA, administration of a daily dose between 1-10 grams and an oral dosage form, and that a POSA would have understood the Dahl Abstract to have implicitly disclosed the presence of the minor components in the amounts recited in the asserted claims. [D.I. 204 at 748:25-749:23, 766:18-768:22]  There is no dispute that a POSA would have known to add an antioxidant to the composition.  [D.I. 202 at 379:25-381:3]

> (5)    The Dahl Abstract Is a Prior Art Printed Publication Under §102(b)

The Dahl Abstract is prior art under 35 U.S.C. § 102(b), because it was publicly displayed to the leading researchers in the field of omega-3 fatty acids without any confidentiality restrictions when Dahl presented his findings at the NATO conference in June 1988.  [D.I. 202 at 433:4-439:25; D.I. 203 at 585:18-586:1 ("this is a major conference")]  *See In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004).  *Klopfenstein* holds that a reference that was temporarily displayed to a conference of experts but neither distributed nor indexed nonetheless is sufficiently publicly accessible to count as a "printed publication" under 35 U.S.C. § 102(b).  The relevant *Klopfenstein* criteria are: "the length of time the display was exhibited, the expertise of the target audience, the existence (or lack thereof) of reasonable expectations that the material displayed would not be copied, and the simplicity or ease with which the material displayed could have been copied." *Id.* at 1350.  Here, the Dahl Abstract was displayed

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

throughout the NATO conference workshop; the Dahl Abstract consisted of one paragraph of text that easily could be copied; there were no confidentiality obligations imposed; the Dahl Abstract actually was copied and cited in a peer-reviewed journal [DTX-210]; and the Dahl Abstract was subsequently published in a book that recorded the NATO conference proceedings. [D.I. 202 at 437:21-439:25; DTX-1572]  *Klopfenstein*, 380 F.3d at 1348; *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1323-24 (Fed. Cir. 2002).

3.     A POSA Would Have Reasonably Expected These Compositions to Contain Minor Components that Were Present in the Starting Materials

A subsidiary question in the obviousness inquiry is whether a person of ordinary skill in the art would have had a reasonable expectation that the combination of references would succeed for its intended purpose. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000).  The standard is not "absolute predictability," but rather is whether a person of skill would have a "reasonable expectation" of success. *Pfizer Inc.*, 480 F.3d at 1364;  *In re O'Farrell*, 853 F.2d 894, 903-904 (Fed. Cir. 1988).  Here, a POSA had every reason to expect that compositions of $\geq$ 80% EPA EE + DHA EE would contain residual amounts of other PUFA ethyl esters, including those having 20, 21 and 22 carbons in length, such as the minor components (HPA (C21:5$\omega$3), DPA (C22:5$\omega$3) and AA (C20:4$\omega$6)).

Dr. Rizvi testified that by August 1988 a POSA would have known that the concentrated EPA/DHA EE compositions disclosed in, for example, Krzynowek, Skrinska, Nilsson, and the Dahl Abstract, contained small amounts of minor components.  [D.I. 204 at 908:13-910:5, 920:14-25]  The 70.8% NMFS composition disclosed in Nilsson retained 1.3% by weight of 21:5 omega-3 (HPA) and 1.4% by weight of C 20:4 omega-6.  *See* DTX-1448 at tbl.1.  A POSA would understand that these minor components are retained in the concentrated EPA + DHA composition because they are similar in weight and volatility to EPA and DHA ethyl esters and

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

thus behave like them in processing techniques such as urea fractionation and supercritical fluid extraction.  [D.I. 204 at 908:13-910:5, 916:13-920:17]

For example, a skilled practitioner using SFE to increase the percentage of EPA and DHA in the PUFA2 material described in Nilsson from 70.8 % to 80% or more would reasonably have expected the minor components present in PUFA2 (i.e., HPA, DPA and AA ethyl esters) to persist in the 80% or more EPA + DHA composition in at least their present concentration.  [D.I. 204 at 924:20-927:3]  The same would be true for any of the prior art compositions.

4.     The Prior Art Enabled a POSA to Prepare the Claimed Compositions

The testimony of Dr. Ganem and Dr. Rizvi that a POSA would have been able to prepare compositions containing at least 80% by weight EPA + DHA by using the known processing techniques is unrebutted.  [D.I. 204 at 870:24-871:7, 924:25-927:3]  These processing techniques—including those according to the "preferred" method of the patents:  urea fractionation and molecular distillation or SFE and/or chromatography—were well established by August 1988.  [D.I. 204 at 764:20-766:17, 887:21-888:15]  No experimentation was needed to arrive at a concentrated EPA/DHA composition falling within the claimed limitations, only the routine application of well-known tools available to the skilled artisan.  [D.I. 204 at 870:24-871:7, 924:25-927:3]

The prior art provides ample disclosure about how to prepare such compositions, well beyond the specifications of the asserted patents.  [D.I. 204 at 793:9-794:4]  The preferred process described generally in the '077 and '667 patents is a two-stage process of urea fractionation, followed by molecular distillation or SFE and/or chromatography.  [PTX-1 at col. 3, ll. 24-29, col. 3, ll. 65-67; D.I. 204 at 796:11-798:2]  This exact sequence was already well

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

known to skilled artisans—including the '077 and '667 inventors before they adopted it—because it was taught by the NMFS prior art as discussed above.  [D.I. 204 at 794:9-798:2; DTX-162 at PRV00863985; DTX-131 at PRV 00925006]  A POSA would have reasonably expected success in using these techniques to achieve a composition having >80% EPA/DHA by no more than routine implementation and optimization of these processes.  [D.I. 204 at 870:24-871:7, 924:25-927:3]

SFE was a process known to be useful and selective in fractionating and concentrating PUFA ethyl esters in fish oil compositions.  [*See, e.g.,* DTX-938R (Rizvi book chapter); DTX-1448; D.I. 204 at 893:11-19]  As Dr. Rizvi's unrebutted testimony shows, using the composition disclosed in De Bernardi as a target concentration of EPA + DHA (*i.e.* 85% by weight), a POSA would have simply applied SFE to the composition available from the NMFS BTM Program and described as "PUFA2" in Nilsson to obtain a composition containing at least 80% by weight EPA/DHA ethyl esters.  [D.I. 204 at 924:25-927:3]  In fact, Norsk Hydro reduced to practice the 90% EPA + DHA composition disclosed in the Breivik PCT using an SFE method described in the literature.  [D.I. 204 at 755:9-758:3; DTX-652; DTX-162; DTX-745, DTX-1412; (English translation)]  Dr. Rizvi's unrebutted testimony also establishes that a POSA using SFE to concentrate EPA EE + DHA EE would have known that this processing would also concentrate the minor components.  [D.I. 204 at 921:7-18]

> a.  The Prior Art Provided Motivation to Make the Claimed Concentrated Compositions

A POSA would have been motivated to concentrate the prior art EPA + DHA compositions to reduce the number of capsules required per day, reduce the amount of unwanted components and reduce undesirable side effects associated with administering large amounts of the prior art commercial fish oil compositions.  [D.I. 203 at 572:22-574:9; D.I. 204 at 788:2-

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

789:2; DTX-938R at 90]  Concentrating the compositions would improve the therapeutic effect and improve patient compliance while increasing the amount of EPA + DHA administered per dose.  [D.I. 203 at 572:22-574:9; D.I. 204 at 788:2-789:2]  This motivation was expressed by Pronova's expert Mr. Bimbo in 1987: "a recent trend has been toward higher concentrations of the n-3 fatty acids.  The theory is that more is better, and so we have seen 30% concentrates, then 50% concentrates, and now 80% concentrates, …."  [*See* DTX-1276; D.I. 204 at 788:2-789:2, 789:18-790:2]

So motivated, a POSA aiming at the ≥ 80% EPA EE + DHA EE compositions disclosed in Krzynowek, Skrinska, Dahl, or the composition in De Bernardi, would use known processing methods to further concentrate the NMFS compositions disclosed in Joseph or Nilsson, and would have had a reasonable expectation of success in doing so.  As explained by Defendants' experts Drs. Rizvi and Ganem, the experimentation needed to arrive at the claimed compositions was nothing more than routine application of well-known tools to concentrate fatty acids or esters.  [D.I. 204 at 870:24-871:7, 924:25-927:3]  A POSA would then have had the motivation to use an 80% EPA EE + DHA EE composition to treat patients with hypertriglyceridemia and the strong expectation that it would successfully reduce triglycerides in those patients based upon the wealth of knowledge in the prior art regarding fish oil compositions containing EPA + DHA. [D.I. 203 at 570:7-571:9]

5.    The Asserted Compositions Claims Are *Prima Face* Obvious

At least four prior art references [DTX-699 (tbl.2); DTX-1429; DTX-137-A; DTX-80-86] disclose compositions > 80% EPA + DHA, the percentage in the asserted compositions claims, and having the claimed EPA:DHA ratios.  Further, as Drs. Ganem and Rizvi testified, a POSA would have understood the "minor components" to be present in these compositions in

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

amounts corresponding to the values set forth in the asserted claims.  Where, as here,  the claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness.  *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1331 (Fed. Cir. 2008) (holding that where prior art references disclosed a range that overlapped the *range* claimed by the patent in suit, the claims of the patent in suit were "presumed obvious"), *cert. denied*, 129 S. Ct. 2864 (2009); *Ormco,* 463 F.3d at 1311; *Iron Grip Barbell, Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004) ("Where there is a range disclosed in the prior art, and the claimed invention falls within that range, there is a presumption of obviousness.").  The presumption may be rebutted only if the prior art teaches away from the claimed range or the claimed range produces new and unexpected results. *Ormco*, 463 F.3d at 1311; *Iron Grip Barbell,* 392 F.3d at 1322 ("[To show "unexpected results"] where, the difference between the claimed invention and the prior art is some range or other variable within the claims . . ., the [patentee] must show that the particular range is critical, generally by showing that the claimed range achieves unexpected results.'") (citation omitted).  Here, the prior art does not teach away from the claimed range, and Pronova failed to introduce any evidence of unexpected results.

A *prima facie* case of obviousness also exists when, as in the case of five other prior art references [DTX-1448, DTX-699 (Krzynowek text), DTX-1434, DTX-1567, and PTX-547] that disclose compositions from 70-75% EPA + DHA and having the claimed ratios, or nearly so, the claimed range and the prior art range do not overlap but are close enough that one skilled in the art would have expected them to have the same properties.  *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003); *see also Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1577 n.3 (Fed. Cir. 1993) ("When the difference between the claimed invention and the prior art is the range or

value of a particular variable, then a *prima facie* rejection is properly established when the difference in range or value is minor.")  "It is not inventive to discover the optimum or workable ranges by routine experimentation."  *In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997). (quoting *In re Aller*, 42 C.C.P.A. 824 (1955)).

### E.   **The Asserted Claims Are Invalid as Anticipated**

#### 1.   The Law of Anticipation

A claim is anticipated when a single prior art reference discloses every claim limitation, either explicitly or inherently**.  *See* 35 U.S.C. § 102; *In re Cruciferous Sprout Litig.***, 301 F.3d 1343, 1349 (Fed. Cir. 2002).  When a claim covers several structures or compositions, the claim is anticipated if any of the structures or compositions within the scope of the claim is known in the prior art.  *Brown v. 3M***, 265 F.3d 1349, 1351 (Fed. Cir. 2001).  Anticipation is a question of fact.  *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006).

#### 2.   The Law of Prior Public Use

The 35 U.S.C. § 102 public use bar states:  "A person shall be entitled to a patent unless – (b) the invention was…in public use…in this country, more than one year prior to the date of the application for patent in the United States…."  35 U.S.C. § 102(b) (2006).  "A bar under § 102(b) arises where, before the critical date, the invention is in public use and ready for patenting."  *Invitrogen Corp. v. Biocrest Mfg. L.P.,* 424 F.3d 1374, 1379 (Fed. Cir. 2005).

The public use prong of § 102(b) can be established if the purported use either: "(1) was accessible to the public; or (2) was commercially exploited."  *See Invitrogen*, 424 F.3d at 1380. The test for the public use prong requires consideration of evidence regarding "the nature of the activity that occurred in public; public access to the use; confidentiality obligations imposed on members of the public who observed the use; and commercial exploitation."  *Id*. (citing *Allied*

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

*Colloids, Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1574 (Fed. Cir. 1995)).  "The statutory phrase 'public use' does not necessarily mean open and visible in the ordinary sense; it includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor."  *See New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297 (Fed. Cir. 2002).  Public use is established by even a single disclosure of a claimed invention to a person who is not under an obligation of confidentiality.  *See Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1334 (Fed. Cir. 2005) (vacating JMOL determination of no public use where inventor gave a "demonstration to two Sun Microsystems employees without confidentiality agreements").

The asserted composition claims are invalid for public use before the statutory bar date.  Norsk Hydro made commercial public use of its product by disclosing its contents and providing product samples to, among others, Dr. Skrinska.  Dr. Skrinska made public use of the Skrinska material by testing to confirm its contents and discussing it with colleagues.  In addition, Dr. Skrinska made further public use of the Skrinska material by administering capsules to himself and others.  No confidentiality agreement restricted these public uses.

      3.      <u>The Skrinska Materials — Batch No. 222 Products, Documentation, and Capsules, and Their Subsequent Uses — Render the Asserted Composition Claims Invalid Under 35 U.S.C. § 102(b)</u>

The evidence shows, clearly and convincingly, that Dr. Skrinska used publicly in the United States certain compositions later claimed in the asserted composition claims patent more than one year before the U.S. filing date.  Dr. Skrinska's public use of the later-claimed inventions is extensively documented and corroborated by multiple pieces of direct and indirect evidence, his direct testimony, contemporaneous direct evidence, and testimony by former Norsk Hydro business development manager Sigurd Gulbrandsen.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

    a.    <u>The Batch No. 222 Products and Related Documentation</u>

On September 8, 1987—more than one year before the August 4, 1989 U.S. filing date for the '077 and '667 patents—Norsk Hydro sent at least two 100 ml liquid vials of "K-80" ethyl esters from Batch No. 222, along with documentation (including a full certificate of analysis) to Dr. Skrinska, then the Director of Biotechnology at the Cardiovascular Research Center at the Cleveland Research Institute in Cleveland, Ohio.  [DTX-81A; DTX-82; DTX-83; DTX-84; DTX-85; DTX-86; D.I. 202 at 482:1-484:6; D.I. 203 at 696:15-697:7]

The unrebutted trial evidence establishes that the Batch No. 222 products met all of the claimed limitations, in that they contained **86.5% by weight EPA EE + DHA EE (<u>53.2% by weight EPA</u>, <u>33.3% by weight DHA</u>)** as well as the other omega-3 and omega-6 fatty acids and Vitamin E (as an antioxidant) recited in the asserted claims.  [DTX-86 (certificate of analysis); D.I. 203 at 698:3-699:12 (admission of Gulbrandsen that certificate of analysis was accurate); D.I. 202 at 483:24-484:6 (testimony of Dr. Skrinska that he independently corroborated the findings of the certificate of analysis)]  Dr. Ganem testified at trial, without rebuttal, that the composition of the Batch No. 222 products met each and every claim limitation found in claims 20, 44, and 50 of the '667 patent, and the composition claim limitations found in claim 9 of the '077 patent.  [D.I. 204 at 743:24-748:19]

    b.    <u>The Capsules Sent to and Used by Dr. Skrinska in a Clinical Study</u>

Dr. Skrinska testified that, in addition to the Batch No. 222 products he received in September 1987, Norsk Hydro also provided him with a large number (500-1000) of capsules containing concentrated amounts of EPA and DHA.  [D.I. 202 at 477:10-17]  Dr. Skrinska analyzed the capsules he received and determined that they contained "approximately the same distribution" of fatty acids as the Batch No. 222 products.  [D.I. 202 at 483:24-484:19]  Dr.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

Skrinska testified that he conducted a clinical study with six volunteers (including himself) using the capsules he received from Norsk Hydro.  [D.I. 202 at 484:20-486:11]

Dr. Skrinska's study was open and therefore "everyone related to the Cleveland Research Institute was aware of what we were doing through just regular meetings and updates."  [D.I. 202 at 493:4-18; DTX-80 (funded grant entries 12, 13 & 14)]  Dr. Skrinska disclosed his clinical study using the Norsk Hydro capsules to others the Cleveland medical community.  [D.I. 202 at 493:15-18]  As noted below, Dr. Skrinska's account is corroborated by contemporaneous documentation.

Dr. Skrinska's clinical study using the Norsk Hydro capsules was an invalidating public use, as the 500-1000 capsules containing approximately the same fatty acid distribution as the Batch No. 222 products were disclosed to and used by: (1) Dr. Skrinska, (2) five other volunteers in his study, (3) other staff members at the Cleveland Research Institute, and (4) others in the Cleveland medical community.

      c.    <u>No Confidentiality Restrictions Applied to the Batch 222 Vials or Capsules</u>

Each and every instance of public use described above was free of any confidentiality restrictions or secrecy.  There is no evidence that any of the numerous instances of public use were in any way secret or confidential.  On the contrary, all of the evidence establishes, clearly and convincingly, that the public uses were unrestricted.

First, Dr. Skrinska testified that there were no confidentiality agreements or other restrictions placed on his use of the Batch No. 222 products or capsules sent in 1987.  [D.I. 202 at 486:23-493:3;  D.I. 203 at 501:22-502:16]  Thus, Dr. Skrinska was under no restrictions to maintain confidentiality regarding the information concerning the Batch No. 222 products or capsules, nor his use of the materials nor the results of his use.  In fact, Dr. Skrinska publicly

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

disclosed his use of the Batch No. 222 products and capsules and disclosed the research

performed with the capsules to colleagues both at the Cleveland Research Institute and

elsewhere.  [DTX-111; D.I. 202 at 493:4-18]

None of the inventors listed on the face of the '077 and '667 patents exercised any sort of

control or supervision over Dr. Skrinska's use of the samples or capsules.  [D.I. 205 at 1127:16-

23 (Børretzen), 1109:5-10 (Bønaa), 981:16-982:6 (Breivik), 1061:15-1062:1 (Krokan); D.I. 202

at 408:4-13 (Dahl), D.I. 203 at 700:1-701:1 (Gulbrandsen)]  It is undisputed that no one affiliated

with Norsk Hydro or the inventers exercised any sort of control or supervision over Dr.

Skrinska's public use of the later-claimed invention.  [*Id.*]

> d. Dr. Skrinska's Public Uses Are Corroborated by Other
> Contemporaneous Public Uses of the Later-Claimed Invention

>> (1) Dr. Skrinska's Public Use Related to His Communication of the
>> Capsules to Drs. Wei and Sheehan

Dr. Skrinska disclosed his use of the Norsk Hydro capsules to others in the Cleveland

medical community.  [D.I. 202 at 493:15-18]  On February 28, 1988, approximately six months

after Dr. Skrinska received the Batch No. 222 products, Norsk Hydro received a letter from two

medical researchers at the Case Western Reserve University School of Medicine, Drs. Irene Wei

and John Sheehan, referring to the capsules.  [DTX-111; DTX-112;  D.I. 203 at 703:21-705:6]

The letter from Drs. Wei and Sheehan stated that they had "learned of" Norsk Hydro's 80%

omega-3 product from Dr. Skrinska.  [DTX-111]  One of the inventors, Dr. Hans Krokan, replied

to Drs. Wei and Sheehan on April 29, 1988, more than one year before the U.S. filing date.

[DTX-112]  Dr. Krokan again disclosed the later-claimed composition, and offered to provide

them with capsules.  [DTX-112 at PRV00863721]  Norsk Hydro offered Dr. Skrinska's

colleagues the same type of K85 capsules that Dr. Skrinska testified that he had received and

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

used in his own clinical study.  *Compare* DTX-112 at PRV00863721 *with* DTX-86 (the Batch

No. 222 products received by Dr. Skrinska contained 53.2% EPA and 33.3% DHA).

> (2)    Public Use of Capsules Sent to Arne Nordøy and Other Scientists
> at Oregon Health Sciences University

Other contemporaneous documents corroborate Dr. Skrinska's testimony.  For instance,

in January 1988 (a few months after Dr. Skrinska received his samples and capsules), Dahl sent

Professor Arne Nordøy "1000 capsules of K85."  [DTX-150 at PRV00948970_T]  None of the

three "conditions" placed on Dr. Nordøy's use of the 1000 capsules of K85 in any way imposed

obligations of confidentiality, secrecy, or otherwise restricted Dr. Nordøy's ability to make

further public disclosures of the capsules.  [DTX-150 at PRV00948970T]  The inventors

admitted during prosecution of the patents in suit that the 1000 capsules sent to Dr. Nordøy—

then working at an institute in the United States—in early 1988 were an embodiment of the

claims of the patent.  [PTX-9 at PRV00409089-123 ("Declaration of Harald Breivik et al. Under

37 C.F.R. § 1.131")]

> (3)    Other Contemporaneous Public Use in the United States

On February 17, 1987—18 months before the U.S. patents were filed—Norsk made

public use in the U.S. of the later-claimed invention when it sent Dr. Fran Peterson of General

Mills samples of "K-80".  [DTX-99]  This shipment was contemporaneously recorded in an

invoice.  [*Id.*]  There is no evidence that Norsk Hydro requested that the shipped product be

accorded confidential treatment.

On January 8, 1988, Norsk Hydro made public use in the U.S. of its later-claimed

invention when it sent samples of "K-80" to Prof. Roger Davis of the University of Colorado.

[DTX-113; DTX-114]  There is no evidence that Norsk Hydro requested that the shipped product

be accorded confidential treatment.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

(4)     <u>The Product Samples Sent to U.S. Researchers and Companies</u>
<u>Were for Marketing Purposes</u>

Norsk Hydro's former business development manager, Sigurd Gulbrandsen, testified at

length regarding his previous role at Norsk Hydro in contacting other companies — including

those in the United States starting in 1986 — to determine possible medical markets and uses for

Norsk Hydro's K80/K85 product.  [D.I. 203 at 650:2-11, 659:14-660:21, 661:7-662:25, 664:10-

665:4, 665:16-666:17; 667:7-17, 668:20-672:16, 674:4-21]  The record demonstrates that Mr.

Gulbrandsen and others at Norsk Hydro met with several U.S. companies and institutions

regarding Norsk Hydro's K85 product to determine potential marketing relationships, research

medical uses, or assess pricing information.  [DTX-241; DTX-124 (disclosure without

confidentiality agreement between January 12-18, 1987 to St. Vincent's Charity Hospital,

including Dr. Skrinska; doctors at the Cleveland Clinic Foundation; Flint Laboratories, Inc.;

Travenol Laboratories, Inc.; Pharmacaps, Inc., and Warner-Lambert (Parke-Davis)); DTX-100 at

PRV01778404 (letter to Pharmacaps disclosing "using the 85% EPA/DHA with essentially the

same ratio of EPA/DHA as in SuperEPA and made from the same raw materials"); DTX-1399 at

PRV00924994_T (disclosure to General Mills on January 23, 1987); *id.* at PRV00924995_T

(disclosure to Sandoz Nutrition on January 23, 1987, including negotiation of price); *id.* at

PRV00924996_T (disclosure to Squibb on January 24, 1987); DTX-99 (additional samples

provided to General Mills on February 19, 1987); D.I. 203 at 664:20-665:4, 661:16-662:5]

These interactions in 1986, 1987, and 1988 (more than one year before the U.S. filing date)

provide further evidence that Norsk Hydro publicly disclosed its later-claimed invention in the

United States without any restrictions on confidentiality or secrecy.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

e.    The Skrinska Materials Were "In Public Use"

The Skrinska materials were "in public use," the first prong of the public use bar.  The later-claimed composition (the K80/Batch No. 222 samples and capsules) was accessible to the public—Dr. Skrinska and others who gained knowledge of the later-claimed composition from Dr. Skrinska, such as the study volunteers, members of his research institute, as well as others in the medical community such as Drs. Wei and Sheehan.

The other factors identified by the Federal Circuit—the nature of the activity that occurred in public; public access to the use; confidentiality obligations imposed on members of the public—all weigh decidedly in favor of a public use.  Norsk Hydro treated K80 essentially as a commercial product which it sent to members of the public and potential marketing partners (i.e., Fran Peterson of General Mills).  Dr. Skrinska, his colleagues at the Cleveland Institute, as well as doctors at other institutions such as Drs. Wei and Sheehan, were all members of the public that learned of the later-claimed invention through Norsk Hydro's disclosure of the Batch No. 222 products, related documentation, and capsules.  As shown above, it is indisputable that none of members of the public were under any duty of confidentiality to Norsk Hydro or the inventors.  Accordingly, the Batch No. 222 products and related documentation were placed into the public domain.

f.    The Skrinska Materials Were "Ready for Patenting"

Defendants have also established, by clear and convincing evidence, that the Skrinska materials were "ready for patenting"—the second prong of the public use bar.  The "ready for patenting" prong "may be satisfied in a least two ways: [1] by proof of reduction to practice before the critical date; or [2] by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

skilled in the art to practice the invention." *See Pfaff v. Wells Elec., Inc.*, 525 U.S. 55 at 67-68 (1998). Here, Defendants established "ready for patenting" in both manners.

Norsk Hydro reduced the invention to practice before the critical date. "'A composition of matter is reduced to practice when it is completely composed.'" *See id.* at 57 n.2 (quoting *Corona Cord Tire Co. v. Dovan Chemical Corp.*, 276 U.S. 358, 383 (1928)). The Skrinska materials were a completely composed embodiment of the claimed invention and the certificate of analysis was a detailed description sufficient to allow a POSA to practice it. As shown in the table below, they contained essentially the same composition as those disclosed as examples in the patents in suit. *See, e.g., Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) (nucleotide sequence was ready for patenting because it "was shown to be the same as an ATCC deposit made for the purpose of supporting the patent application"):

| Fatty Acid Distribution, % of Weight | Table 2 "Test Sample"[1] | Skrinska's Batch No. 222 |
|---|---|---|
| EPA | 53.4% | 53.2% |
| DHA | 34.3% | 33.3% |
| Sum EPA + DHA | 87.7% | 86.5% |
| C20:4 n6 | 1.4% | 1.6% |
| C21:5 n3 | 1.6% | 1.7% |
| C22:5 n3 | 3.1% | 3.2% |

### (1)   The Experimental Use Exception is Not Available

The prior use bar of Section 102(b) is subject to a narrowly-construed exception for "experimental use." A use may be experimental "only if it is designed to (1) test claimed features of the invention or (2) to determine whether an invention will work for its intended purpose. . . ." *Clock Spring¸* 560 F.3d at 1327. While the burden is on Defendants to establish the public use of the claimed inventions, the burden is on Plaintiff to prove "experimental use" by "proof which is full, unequivocal, and convincing." *See, e.g., Application of Theis*, 610 F.2d

---

[1]   *See* PTX-1, col. 5, ll. 20-55.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

786, 792 (C.C.P.A. 1979); *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1316 (Fed. Cir. 2005) ("if

the challenging party presents a *prima facie* case of public use, the patentee must come forward

with 'convincing evidence' of experimental use to counter that showing") (quoting *T.P.*

*Laboratories, Inc. v. Professional Positioners Inc.*, 724 F.2d 965, 971 (Fed. Cir. 1984)).

Plaintiff cannot invoke the "experimental use" exception for at least three reasons, each

of which is independently sufficient.  First, Norsk Hydro's reduction to practice of the invention

before the experimental use forecloses a finding of experimental use.  *See Clock Spring*, 560

F.3d at 1327 n.8 ("experimental use cannot negate a public use when it is shown that the

invention was reduced to practice before the experimental use").  Second, Dr. Skrinska's public

uses were not performed by the inventors or under their direction, and "the experimental use

exception only concerns the actions of the inventors and their agents. . . ."  *See Atlanta*

*Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1366 (Fed. Cir. 2008).  None of the

inventors listed on the face of the '077 and '667 patents had "any input" or "exercised any

control" over Dr. Skrinska's use of the samples or capsules, and Dr. Skrinska did not report the

results of his experiments to anyone associated with Norsk Hydro.  [D.I. 202 at 486:12-491:23

(testimony of Dr. Skrinska); D.I. 205 at 1127:16-22 (corroboration by inventor Børretzen); D.I.

205 at 1109:5-10 (corroboration by inventor Bønaa); D.I. 205 at 981:16-982:6 (corroboration by

inventor Breivik); D.I. 205 at 1061:15-1062:1 (corroboration by inventor Krokan); D.I. 202 at

408:4-13 (corroboration by inventor Dahl); D.I. 203 at 700:1-701:22 (corroboration by

Gulbrandsen)]

Third, the work performed by Dr. Skrinska was not performed for the purpose of filing a

patent application.  "[T]here is no experimental use unless claimed features or overall

workability are being tested for purposes of the filing of a patent application."  *Clock Spring*,

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

560 F.3d at 1327.  Dr. Skrinska's work played no part in preparing the patent applications.  Dr. Skrinska testified that none of the clinical testing he did was for the purpose of assisting Norsk Hydro in perfecting its product or filing a patent application.  [D.I. 203 at 502:17-503:15] Gulbrandsen admitted that "the samples provided to Dr. Skrinska in no way further improved or finalized the composition of the K85 product."  [D.I. 203 at 703:9-18 ("the product was finalized . . . independent of any work done by Victor Skrinska")]

### F.  Claim 9 of the '077 Patent and Claims 44 and 50 of the '667 Patent Are Invalid for Improper Dependency Under § 112 ¶4

A proper dependent claim incorporates by reference all the limitations of the parent claim and also specifies a further limitation.  35 U.S.C. § 112 ¶ 4.  If the Court adopts Defendants' proposed claim construction of the term "fatty acids," (*see* D.I. 204 at 722:13-18) which requires the compound to be an <u>acid</u> rather than an ethyl ester, then dependent claims of the '077 and the '667 patents that are directed to "ethyl ester" rather than "fatty acids" are invalid because their subject matter does not overlap with the subject matter of the claims from which they depend. [D.I. 204 at 722:4-723:4; 725:12-726:7; 731:1-25 (Dr. Ganem opined that it is "scientifically impossible…for a fatty acid to be in "ethyl ester form")]

Under Defendants' construction, claim 9 of the '077 patent and claims 44 and 50 of the '667 patent are invalid for this reason.  Claim 1 of the '077 patent requires a "mixture of fatty acids."  Claim 9, which depends from claim 1, requires those "fatty acids" to be in "ethyl ester form."  In the '667 patent, claim 44 depends from claim 28, which requires a "mixed-fatty acids composition," and claim 50 depends from claim 49, which has the same element.  Claims 44 and 50 each require that the "fatty acids" in the recited compositions be in "ethyl ester form."  A substance in "ethyl ester form" as understood by a person skilled in the art based on the intrinsic record, is not a "fatty acid" of any type.  These claims are not properly dependent because the

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

"esters" of the dependent claims are not "fatty acids" which are set forth in the independent claims.  [D.I. 204 at 722:13-723:4]

### G.   Claim 20 of the '667 Patent Is Invalid for Indefiniteness of "Fatty Acid"

If the Court adopts Pronova's proposed claim construction for the term "fatty acids," then claim 20 of the '667 patent would cover free fatty acids and any and all derivatives thereof.  The range of possible species suggested by Pronova's construction is so broad that a skilled practitioner would be unable to determine what compounds fall within the scope of "fatty acids," thereby rendering claims directed to "fatty acids" invalid for indefiniteness.  [D.I. 201 at 142:24-143:6, 144:6-9 (Dr. Curtis' testimony that the number of fatty acids is indeterminate)]

## VI.   INEQUITABLE CONDUCT ARGUMENT

Defendants proved at trial that Pronova and inventor Dahl committed inequitable conduct by preparing and submitting to the PTO in support of patentability an unmistakably false declaration, and by repeatedly concealing experimental data that showed the declaration to be false.  Defendants proved both materiality and intent by clear and convincing evidence.

### A.   Inventor Dahl Conducts 1987-88 Study Comparing Norsk Hydro's K85 Product to Prior Art TG 30 Product

During late 1987 and early 1988, named inventors Dahl and Krokan set out to perform a controlled study in human volunteers (the "Comparison Study") to test their K85 product against a prior art product TG30 that was on the market.  TG30 had an EPA + DHA concentration of about 30%.  [DTX-141 at PRV 1148250]  K85 was the product Norsk Hydro later deemed the preferred embodiment of the '667 and '077 patents.

### 1.   The Comparison Study Had Five Groups

The Comparison Study included five test groups of eight volunteers.  [D.I. 202 at 430:15-17, 441:19-442:13, D.I. 203 at 581:6-23; DTX-141 at PRV01148251]  K85 was administered to

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

three test groups, eight volunteers per group, who received 4 gram, 8 gram or 14 gram daily

doses of K85, respectively, for two weeks each (the "Hazleton K85 Study"). [D.I. 202 at

296:10-297:11, 420:9-424:18; DTX-1574 at PRV00010877] TG30 was administered to two test

groups, eight volunteers per group, who received 12 gram or 24 gram daily doses of TG30,

respectively, for two weeks each. [D.I. 202 at 427:17-24; DTX-1026 at PRV00950086] The

subjects received K85 or TG 30 as follows:

| GROUP | N | TEST SUBSTANCE | DAILY DOSE OF : | | |
|---|---|---|---|---|---|
| | | | OIL | EPA | DHA |
| 1 | 8 | K85 (ethylester) | 4 g | 2.2 g | 1.2 g |
| 2 | 8 | K85 (ethylester) | 8 g | 4.4 g | 2.4 g |
| 3 | 8 | K85 (ethylester) | 14 g | 7.7 g | 4.2 g |
| 4 | 8 | TG-30 (triglyc.) | 12 g | 2.2 g | 1.4 g |
| 5 | 8 | TG-30 (triglyc.) | 24 g | 4.4 g | 2.9 g |

[DTX-141 at PRV01148251] The doses were chosen so that Groups 1 and 4 received 2.2 grams

per day of EPA and Groups 2 and 5 received 4.4 grams per day of EPA. [D.I. 203 at 581:6-23]

Groups 1 and 2 differed from groups 4 and 5 based on whether the EPA + DHA were

administered as high concentration ethyl esters (K85) or as low concentration triglycerides

(TG30). [D.I. 202 at 442:5-443:13]

> 2.   The Comparison Study Evaluated Both Efficacy and Absorption for K85
>       and TG30.

In the protocol for the TG30 portion of the study, Dahl stated clearly that "the aim of the

present study was to assess **efficacy** of TG30 **as a lipid lowering agent** in healthy volunteers and

to measure the uptake of the marine fatty acids EPA/DHA to the serum lipid pool after a period

of 14 days intake of TG 30." [DTX-1026 at PRV 950102-03; D.I. 202 at 429:12-23] One of the

principal lipids for which lipid-lowering data were obtained was serum triglycerides. [DTX-

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

1026 at PRV 950106]  Dahl's protocol stated that the measurements from the TG30 wing of the

study would be of particular value because, due to the similarity in design with the Hazelton K85

study, the data would "**enable a comparison of the serum lipid lowering effect of these two**

**compounds**." [D.I. 202 at 429:24-430:17; DTX-1026 at PRV 950103]

        3.      <u>TG30 Showed Superior Efficacy to K85 for Lowering Triglycerides.</u>

The efficacy results were not what Dahl had hoped for—TG30 lowered triglycerides

better than K85 in the study.  Dahl reported that TG30 resulted in substantial triglyceride

reduction:  "It is evident that TG30 in the used doses **exert[s] a marked hypo-triglyceridemic**

**effect** already after one week.  In group I, the level is reduced to 58% at day 8 and 49% at day

15.  In group II, the level is reduced to 54% at day 8 and 57% at day 15." [DTX-1026 at 950087,

950098].  For the K85 group, in contrast, Dahl reported only a slight impact on triglycerides:

"For all 3 groups, mean plasma **triglyceride levels had fallen slightly** when measured on day 8

of treatment, however, on days 15 and 28 (14 days after the last dose) concentrations were

similar to those on day 1."  [DTX-1574 at PRV 10882, PRV 10893, 10896-10901]

Dahl was central to the planning and monitoring of the Comparison Study, and travelled

to Hazelton several times during the course of the study.  [D.I. 202 at 421:8-15]  He was fully

aware of what data were being collected.  [D.I. 202 at 421:16-19]

        4.      <u>Dahl Repeatedly Concluded that the Comparison Study Demonstrated that</u>
<u>EPA and DHA Were Absorbed with the Same Efficacy from K85 and</u>
<u>TG30</u>

In addition to the efficacy data from the Comparison Study reported in DTX-1574 and

DTX-1026, Dahl also compared the absorption or bioavailability results for the two products.

[DTX-141; D.I. 202 at 440:1-8]  On multiple occasions, Dahl and his colleagues reported that the

Comparison Study demonstrated that EPA and DHA were **equally absorbed** from K85 and

TG30.  <u>First</u>, in June 1988, Dahl reported that the Comparison Study demonstrated that K85 and

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

TG30 were "absorbed with the same efficacy" in the Dahl Abstract he presented at a NATO

workshop held in Belgirate, Italy in June of 1988: "The serum lipid fatty acid profile changes

were the same whether the EPA was taken as ethylester [i.e., K85] or as triglyceride [i.e., TG30].

***This shows that an EPA-ethylester [i.e., K85] is absorbed with the same efficacy as an EPA-***

***triglyceride [i.e., TG30].***"   [D.I. 202 at 433:4-434:14; DTX-137A (emphasis added)]

Second, in September 1988, Dahl analyzed the results of the Comparison Study in an

extensive internal report.  [DTX-141 (the "September 1988 Report") at PRV01148283 (Table 4);

*see also* DTX-212]  Dahl concluded that EPA and DHA were "absorbed with the same efficacy"

whether taken as K85 or prior art TG30.  [DTX-141 at PRV01148261; *see also* DTX-217; D.I.

202 at 440:1-441:18]  Dahl concluded in the September 1988 Report: "When the same amounts

of EPA was taken as ethylester [i.e., K85] or as triglyceride [i.e., TG30], a similar increase in the

fraction of serum EPA was observed," and "[t]he differences observed between the two forms of

EPA (ethylester [i.e., K85] and triglyceride [i.e., TG30]) are concluded to be within individual

and experimental variation."  [DTX-141 at PRV01148248, PRV01148257]   At trial, Dahl

confirmed that all the data were scientifically valid, and that the full set of data demonstrated that

"absorption was the same when you took into account all of the data for EPA."  [D.I. 202 at

449:25-451:23]

Third, in October 1988, Dahl was listed as an author on an abstract that reported the same

conclusion at a symposium in Rome, Italy (the "Rome Abstract"): "The results strongly indicate

that ethyl and glycerol esters of EPA are absorbed to the same extent in man when given

perorally."  [DTX-95; DTX-101]  Using the same data as reported in the September 1988 Report

(D.I. 205 at 1089:12-1092:3), the Rome Abstract stated that there were "***statistically no***

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

*significant differences*" between the K85 and TG30 groups in (i) phospholipid or (ii) total serum

lipid concentrations of EPA or DHA.  [DTX-95 (emphasis added)]

Dahl and co-inventor Krokan made similar written statements about the Comparison

Study to other omega-3 researchers.  [DTX-150; DTX-101; D.I. 202 at 391:24-393:12]  Dahl and

Krokan never submitted the Dahl Abstract, the September 1988 Report, the Rome Abstract or

any other documentation showing equal absorption to the PTO.

**B.**  **Inventor Dahl Submitted a False July 1990 Declaration Reporting Only Selected Data from the Comparison Study, and Representing that the Study Demonstrated K85 Had Superior Bioavailability and Efficacy Compared to TG 30, While Omitting All Contradictory Data Claim**

Following a March 22, 1990 Office Action rejecting all claims then-pending during

prosecution (DTX-7), Dahl submitted the July 1990 Declaration to the Patent Office on July 23,

1990, relying on a portion of the data from the Comparison Study.  [DTX-9]  The Dahl

Declaration was submitted to provide a "showing of unexpected superior results achieved in

accordance with the present invention as compared to the prior art."  [DTX-8 at PRV00408242

(July 23, 1990 Amendment)]  The Dahl Declaration began with the false representation that "[a]

study in healthy volunteers . . . was designed as follows: Two groups (each of eight persons)

were given either K85 or TG30 twice daily for two weeks."  [DTX-9 at PRV000408246]  Dahl

further falsely declared that: "The design of the study is described in Table I."  Table I described

only two groups of the five-group Comparison Study: (1) the group that received K85

corresponding to 4.4 daily grams of EPA, and (2) the group that received TG30 corresponding to

4.4 daily grams of EPA.  [DTX-9]

These representations in the July 1990 Declaration were false for the inescapable reason

that the Comparison Study consisted of five groups, not two.  The July 1990 Declaration entirely

excluded the groups that received K85 corresponding to 2.2 daily grams of EPA (Group 1), and

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

K85 corresponding to 7.7 daily grams of EPA (Group 3) and TG30 corresponding to 2.2 grams of EPA (Group 4). *Compare* DTX-9 to DTX-141 (Table 4). The declaration also excluded all of the absorption data for total lipids, reporting only the phospholipid data for Groups 2 and 5. [D.I. 203 at 581:24-582:13, 589:18-590:22] Dahl's misrepresentations were the lynchpin to Dahl's scheme to mislead the PTO, because the excluded data demonstrated that K85 and TG30 have equivalent absorption, as Dahl admitted at trial: "absorption was the same when you took into account all of the data for EPA." [D.I. 202 at 449:25-452:4; D.I. 203 at 585:12-17; DTX-212]

### C. Inventors Dahl and Krokan, Along with Co-Authors, Prepared a Draft 1993 Publication Reporting the Complete Bioavailability and Triglyceride-Lowering Efficacy Data from the 1988 Comparison Study

Dahl subsequently participated in a scheme to suppress the publication of a journal article that threatened to expose his July 1990 Declaration as a fraud. In 1993—before the patents in suit had issued—Dahl, Dr. Krokan and two others wrote an article that truthfully disclosed that the Comparison Study demonstrated that EPA and DHA were equally bioavailable from K85 and TG30 and that K85 did not have superior efficacy to TG30 for lowering triglyceride levels. They submitted it for publication in a peer-reviewed journal. [*See* DTX-143; D.I. 202 at 460:22-461:2] At the time, Dahl worked as a consultant for Pronova. [D.I. 202 at 463:8-10]

As the article neared publication, Dahl and Pronova recognized that its publication could "harm" the pending patent application. As he recounted in a 2007 letter to Pronova demanding more money for his efforts in obtaining the patents in suit, Dahl attempted in 1993 to suppress the publication of the article for fear that it would "harm the Omacor patent" and when that failed, he withdrew as an author at the request of Pronova:

> In 1993 I (along with three other authors) wrote a manuscript for publication based on work done at the Research Center. The manuscript was accepted for publication in *Biochemica et*

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

> *Biophysica Acta*. Before publication, the manuscript was presented
> to [Pronova], and for fear that **the publication might harm the
> Omacor patent** I was strongly requested to withdraw as author**. I
> then withdrew as author, but was not able to prevent the other
> three from publishing the work.**

[DTX-1577 at PRV01832203 (emphasis added); DTX-215]  Dahl discussed his reasons for

withdrawing with Dr. Krokan.  [D.I. 202 at 463:1-19]  After talking to Dahl, Dr. Krokan told the

publisher that Dahl's withdrawal was due to a "conflict of interest" regarding his consulting

work and had "nothing to do with the scientific soundness of the paper."  DTX-216.

Despite Dahl's attempts to suppress publication, the article was published in *Biochemica

et Biophysica Acta* in 1993 with Dr. Krokan and two others as authors.  It concluded that the

amounts of EPA and DHA "in total serum lipids and in serum phospholipids were **essentially

identical**" for K85 and TG30 in the Comparison Study.  [DTX-217 at PRV00917658]  It also

reported the comparative efficacy data for the triglyceride-lowering effect of K85 and TG30.

### D.     The Legal Standard for Inequitable Conduct

"To successfully prove inequitable conduct, the accused infringer must provide evidence

that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose

material information, or submitted false material information, and (2) did so with intent to

deceive the PTO."  *Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 732 (Fed. Cir.

2010) (citing *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir.

2008)), *reh'g en banc denied*, 637 F.2d 1293 (Fed. Cir. 2011).   At least a threshold level of each

element—materiality and intent—must be proven by clear and convincing evidence.  *Star

Scientific*, 537 F.3d at 1365.  Once the party challenging the patent has met its evidentiary

burden with respect to each element, the Court must balance the equities to determine whether

the applicants' misconduct before the PTO warrants holding the patents unenforceable.  *Id.*

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

In *Therasense*, the Federal Circuit held that materiality can be established in one of two

manners. *Therasense, Inc. v. Becton Dickinson & Co.*, 2011 WL 2028255 (Fed. Cir. May 25,

2011)  Claims of inequitable conduct based on "mere nondisclosure of prior art reference to the

PTO [or] failure to mention prior art references in an affidavit . . . require proof of but-for

materiality." *Id.* at *12.  The "but-for materiality" standard requires the court to determine by a

preponderance of the evidence "whether the PTO would have allowed the claim if it had been

aware of the undisclosed reference." *Id.* at *11  Second, *Therasense* announced a *per se* rule that

"[w]hen the patentee has engaged in affirmative acts of egregious misconduct, such as the filing

of an unmistakably false affidavit, the misconduct is material." *Id.* at *12.

To establish intent to deceive the PTO, "the specific intent to deceive must be 'the single

most reasonable inference able to be drawn from the evidence.'" *Id.* at *10 (quoting *Star*

*Scientific*¸ 537 F.3d at 1366).  The inference of deceptive intent need not be proven by direct

evidence.  "Because direct evidence of deceptive intent is rare, a district court may infer intent

from indirect and circumstantial evidence." *Id.*  "[W]hen there are multiple reasonable

inferences that may be drawn, intent to deceive cannot be found." *Id.*

*Therasense* left undisturbed the Federal Circuit's well-established rule that fraudulent

intent can be inferred "where material false statements are proffered in a declaration or other

sworn statement submitted to the PTO." *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 480 F.3d 1129,

1138 (Fed. Cir. 2007).  The inference of deceptive intent "arises not simply from the materiality

of the affidavits, but from the affirmative acts of submitting them, their misleading character, and

the inability of the examiner to investigate the facts." *Paragon Podiatry Lab. Inc. v. KLM Labs.*

*Inc.*, 984 F.2d 1182, 1191 (Fed. Cir. 1993).  *See Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d

1576, 1583 (Fed. Cir. 1996) ("The affirmative act of submitting an affidavit must be construed as

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

being intended to be relied upon."); *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983) (the submission of affidavits "usually will support the conclusion that the affidavit in which [the material false statements] were contained was the ***chosen instrument of an intentional scheme to deceive the PTO***.") (emphasis added).

> **E.    The '077 and '667 Patents Are Unenforceable Due to Inequitable Conduct By Inventor Dahl and Norsk Hydro**

The *en banc* Federal Circuit *Therasense* decision makes it clear that the '077 and '667 patents must be held unenforceable.  Dahl and Pronova engaged in a pattern of fraudulent conduct before the PTO that included submitting an unmistakably false declaration, concealing material information contradicting the July 1990 Declaration, and subsequently attempting to suppress the contradictory information.

> 1.    Materiality Under the "Egregious Acts of Affirmative Misconduct" Test

Materiality of the July 1990 Declaration is established by the fact it is an "unmistakably false affidavit" that was part of a "deliberately planned and carefully executed scheme to defraud the PTO." *Therasense*, 2011 WL 2028255, at *12.  Dahl launched a scheme to defraud the PTO into believing that he had conducted a clinical study that demonstrated "unexpected superior results" for K85 over the prior art, when, in fact, the Comparison Study demonstrated the precise opposite.  [D.I. 203 at 580:19-581:5]  Since Dahl knew that the full data set established that there was no difference in efficacy between K85 and TG30, he falsely represented to the PTO that there were only two groups, and then materially misrepresented the results of the study.  [DTX-9 at PRV00408249, PRV00408256]  *Therasense* held that this type of affirmative misconduct is always material.  *Therasense*, 2011 WL 2028255, at *12.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

2.      Defendants Have Established "But For Materiality"

Defendants have also established that "but for" Dahl's inequitable conduct the PTO

would not have allowed the claims of the patents in suit. *See id.* at *11. The "but for" test is

satisfied by showing that if the PTO had been aware of the undisclosed references, it would not

have allowed the claims to issue. *Id.* Here, but for Dahl's inequitable conduct, the Examiner

would have known that the Comparison Study revealed that the claimed invention, K85, was no

more effective than the prior art, TG30, in raising EPA and DHA levels and lowering

triglyceride levels. [DTX-95 (EPA and DHA levels); DTX-137A (EPA and DHA levels); DTX-

141 (EPA and DHA levels); DTX-217; DTX-143 (EPA, DHA and triglyceride levels); DTX-212

(EPA and DHA levels)] Throughout prosecution, the Examiner required a demonstration of the

superiority of K85 against the prior art in raising EPA and DHA levels and lowering triglyceride

levels in test subjects as a condition for patentability. [PTX-9 at PRV00408513-522 (declaration

comparing bioavailability of K85 and prior art compositions based on literature searches); PTX-9

at PRV00408443-54, PRV00408909-19, PRV00408968-92 (declarations comparing

hypotriglyceridemic effects against prior art)] Had the Examiner known that K85 performed no

better than prior art TG30 in raising EPA and DHA levels and lowering triglyceride levels in test

subjects, the PTO never would have allowed the claims.

**F.      Dahl's and Pronova's Actions Overwhelmingly Show Intent to Deceive the Patent Office**

The only reasonable inference from the evidence is that the July 1990 Declaration was

Dahl's "chosen instrument of an intentional scheme to deceive the PTO." *Rohm & Haas*, 722

F.2d at 1571.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

1.     Dahl Knew the July 1990 Declaration Was False

Dahl knew that the Comparison Study consisted of five groups, but nonetheless swore in the July 1990 Declaration that the study consisted of two groups.  [DTX-9 at PRV00408249; D.I. 202 at 458:4-22]  By falsely declaring that there were only two groups in his study—and failing to disclose to the PTO that there were five groups in the study—Dahl purposefully manufactured the "inability of the examiner to investigate the facts."  *Paragon*, 984 F.2d at 1191.  Dahl's self-evident scheme was to provide the PTO only the false July 1990 Declaration, and deprive the PTO of the ability to investigate its veracity.  As an author of the Rome Abstract (DTX-137A), the September 1988 Report (DTX-141, DTX-212) and the Dahl Abstract (DTX-95, DTX-101), Dahl knew that they disclosed that EPA and DHA were absorbed with "equal efficacy" from K85 and TG30, but he never provided any of those documents to the PTO.  [DTX-141 at PRV01148261; *see also* DTX-217; DTX-137A; DTX-95; DTX-101]  There is no dispute that Dahl cherry-picked part of the data from "two groups" out of the five and reported those results to the PTO as if they were the entire study.  [D.I. 202 at 458:8-22]  Dahl knew that the representation of enhanced bioavailability of EPA and DHA from K85 in his July 1990 Declaration was directly contradicted by the data that he failed to provide to the PTO that "absorption was the same when you took into account all of the data for EPA."  [D.I. 202 at 451:13-23]  These admissions that Dahl knew that his declaration included false statements, alone, are sufficient to establish Dahl's scienter.  *See eSpeed*, 480 F.3d at 1138 (affirming finding of scienter based upon "deceptive, and in one case, an outright false statement in the declarations").

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

2.    <u>There Is No Plausible Scientific Explanation For Dahl's Misconduct</u>

There can be no plausible innocent explanation for why Dahl concealed the data and

conclusions that contradicted the representations in his July 1990 Declaration.  Dr. Sacks, an

expert qualified in the design and analysis of clinical study data, testified that the hidden data

were material because "the totality of the data" from the September 1988 report demonstrated

"that the absorption or bioavailability or the achieved level of EPA and DHA in total lipids or

phospholipids is the same for TG30 or K85."  [D.I. 203 at 585:12-17]  He testified there was no

plausible scientific basis to omit the total lipid data and submit only the phospholipid data

because (1) absorption is best determined by analysis of the total lipid fraction, not merely the

phospholipid levels and (2) there is no scientific evidence that the phospholipid fraction "would

somehow be more related to" or have "some better biological connection" to the patent claims.

[D.I. 203 at 589:18-21, 590:4-22]  Dr. Sacks also testified that there was no plausible scientific

basis to withhold the lower dose data.  [D.I. 203 at 590:23-591:6]  Dr. Sacks' testimony was

unrebutted.

3.    <u>Dahl's Trial Testimony Confirms His Intent to Deceive</u>

Dahl's intent to deceive the PTO was confirmed by his testimony about the Comparison

Study at trial.  Before trial, Pronova and Dahl were precluded by Court Order from offering an

explanation for Dahl's withholding of the data and his withdrawal as an author of the 1993

Krokan Article, because Pronova had broadly asserted privilege at Dahl's deposition, precluding

him from offering any explanation for these acts.  [Pretrial Hr'g Tr. 67:7-8, Mar. 15, 2011; D.I.

202 at 449:6-11; 463:11-16]  But Pronova and Dahl attempted on direct examination to offer an

explanation anyway.  Dahl testified that at the time his declaration was prepared, he did not have

efficacy data for TG30.  [D.I. 202 at 315:3-8, 391:19-23]  Notwithstanding the Court's Order,

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

Dahl strongly implied that he chose the data for his declaration (i) because he lacked

comparative efficacy data between TG30 and K85 and (ii) he therefore wanted to show superior

efficacy for K85 indirectly by reference to clinical data obtained in another study, which he

called the phase II study.  [D.I. 202 at 315:3-13; DTX-213; D.I. 202 at 316:1-318:11]  Pronova

further attempted to show Dahl's innocence by pointing to a January 1990 Report that Dahl

prepared containing the same selective data later reported in his July 1990 Declaration.  [DTX-

213; D.I. 202 at 316:1-318:11]  Because the January 1990 report was dated a few months before

the PTO rejection (DTX-8), Pronova tried to suggest that Dahl could not have selected the data

with intent to deceive the PTO.  [*See* D.I. 203 at 635:20-638:8]  Despite the Court's Order, Dahl

tried to imply an innocent reason for withdrawing his name as an author of the 1993 Krokan

Article, testifying "at this time I knew more and I did not agree with this publication as written."

[D.I. 202 at 461:14-21]  But Dahl's trial testimony on these points directly conflicts with the

record evidence.

> a.  Dahl's Trial Testimony that He Lacked Efficacy Data for K85 and TG30 Conflicts with the Evidence

Dahl's testimony on direct examination that he did not have comparative efficacy data for

K85 and TG30 when he prepared his declaration conflicts with the evidence.  Dahl knew that

triglyceride-lowering efficacy data had been collected in the Comparison Study.  [D.I. 202 at

348:3-9]  Dahl's Protocol for the Comparison Study shows that Dahl's principal purpose for the

study was to collect comparative efficacy data on lipid lowering, including lowering of

triglycerides.  [DTX-1026 at 95102-03]  And the resulting efficacy data are clearly reported in

the study reports, DTX-1574 and DTX-1026.  Dahl conceded that he wrote in DTX-1026 that

TG30 had a "marked hypotriglyceridemic effect," which meant that it lowered triglycerides.

[D.I. 202 at 428:20-429:2]  He further admitted that he obtained the triglyceride-lowering data

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

from the study participants, and that these data were intended to be used in connection with the similar data from the Hazelton K85 wing of the study.  [D.I. 202 at 429:15-430:14]  Dahl even appeared to agree that the point of the Comparison Study was to compare the results on serum lipid-lowering effect of the two compounds tested, K85 and TG30.  [D.I. 202 at 430:6-14]  But when confronted with the statements in the study Protocol that he drafted, showing that he in fact had comparative efficacy data for triglyceride lowering for K85 and TG30, Dahl incredibly testified that his own study protocol was wrong about the aim of the study, and that the efficacy data were meaningless.  [D.I. 202 at 429:15-431:17 ("No. This [document – the study protocol] is not correct.  I can say this is written in this report.")]

Faced with the fact that his direct testimony was contradicted by his own report, which he had just testified did not exist, Dahl cobbled together three excuses why the Comparison Study efficacy data—which he had just testified did not exist—were unreliable.  First, Dahl testified that the studies were done on "non-fasting persons."  [D.I. 202 at 430:22-431:1]  This is simply false, as is apparent from both study reports (DTX-1026 at PRV 950083:  "**Fasting** blood samples were collected predose, at day 8 and at day 15" and DTX-1574 at PRV 10879:  "On the evening before days 1, 8, 14, 15, and 28, **subjects fasted overnight**."  The 1993 Krokan Article and the draft that Dahl participated in writing reported the triglyceride lowering data from the Comparison Study, clearly stating that the study was done in the fasting state.  [DTX-217, DTX-143 at PRV 861551 ("Fasting blood samples were drawn prior to start of the study and in the morning of day 8 and day 15 . . .")]

The Comparison Study was a central focus of Dahl's direct testimony, during which he had no difficulty exhibiting full command of other portions of the same three documents when it suited his and Pronova's interests.  [D.I. 202 at 295:19-297:15, 303:18-305:18]

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

Dahl's next trial-induced excuse why the comparative triglyceride-lowering efficacy data were supposedly unreliable was that they were obtained from healthy volunteers: "we would never argue efficacy based on these measurements in healthy volunteers."  [D.I. 202 at 431:4-5] But the very studies that Pronova ultimately relied on to obtain the '077 patent—claiming a method of reducing triglycerides—was a study purporting to show superior triglyceride reduction by K85 in healthy volunteers.  [DTX-9 at PRV 000408443-55, 408909-19, 408968-92]

Dahl's final excuse was that the triglyceride-lowering effect of fish oil was so well known that the strong triglyceride-lowering effect of TG30 was not important: "There were . . . at least 20 different studies with serum triglycerides and looking at the lowering effect, in particular serum triglycerides.  So this was not an important finding."  But by that point in his testimony Dahl had apparently forgotten that the lack of these precise data—efficacy data for TG30—was a central point of his testimony on direct examination. [*Cf.* D.I. 202 at 315:3-8 ("Q: Now in January of 1990, were you aware whether or not Pronova had conducted any efficacy studies using TG30?... **No.  I was not involved in such studies, and I am not aware of such studies**.") *with* DTX-1026 at 95103 ("The aim of the present study was to assess the efficacy of TG30…")]

b.      The Dahl January 1990 Report Does Not Show Good Faith

Dahl's attempted reliance on his January 1990 Report to show lack of intent did not withstand cross examination.  [D.I. 202 at 316:1-318:11; DTX-213]  When asked to confirm that the document "was not prepared in the ordinary course of [his] scientific research, but rather was prepared at the request of Norsk Hydro's patent attorney for patent prosecution purposes," he denied it.  [D.I. 202 at 456:9-14; 457:5-21]  But after being confronted with his prior contrary

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

deposition testimony, Dahl agreed that the Report was prepared for patent prosecution purposes. [D.I. 202 at 457:5-18]

At his deposition, Pronova instructed Dahl not to answer questions about why he prepared the January report and not to answer questions about why he did not include certain data in the report.  [D.I. 202 at 457:5-25]  Dahl also acknowledged as recently as 2007 that the January 1990 report was part of the work that he performed for Norsk Hydro "in connection" with assisting the Norsk Hydro patent department to obtain the issuance of patents.  [DTX-1577 at PRV01832202-03 (July 24, 2007 letter to Pronova from Dahl regarding inventor compensation)]

Finally, Dahl's 2007 letter to Pronova contains direct evidence of deceptive intent.  Dahl testified that he removed his name from the 1993 Krokan publication because "at this time I knew more and I did not agree with this publication as written."  Yet in his 2007 letter, Dahl candidly stated to Pronova that he withdrew as an author "for fear that it would harm the Omacor patent."  [*See* DTX-1577 at PRV01832203]  This unequivocally shows that Dahl and Pronova knew the materiality of the complete data in the 1993 publication, and intentionally concealed it from the PTO.

Given the undisputed evidence on materiality and intent, this Court should exercise its discretion to hold the patents in suit unenforceable for inequitable conduct.

## VII.   CONCLUSION

For the foregoing reasons, Defendants ask this Court to enter an order that the asserted claims of the '077 and '667 patents are (1) invalid for obviousness, anticipation by prior public use, and depending on the court's claim construction of the term "fatty acids," failure to satisfy the requirements of § 112; and (2) unenforceable for inequitable conduct before the PTO.

*FILED UNDER SEAL – Contains Confidential Information Subject to Protective Order*

DATED:  June 30, 2011 **[SECOND CORRECTED VERSION October 17, 2011]**

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*
_____
John W. Shaw (#3362)
Karen L. Pascale(#2903)
Pilar G. Kraman (#5199)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
kpascale@ycst.com

Frederick H. Rein
Annemarie Hassett
Gregory T. Sandidge
David E. Lansky
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 813-8800

J. Anthony Downs
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts  02109
Telephone: (617) 570-1000

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

RICHARDS LAYTON & FINGER, P.A.

*/s/ Steven J. Fineman*
_____
Frederick L. Cottrell, III (#2555)
Steven J. Fineman (#4025)
Stephen M. Ferguson (#5167)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone: (302) 651-7700
fineman@rlf.com

Daniel G. Brown
Mitchell E. Epner
Jennifer R. Saionz
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Telephone: (212) 999-5800

*Attorneys for Defendants*
*Par Pharmaceutical, Inc. and*
*Par Pharmaceutical Companies, Inc.*