# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRONOVA BIOPHARMA NORGE AS, | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) ) | |
| Defendant. | ) ) | |
| PRONOVA BIOPHARMA NORGE AS, | ) | Civil Action No. 09-286-SLR-MPT |
| Plaintiff, | ) ) | (Consolidated) |
| v. | ) ) | |
| PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL COMPANIES, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

## PRONOVA'S POST-TRIAL ANSWERING BRIEF
## REGARDING VALIDITY AND ENFORCEABILITY

*Of Counsel:*
James B. Monroe
Michael J. Flibbert
Jennifer H. Roscetti
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Pronova BioPharma Norge AS*

Dated: August 30, 2011

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     NATURE AND STAGE OF THE PROCEEDINGS .........................................1

III.    SUMMARY OF THE ARGUMENT ...................................................................1

IV.     COUNTERSTATEMENT OF FACTS ...............................................................3

        A.    The Specific Concentrated Fish Oil Compositions of the Asserted Claims ...........3

        B.    Variability of Processed Fish Oils ................................................................4

        C.    The Prior Art's Failure to Suggest the Claimed Compositions ...............................6

              1.    Sanders ................................................................................................6

              2.    Simons..................................................................................................7

              3.    Phillipson ............................................................................................7

              4.    Harris...................................................................................................7

              5.    Dictionnaire Vidal...............................................................................8

              6.    Rote List..............................................................................................9

              7.    Haagsma...............................................................................................9

              8.    Bronsgeest-Schoute...........................................................................9

              9.    1987 NIH Notice ...............................................................................10

              10.   Joseph Handout.................................................................................10

              11.   1988 NIH Notice ...............................................................................11

              12.   Krzynowek.........................................................................................11

              13.   Nilsson ..............................................................................................12

              14.   Breivik PCT ......................................................................................12

              15.   De Bernardi.......................................................................................13

              16.   Summary of Claim Elements Missing from the Prior Art .........................14

        D.    Norsk Hydro's Interactions with Dr. Skrinska and Other U.S. Contacts .............16

    1.  Dr. Skrinska's Deposition Testimony.........................................19

    2.  The Absence of Any Corroboration That Dr. Skrinska Conducted a Clinical Study.....................................................................20

  E. Studies Leading to the Bønaa/Dahl Declaration ...................................21

    1.  Dr. Dahl's Safety and Tolerability Study for K85 ....................21

    2.  Dr. Dahl's Absorption Study for TG30 .....................................21

    3.  Dr. Dahl's Absorption Comparison Study for K85/TG30.........22

    4.  Dr. Bønaa's Blood Pressure Efficacy Study for K85 ................23

    5.  Dr. Dahl's Statistical Study for K85/TG30................................24

  F. Prosecution History of the '077 Patent .................................................25

V. ARGUMENT ...................................................................................................27

  A. Defendants Have Failed to Prove Obviousness ....................................27

    1.  Legal Standards.........................................................................27

    2.  Defendants Fail to Address the Claimed Inventions as a Whole..............28

    3.  No Prior Art Suggests the Desirability of the Specific Mixtures of Fatty Acids Required by the Asserted Claims ...........................29

    4.  Defendants' "Implicit Disclosure" Argument Is Unsupported.................30

    5.  Defendants' NMFS Arguments Lack Merit ..............................33

      a)  Defendants Misapply the "Reasonable Expectation of Success" Standard ..........................................................34

      b)  A Person of Ordinary Skill Would Not Have Further Concentrated the NMFS Test Materials .......................34

      c)  A Person of Ordinary Skill Would Not Have Achieved The Claimed Compositions by Concentrating the NMFS Test Materials ...........................................................36

    6.  The "Overlapping Range" Cases Are Inapposite.......................37

    7.  Secondary Considerations Support a Conclusion of Nonobviousness ........................................................................38

|  |  | a) | Commercial Success .................................................................38 |
|  |  | b) | Long-Felt but Unmet Need ........................................................41 |
|  |  | c) | Copying ......................................................................................42 |

B. Defendants Have Failed to Prove Public Use ........................................................42

   1. Legal Standards........................................................................................42

   2. Dr. Skrinska Did Not Publicly Use the Claimed Inventions ...................43

      a) Contemporaneous Documents Show That Dr. Skrinska Received Only Small Liquid Samples of K80 and There Is No Evidence That He Publicly Used Them..................................43

      b) Dr. Skrinska's Deposition Testimony Concerning an Alleged Clinical Trial Is Uncorroborated ......................................44

      c) Dr. Skrinska's Testimony Is Unreliable........................................45

C. Defendants Have Failed to Prove Improper Dependency or Indefiniteness..........47

   1. Defendants' Improper Dependency Argument Is Based on an Incorrect Proposed Claim Construction....................................................47

   2. Defendants' Indefiniteness Argument Is Factually and Legally Unsupported...............................................................................................48

D. Defendants Have Failed to Prove Inequitable Conduct........................................49

   1. Legal Standards........................................................................................49

   2. Dr. Dahl Did Not Mischaracterize the Design of His January 1990 Statistical Study Included in the Bønaa/Dahl Declaration........................49

   3. Dr. Dahl Did Not Omit Any Relevant Information from His January 1990 Statistical Study Included in the Bønaa/Dahl Declaration ..............................................................................................50

      a) Defendants Ignore Dr. Bønaa's Portion of the Declaration...........51

      b) Total Lipid Absorption Data Were Not Relevant to Dr. Bønaa's Reliance on Phospholipid Absorption Data....................51

      c) Additional DHA Phospholipid Data Would Have Further Supported a Conclusion of Increased Bioavailability for K85........................................................................................................52

           d)      K85 Group 3 Had No Corresponding TG30 Group ..................... 53

           e)      Dr. Dahl's Analysis of the Highest Comparable Dosage
                  Groups Was Consistent with Dr. Bønaa's Blood Pressure
                  Results ........................................................................................... 53

           f)      Triglyceride Lowering Data Were Not Relevant to the
                  Results of Dr. Bønaa's Blood Pressure Study ............................... 53

      4.     There Is No Evidence of Deceptive Intent ................................................ 54

           a)      Dr. Dahl Had Not Carried Out His January 1990 Statistical
                  Study at the Time of His Earlier Abstracts and Reports ............... 54

           b)      Dr. Dahl Conducted His January 1990 Statistical Study
                  Two Months Before Any Office Action Issued ............................. 56

           c)      Dr. Dahl's Withdrawal from the Krokan Paper Shows a
                  Good-Faith Belief in His January 1990 Statistical Study ............. 57

           d)      Defendants Inaccurately Characterize Dr. Dahl's
                  Testimony ..................................................................................... 59

VI.    CONCLUSION ............................................................................................................ 60

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Am. Seating Co. v. USSC Group, Inc.*,
   514 F.3d 1262 (Fed. Cir. 2008)........................................................................42

*Cancer Research Tech. Ltd. v. Barr Labs., Inc.*,
   625 F.3d 724 (Fed. Cir. 2010)..........................................................................52

*Continental Can Co. USA, Inc. v. Monsanto Co.*,
   948 F.2d 1264 (Fed. Cir. 1991).........................................................................31

*CPC Int'l Inc. v. Archer Daniels Midland Co.*,
   831 F. Supp. 1091 (D. Del. 1993).....................................................................47

*Dana Corp. v. Am. Axle & Mfg., Inc.*,
   279 F.3d 1372 (Fed. Cir. 2002).........................................................................27

*Dayco Prods., Inc. v. Total Containment, Inc.*,
   329 F.3d 1358 (Fed. Cir. 2003).........................................................................32

*Deering v. Winona Harvester Works*,
   155 U.S. 286 (1984)....................................................................................43, 46

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
   851 F.2d 1387 (Fed. Cir. 1988).........................................................................38

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*,
   533 F.3d 1353 (Fed. Cir. 2008).........................................................................27

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*,
   471 F.3d 1369 (Fed. Cir. 2006).........................................................................47

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
   575 F.3d 1312 (Fed. Cir. 2009).........................................................................59

*Finnigan Corp. v. U.S. Int'l Trade Comm'n*,
   180 F.3d 1354 (Fed. Cir. 1999)....................................................................42, 43

*In re Geisler*,
   116 F.3d 1465 (Fed. Cir. 1997).........................................................................38

*In re Gordon*,
   733 F.2d 900 (Fed. Cir. 1984)...........................................................................36

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)..............................................................................27, 41, 42

*Haynes Int'l, Inc. v. Jessop Steel Co.*,
  8 F.3d 1573 (Fed. Cir. 1993)...................................................................38

*In re Hedges*,
  783 F.2d 1038 (Fed. Cir. 1986)...............................................................30

*Iron Grip Barbell, Co. v. USA Sports, Inc.*,
  392 F.3d 1317 (Fed. Cir. 2004)...............................................................38

*Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*,
  456 F. Supp. 2d 644 (D.N.J. 2006), *aff'd*, 233 Fed. Appx. 999 (Fed. Cir. 2007)...................42

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
  292 F.3d 728 (Fed. Cir. 2002)..................................................................42

*In re Klopfenstein*,
  380 F.3d 1345 (Fed. Cir. 2004)...............................................................33

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)........................................................................27, 28, 37

*Lacks Indus. v. McKechnie Vehicle Components USA, Inc.*,
  322 F.3d 1335 (Fed. Cir. 2003)...............................................................45

*Microsoft Corp. v. i4i Ltd. P'ship*,
  131 S.Ct. 2238 (2011).............................................................................27

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
  303 F.3d 1294 (Fed. Cir. 2002)...................................................... 43, 44, 46

*Motorola, Inc. v. Interdigital Tech. Corp.*,
  121 F.3d 1461 (Fed. Cir. 1997)...............................................................33

*Oakwood Labs., L.L.C. v. Tap Pharm. Prods., Inc.*
  2003 WL 22400759 (N.D. Ill. Oct. 21, 2003)................................. 55-56

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006).......................................................... 37-38

*Ortho Pharm. Corp. v. Smith*,
  959 F.2d 936 (Fed. Cir. 1992)..................................................................29

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
  520 F.3d 1358 (Fed. Cir. 2008)...........................................................28, 37

*In re Peterson*,
   315 F.3d 1325 (Fed. Cir. 2003)...................................................................38

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007)...................................................................34

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009)....................................................................34

*Ricoh Co. v. Quanta Computer Inc.*,
   550 F.3d 1325 (Fed. Cir. 2008)...................................................................37

*Sanofi-Synthelabo v. Apotex, Inc.*,
   550 F.3d 1075 (Fed. Cir. 2008).............................................................27, 30

*Takeda Chem. Indus., Ltd. v. Alphapharm PTY., Ltd.*,
   492 F.3d 1350 (Fed. Cir. 2007).............................................................27, 30

*The Barbed Wire Patent*,
   143 U.S. 275 (1892)...............................................................................43, 45

*Therasense, Inc. v. Becton, Dickinson & Co.*,
   2011 WL 2028255 (Fed. Cir. May 25, 2011) .......................................49, 59

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
   587 F.3d 1339 (Fed. Cir. 2009)...................................................................48

*Unigene Labs., Inc. v. Apotex, Inc.*,
   No. 2010-1006, slip op. (Fed. Cir. Aug. 25, 2011) ..............................27, 30

*Upjohn Co. v. Mova Pharm. Corp.*,
   225 F.3d 1306 (Fed. Cir. 2000)............................................................. 32-33

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
   721 F.2d 1540 (Fed. Cir. 1983)...................................................................29

*Wellman, Inc. v. Eastman Chem. Co.*,
   642 F.3d 1355 (Fed. Cir. 2011)...................................................................48

*Woodland Trust v. Flowertree Nursery, Inc.*,
   148 F.3d 1368 (Fed. Cir. 1998).............................................................43, 44

## FEDERAL STATUTES

35 U.S.C. § 102(a) ..........................................................................................7

35 U.S.C. § 102(b) ...............................................................................7, 33, 42

35 U.S.C. § 103................................................................................................................28

35 U.S.C. § 282.........................................................................................................27, 29

## I.     INTRODUCTION

Pronova has asserted infringement of claim 20 as it depends from claim 18 ("claim 20/18"), claim 44 as it depends from claim 31 ("claim 44/31"), and claim 50 of U.S. Patent No. 5,656,667 ("the '667 patent"); and claim 9 as it depends from claim 6 ("claim 9/6") and claim 9 as it depends from claim 7 ("claim 9/7") of U.S. Patent No. 5,502,077 ("the '077 patent"). Those claims are directed to unique mixed-fatty-acid compositions and methods for treating hypertriglyceridemia using those compositions. Claim 20/18, for example, requires *specific* concentrations and ratios of five omega-3 and omega-6 fatty acids: eicosapentaenoic acid ("EPA"), docosahexaenoic acid ("DHA"), heneicosapentaenoic acid ("HPA"), docosapentaenoic acid ("DPA"), and arachidonic acid ("AA"). The claimed compositions are embodied by Pronova's successful Lovaza® product, which is the first and only FDA-approved fish oil-derived prescription drug.

Defendants have asserted defenses of obviousness, public use, improper dependency, indefiniteness, and inequitable conduct. As explained below, none of those defenses has any merit. The Court should therefore hold that the asserted claims are valid and enforceable.

## II.     NATURE AND STAGE OF THE PROCEEDINGS

*See* Pronova's opening post-trial brief. [D.I. 208 at 2]

## III.     SUMMARY OF THE ARGUMENT

Defendants' invalidity and unenforceability contentions are meritless:

1.     <u>Obviousness</u>: Defendants gloss over significant claim limitations, seeking to downplay the deficiencies of the prior art. The charts provided below illustrate that the prior art fails to disclose or suggest the specifically *claimed* compositions. For example, the prior art fails to suggest, among other limitations, the combination of EPA, DHA, HPA, DPA, and AA required by claim 20/18 or the presence of 4.5% C20, C21, and C22 omega-3 fatty acids other

1

than EPA and DHA required by claim 50. Defendants' theory that the prior art "implicitly disclosed" the missing claim elements is factually and legally unsupported. Defendants' alternative argument that one of ordinary skill would have concentrated National Marine Fisheries Service ("NMFS") test materials to arrive at the claimed compositions is also flawed. Defendants misapply the "reasonable expectation of success" standard; cite a series of inapposite "overlapping range" decisions; and ignore that the NMFS materials were *final* test materials intended to be directly administered to test subjects. Commercial success, long-felt but unmet need, and copying further support a conclusion of nonobviousness.

2.   <u>Public Use</u>:   Defendants cannot show that Dr. Victor Skrinska publicly used the claimed inventions. Contemporaneous documents confirm that Dr. Skrinska received only small liquid samples of K80, and there is no evidence that he ever publicly used them. His deposition testimony concerning an alleged clinical trial with "maybe 500 to 1,000 capsules" is uncorroborated by any evidence (documents or testimony). Dr. Skrinska's uncorroborated testimony is insufficient as a matter of law to establish an invalidating prior public use.

3.   <u>Improper Dependency</u>:   This argument is based on an incorrect proposed claim construction of the term "fatty acids." Defendants' own expert, Dr. Sacks, contradicted Defendants' position by agreeing that the term "fatty acid" is used rather generally in the art to refer to different forms of fatty acids, including ethyl ester and triglyceride forms.

4.   <u>Indefiniteness</u>:   Defendants erroneously argue that, if the Court adopts Pronova's proposed construction of the term "fatty acids," the range of possible chemical species suggested by Pronova's construction would be so broad as to render claim 20/18 indefinite. First, Defendants' proposed construction of "fatty acids" is incorrect. Second, Dr. Curtis's testimony, cited by Defendants, does not support their position; he never suggested that a skilled

practitioner would be unable to determine what compounds are "fatty acids." Third, the potentially broad scope of the term "fatty acids" does not render claim 20/18 indefinite.

5.   <u>Inequitable Conduct</u>:  Finally, Defendants assert that inventor Dr. Knut Dahl mischaracterized the design of a study that was included in a declaration filed with the PTO and allegedly omitted material information from that declaration.  Those charges are baseless.  Dr. Dahl *accurately* represented the number of groups (two) described in his January 1990 statistical study presented in the declaration.  In addition, Defendants' suggestion that the declaration was false or misleading ignores that it was a *joint* declaration of Dr. Dahl (who provided "Study I" relating to bioavailability) and coinventor Dr. Kaare Bønaa (who provided "Study II" relating to blood-pressure lowering effects).  Dr. Dahl relied on Dr. Bønaa's blood-pressure study in designing his Study I; thus, his portion of the declaration must be interpreted in light of Dr. Bønaa's related Study II.  Defendants, however, inexplicably fail to even mention Dr. Bønaa's study in their brief, and their expert Dr. Sacks admitted he did not even consider it.  Only by blinding themselves to *half* the declaration can Defendants seek to manufacture a misrepresentation where none exists.

## IV.   COUNTERSTATEMENT OF FACTS

### A.   The Specific Concentrated Fish Oil Compositions of the Asserted Claims

The asserted claims encompass distinct compositions of several omega-3 and omega-6 fatty acids.  [PTX-1; PTX-2]  Claim 20/18 of the '667 patent, for example, is directed to a pharmaceutical mixed-fatty-acid composition having at least 80% by weight EPA plus DHA; at least 1% by weight HPA; at least 1% by weight AA; at least 1% by weight DPA; at least 85% by weight long chain omega-3 fatty acids; 40-60% by weight EPA; 25-45% by weight DHA; and an EPA:DHA weight ratio of from 1:1 to 2:1.  [PTX-2]  Claim 44/31 of the '667 patent has many of the same elements, but additionally requires at least 3% C20, C21, and C22 omega-3 fatty acids

other than EPA and DHA.  [*Id.*]  Claim 50 of the '667 patent similarly has many of the same elements, but also requires at least 4.5% C20, C21, and C22 omega-3 fatty acids other than EPA and DHA.  [*Id.*] The composition required by method claims 9/6 and 9/7 of the '077 patent overlaps those required by claims 20, 44, and 50 of the '667 patent.  [PTX-1; PTX-2]

Pronova's Lovaza® product contains the specific combination of fatty acids required by the asserted claims.  [*See* D.I. 200 at 77:7-15; D.I. 201 at 127:7-128:3; PTX-338; PTX-164]  The Food and Drug Administration ("FDA") has required each Defendant to submit a comparison of its proposed generic product to Lovaza® and to specifically identify the concentrations of EPA, DHA, HPA, AA, and DPA in its proposed generic product.  [PTX-164 at PAR00007147; PTX-337; PTX-338]

## B.    Variability of Processed Fish Oils

The composition of processed or concentrated fish oils will vary in part based on the composition of the starting crude fish oil.  [D.I. 204 at 842:6-844:13, 848:10-12, 850:9-12, 853:7-855:15]  Crude fish oil possesses a complex fatty acid profile that can differ depending on the species of fish, the diet of the fish, as well as the fish's location and season of harvest.  [D.I 200 at 57:5-10; D.I. 204 at 853:10-21; PTX-587 at Tbls. 2, 3 & 4]  As Defendants' expert Dr. Ganem recognized, the fatty acid compositions of fish oils vary "like a vintage wine."  [D.I. 204 at 853:17-21]  Even Defendants' own FDA dossier recognized the inherent variability of starting fish oils.  [*See* PTX-195 at CRO00001492; PTX-219 at CRO00000149]  Because of this variability, not all fish oils contain every possible fatty acid [*see* D.I. 204 at 854:8-855:15; PTX-587 at Tbl. 4], and the concentration of any given fatty acid will vary [D.I. 204 at 865:6-866:2; PTX-587 at Tbl. 4; PTX-1257 at Tbl. 4].  Moreover, fatty acids themselves differ by chain length and number of double bonds.  [D.I. 200 at 56:20-57:4; D.I. 208 at 11]

The variability of crude fish oils was well established in the prior art. [PTX-587; PTX-1257] In one 1982 publication, for example, the fatty acid composition of certain commercially available menhaden oils was shown to vary significantly over five different geographic regions. [PTX-587 at Tbl. 4; D.I. 204 at 854:13-855:18] All five menhaden oils tested contained less than 1% HPA (one having no detectable HPA), with four of five also having less than 1% AA. [*Id.*] The same paper shows an anchovy oil having less than 1% HPA and less than 1% AA. [*Id.*] Similarly, a publication by the renowned researcher Dr. John Kinsella showed the variation of EPA and DHA content and EPA:DHA ratio among fish oils of different species and locations. [PTX-1257 at Tbl. 4; D.I. 204 at 865:6-866:13, 875:15-23] The sum of EPA and DHA ranged from about 17-54% depending on the fish. [PTX-1257 at Tbl. 4; D.I. 204 at 865:6-866:2] In addition, although there was no appreciation and thus no discussion of EPA:DHA ratios, one can calculate that the EPA:DHA ratio exceeded 2:1 in five instances and fell well below 1:2 in twelve other instances, and 23 out of 26 examples had EPA:DHA ratios outside a 1:1 to 2:1 range. [D.I. 204 at 865:6-866:2; PTX-1257 at Tbl. 4] The EPA:DHA ratio even reached a 3:1 level in one example. [D.I. 204 at 865:18-22; PTX-1257 at Tbl. 4]

Techniques used to separate and fractionate fatty acids of crude fish oil include molecular distillation, high performance liquid chromatography ("HPLC"), supercritical fluid extraction ("SFE"), and urea fractionation. [D.I. 204 at 847:15-853:6, 941:19-946:1] Those techniques can produce different fatty acid profiles depending on how they are combined and the specific processing conditions used. [D.I. 204 at 842:6-844:13] For example, HPLC and SFE, which separate fatty acids based on the number of carbon atoms, have been used to obtain compositions of highly pure EPA or pure DHA, separated from other fatty acids such as HPA. [DTX-699 at 74; D.I. 204 at 941:14-23; DTX-1448 at 109, 115-116] Altering the vacuum and temperature of

molecular distillation and whether it is performed alone or before or after urea fractionation can affect the resulting composition.  [D.I. 204 at 849:13-850:12]  In HPLC, the stationary phase or packing material of the column, flow rate, and column size can affect the final composition. [D.I. 204 at 850:22-851:12]   The processing parameters for SFE, such as the solvent, temperature, pressure, flow rate, and rate of extraction, all affect the final composition.  [D.I. 204 at 852:4-853:6, 945:17-946:1]  Urea fractionation leads to a range of concentrated products depending on the starting material, temperature, urea-to-fatty acid ratio, and other factors.  [D.I. 204 at 847:15-848:16, 942:15-944:19]  It may also increase the concentration of DHA more than EPA when using lower temperatures and higher urea-to-fatty acid amounts [DTX-1460 at Tbls. III & IV], or remove DPA (C22:5 ω3) and lower AA (C20:4 ω6), depending on the conditions [D.I. 204 at 855:16-857:15, 950:18-952:10, 953:5-17; DTX-1460 at Tbl. II].

### C.   The Prior Art's Failure to Suggest the Claimed Compositions

The prior art references cited by Defendants are discussed below.

### 1.   Sanders

Sanders describes the use of MaxEPA, a non-FDA-approved fish oil product.  [DTX-1456 at 91 and 93, Tbl. 1; D.I. 203 at 607:25-608:7]  MaxEPA contained 34.27% EPA plus DHA, and a total of 37.93% long chain omega-3 fatty acids.  [DTX-1456 at 93, Tbl. 1]  Sanders does not disclose the presence of HPA or AA.  [DTX-1456 at 93, Tbl. 1]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA:DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Sanders | No | No | No | | No | | No | No |

### 2.    Simons

Simons describes the results of administering MaxEPA (30% EPA+DHA).  [D.I. 203 at 608:8-13; DTX-1458 at 75, 77]  It does not disclose the presence of HPA, AA, or DPA, or at least 85% long-chain omega-3 fatty acids.  [DTX-1458 at 77]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Simons | No | No | No | No | No | | No | No |

### 3.    Phillipson

Phillipson describes the results of administering salmon oil and MaxEPA.  [DTX-1449 at 1211]  Neither MaxEPA nor the salmon oil contained more than 30% EPA plus DHA.  [D.I. 203 at 603:10-16, 608:14-21]  Phillipson does not disclose the presence of HPA, AA, or DPA, or at least 85% long-chain omega-3 fatty acids in either oil.  [DTX-1449]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Phillipson | No | No | No | No | No | | No | No |

### 4.    Harris

Harris[1] reviews previously published studies that administered MaxEPA, fish oils, fish diets, or fatty acid ethyl esters.  [DTX-1436 at Tbl. 1]  Defendants' expert, Dr. Sacks, described

---

[1]    The 1989 publication date disqualifies Harris as prior art under § 102(b).  [DTX-1436; PTX-1; PTX-2]  The UK priority application for the '667 and '077 patents, which was filed August 11, 1988, provides written description support for the composition claims of the '667 patent, and therefore Harris also is not prior art under § 102(a).  [PTX-9 at PRV00408163,
(continued on next page)

Harris as "a very authoritative, important paper." [D.I. 203 at 557:6-7] Of the 45 studies cited, 42 used a test substance having no more than 30% EPA plus DHA. [D.I. 203 at 609:3-614:16; DTX-1436 at Tbl. 1] Of the three remaining studies, Defendants cite only Bronsgeest-Schoute (reference 22), addressed below. [DTX-1436 at Tbl. 1, FN.b; *see* D.I. 209 at 12-17; D.I. 203 at 613:14-614:7] Harris does not disclose that any of the cited compositions included HPA, AA, or DPA, or at least 85% long-chain omega-3 fatty acids. [DTX-1436]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Harris | No | No | No | No | No | | No | No |

### 5. Dictionnaire Vidal

Dictionnaire Vidal discloses MaxEPA, a fish oil containing 12% DHA and 18% EPA. [DTX-1431] It does not suggest that any other omega-3 fatty acids are present, nor does it suggest that MaxEPA contains HPA, AA, or DPA, or at least 85% long-chain omega-3 fatty acids. [DTX-1431]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Vidal | No | No | No | No | No | | No | No |

_____

(continued from previous page)
PRV00408172-174; *see* D.I. 203 at 622:8-623:19] In addition, contrary to Defendants' assertion, claim 9 of the '077 patent is entitled to the priority date of the UK application because the UK application discloses a method of lowering triglycerides with omega-3 fatty acids as well as the composition elements claimed in the '077 patent. [PTX-9 at PRV00408170, PRV00408163, PRV00408172-174]

### 6.   Rote List

Rote List describes a composition called Eicosapen®, another non-FDA-approved fish oil containing 18% EPA and 12% DHA.  [DTX-1453]  It does not disclose the presence of HPA, AA, or DPA, or at least 85% long-chain omega-3 fatty acids.  [DTX-1453]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Rote List | No | No | No | No | No | | No | No |

### 7.   Haagsma

Haagsma describes an omega-3 concentrate containing 27.6% EPA and 44.6% DHA.  [D.I. 203 at 617:8-11; D.I. 204 at 822:17-25; DTX-1434 at Tbl. 1]  It does not suggest the presence of HPA or AA.  [D.I. 204 at 821:1-822:16; DTX-1434 at Tbl. 1]  The EPA:DHA ratio is less than 1.  [D.I. 204 at 823:5-8; DTX-1434 at Tbl. 1]  The sum of C20, C21, and C22 omega-3 fatty acids besides EPA and DHA is also less than the 4.5% required by claim 50 of the '667 patent.  [D.I. 204 at 821:22-822:16; DTX-1434 at Tbl. 1]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Haagsma | No | No | No | | | No | No | |

### 8.   Bronsgeest-Schoute

Bronsgeest-Schoute describes the use of a fish oil concentrate having the same composition as that described in Haagsma.  [D.I. 204 at 823:9-824:7; DTX-1567; *supra* IV.C.7]

### 9.    1987 NIH Notice

In 1986, NMFS and the National Institutes of Health ("NIH") formed a joint venture to provide test materials of consistent quality to qualified researchers ("Fish Oil Test Materials Program").  [DTX-1447 at 1; DTX-1446 at 1; DTX-699]  The May 1987 NIH Notice suggests the future availability of "concentrates of omega-3 fatty acids from menhaden oil" comprising EPA and DHA.  [D.I. 204 at 825:10-15; DTX-1446 at 1-2]  It does not disclose the percentage of EPA or DHA, the presence of HPA, AA, or DPA, or at least 85% long-chain omega-3 fatty acids in the proposed products.  [D.I. 204 at 825:16-826:5; DTX-1446 at 2]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| 1987 NIH Notice | No | No | No | No | No | No | No | No |

### 10.    Joseph Handout

Dr. Jeanne Joseph of NMFS gave a presentation regarding the Fish Oil Test Materials Program.  [*See* PTX-547]  The Joseph Handout mentions a composition containing 48% EPA and 25% DHA.  [D.I. 204 at 824:8-22; PTX-547 at PAR00030521]  HPA is not identified on the included gas chromatograph.  [PTX-547 at PAR00030522]  Dr. Rizvi, who admittedly is not an expert in gas chromatography, could only speculate whether HPA was present based on that chromatograph.  [D.I. 204 at 911:17-21, 928:16-22]  The Joseph Handout discloses a composition containing 85% omega-3 fatty acids, but does not describe at least 85% *long-chain* omega-3 fatty acids.  [PTX-547]  A Technical Note regarding an NMFS product with 48% EPA and 25% DHA was cited in a search report during prosecution.  [PTX-9 at PRV00408840-408841]  Dr. Joseph submitted a declaration to the PTO during prosecution mentioning her work

at the NMFS and supporting Applicants' work replicating and distinguishing a prior art fish oil

composition.  [PTX-10 at PRV00407496-500]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Joseph Handout | No | No | | | No | | | |

## 11.    1988 NIH Notice

In 1988, the NIH released a second notice about the Fish Oil Test Materials Program,

announcing the availability of an ethyl ester concentrate containing approximately 80% omega-3

fatty acids (not made up of only EPA and DHA).  [DTX-1447 at 1]  The 1988 Notice does not

mention the presence or amounts of EPA, DHA, HPA, AA, or DPA, or at least 85% long-chain

omega-3 fatty acids.  [D.I. 204 at 826:6-827:7; DTX-1447 at 1]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| 1988 NIH Notice | No | No | No | No | No | No | No | No |

## 12.    Krznowek

Krznowek describes research efforts by NMFS to produce highly pure compositions of

EPA or DHA.  [DTX-699 at Abstract]  Krznowek obtained a >90% EPA composition and a

>90% DHA composition using HPLC.  [DTX-699]  Krznowek describes a starting feedstock of

48% EPA and 24% DHA, and another of 57% EPA and 31% DHA.  [DTX-699 at 75-76]

11

Krzynowek does not indicate whether the feedstocks contained HPA, AA, or DPA.  [D.I. 204 at 829:6-20]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Krzynowek | | No | No | No | | | | |

### 13.   Nilsson

Nilsson describes the fractionation of certain menhaden oil ethyl esters using SFE.  [D.I. 204 at 777:6-8; DTX-1448]  The "PUFA 2" feedstock contains 48.6% EPA and 22.2% DHA, and the ratio of EPA:DHA is greater than 2:1.  [D.I. 204 at 827:8-828:3, 939:21-941:5; DTX-1448 at Tbl. 1]  PUFA 2 does not contain at least 1% DPA [D.I. 204 at 828:4-6; DTX-1448 at Tbl. 1], or at least 85% long-chain omega-3 fatty acids [DTX-1448 at Tbl. 1 (sum of omega-3 fatty acids in Tbl. 1 less than 85%)].

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Nilsson PUFA 2 | No | | | No | No | No | No | No |

### 14.   Breivik PCT

WO 87/03899 ("Breivik PCT") describes an omega-3 concentrate, product (P), that may contain "20-35% EPA, 35-50% DHA and 15-25% of other polyunsaturated ω3-fatty acid compounds . . . ."  [D.I. 204 at 814:21-815:5; DTX-177 at 8, Box 5]  Therefore, the Breivik PCT's composition could never have 40-60% EPA, and the presence of HPA, AA, or DPA is not suggested.  [D.I. 204 at 816:3-817:23; DTX-177 at 8]  Based on the disclosed ranges, the

EPA:DHA ratio will be less than one except when the amounts of EPA and DHA are equal. [D.I. 204 at 816:9-14, 817:24-818:2; DTX-177]  In the one possible instance when the amounts of EPA and DHA would be equal (35% each), the total amount of EPA plus DHA would be only 70%. [DTX-177 at 8, Box 5]  The Breivik PCT also describes a specific working example (which Defendants do not address) containing only 68% EPA plus DHA. [D.I. 204 at 816:3-8, 815:6-13, 913:10-13; DTX-177 at 10-11]  The working example does not suggest the presence of HPA, AA, or DPA. [D.I. 204 at 816:20-817:3; DTX-177 at 11]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA:DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Breivik PCT | (No)* | No | No | No | | (No)* | No | |

* One or the other must be "No."

The Breivik PCT was cited in a search report during prosecution. [PTX-9 at PRV00408798]

### 15. De Bernardi

De Bernardi reports the toxicological effects of administering a composition of EPA (450 mg) and DHA (400 mg) to pregnant rats. [DTX-1429]  It does not disclose the presence of HPA, AA, or DPA. [D.I. 204 at 818:19-819:5]

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| De Bernardi | | No | No | No | | | | |

13

16.     **Summary of Claim Elements Missing from the Prior Art**

No prior art reference discloses or suggests every limitation of the asserted claims.  Only three prior art references disclose at least 80% EPA plus DHA, but none of them suggests the presence of HPA, AA, or DPA.  [DTX-1429; DTX-699; DTX-177].  The remaining references also fail to suggest one or all of HPA, AA, and DPA.  [*See supra* at IV.C]  In addition, certain prior art references fail to suggest an EPA content between 40-60% or a ratio of EPA:DHA from 1:1 to 2:1.  [DTX-177; DTX-1434; DTX-1449]  Importantly, none of the prior art references cited by Defendants suggest that one can or should *modify* the identified fish oil compositions in the *specific* ways required to obtain the claimed compositions.

The deficiencies of the prior art compared to claim 20/18 are summarized below:

| Claim 20/18 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 1% HPA (C21:5 ω3) | at least 1% AA (C20:4 ω6) | at least 1% DPA (C22:5 ω3) | at least 85% long-chain omega-3 fatty acids | EPA:DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|---|
| Sanders | No | No | No | | No | | No | No |
| Simons | No | No | No | No | No | | No | No |
| Phillipson | No | No | No | No | No | | No | No |
| Harris | No | No | No | No | No | | No | No |
| Vidal | No | No | No | No | No | | No | No |
| Rote List | No | No | No | No | No | | No | No |
| Haagsma | No | No | No | | | No | No | |
| Bronsgeest-Schoute | No | No | No | | | No | No | |
| 1987 NIH Notice | No | No | No | No | No | No | No | No |
| 1988 NIH Notice | No | No | No | No | No | No | No | No |
| Joseph Handout | No | No | | | No | | | |
| Krzynowek | | No | No | No | | | | |
| Nilsson | No | | | No | No | No | | No |
| Breivik PCT | (No)* | No | No | No | | (No)* | No | |
| DeBernardi | | No | No | No | | | | |

\* One or the other must be "No."

Claim 44/31 of the '667 patent has many of the same elements as claim 20/18, but also requires at least 3% C20, C21, and C22 omega-3 fatty acids other than EPA and DHA. The deficiencies of the prior art compared to claim 44/31 are summarized below:

| Claim 44/31 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | at least 3% C20, 21, 22 omega-3 fatty acids other than EPA and DHA | at least 85% long-chain omega-3 fatty acids | EPA: DHA 1:2 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|
| Sanders | No | No | No | | No | No |
| Simons | No | No | No | | No | No |
| Phillipson | No | No | No | | No | No |
| Harris | No | No | No | | No | No |
| Vidal | No | No | No | | No | No |
| Rote List | No | No | No | | No | No |
| Haagsma | No | | | | No | |
| Bronsgeest-Schoute | No | | | | No | |
| 1987 NIH Notice | No | No | No | No | No | No |
| 1988 NIH Notice | No | No | No | No | No | No |
| Joseph Handout | No | No | No | | | |
| Krzynowek | | No | | | | |
| Nilsson | No | No | No | No | | No |
| Breivik PCT | | No | | | No | |
| DeBernardi | | No | | | | |

Claim 50 of the '667 patent requires many of the same elements as claims 20/18 and 44/31, but also requires least 4.5% C20, C21, and C22 omega-3 fatty acids other than EPA and DHA—a limitation not met by *any* prior art reference. [*See supra* at IV.C] The deficiencies of the prior art compared to claim 50 are summarized below:

| Claim 50 of '667 patent | at least 80% EPA+DHA (C20:5ω3 + C22:6ω3) | 1-4% HPA (C21:5 ω3) | at least 4.5% C20, 21, 22 omega-3 fatty acids other than EPA and DHA | at least 90% long-chain omega-3 fatty acids | EPA: DHA 1:1 to 2:1 | 40-60% EPA | 25-45% DHA |
|---|---|---|---|---|---|---|---|
| Sanders | No | No | No | No | | No | No |
| Simons | No | No | No | No | | No | No |
| Phillipson | No | No | No | No | | No | No |
| Harris | No | No | No | No | | No | No |
| Vidal | No | No | No | No | | No | No |
| Rote List | No | No | No | No | | No | No |
| Haagsma | No | No | No | No | No | No | |
| Bronsgeest-Schoute | No | No | No | No | No | No | |
| 1987 NIH Notice | No | No | No | No | No | No | No |
| 1988 NIH Notice | No | No | No | No | No | No | No |
| Joseph Handout | No | No | No | No | | | |
| Krznowek | | No | No | No | | | |
| Nilsson | No | | No | No | No | | No |
| Breivik PCT | (No)* | No | No | No | (No)* | No | |
| DeBernardi | | No | No | No | | | |

* One or the other must be "No."

The composition recited in method claims 9/6 and 9/7 of the '077 patent completely overlaps with those required by claims 20/18, 44/31, and 50 of the '667 patent, and therefore a separate summary chart is not provided for those claims. [PTX-1; PTX-2]

## D. Norsk Hydro's Interactions with Dr. Skrinska and Other U.S. Contacts

During the development of Norsk Hydro's concentrated omega-3 products, Dr. Sigurd Gulbrandsen was responsible for organizing meetings with U.S. contacts. [D.I. 203 at 667:3-22] He and other Norsk Hydro representatives traveled to the U.S. in January 1987 to meet with, among others, Dr. Victor Skrinska of St. Vincent Charity Hospital in Cleveland. [D.I. 203 at 688:18-689:10; DTX-124; *see also* D.I. 205 at 1051:6-1052:16]

Norsk Hydro provided small liquid samples to these contacts a few times for informational purposes to show that it could make the omega-3 concentrates being developed. [D.I. 203 at 664:1-665:4, 694:9-18, 659:23-662:20; D.I. 202 at 481:20-25]  The samples could differ from one to the next and were not prepared for any medical use or testing.  [D.I. 203 at 662:21-25, 663:3-12, 669:14-670:21, 694:9-18]

In July 1987, Dr. Gulbrandsen sent Dr. Skrinska a small (100 mL) liquid sample of "K80" and a 100 mL liquid sample of 30% cholesterol-free triglyceride concentrate.  [D.I. 202 at 480:21-481:13; DTX-82; DTX-83]  In September 1987, he sent Dr. Skrinska two 100 mL liquid samples of K80 from Batch No. 222 to replace the first sample (which came from a non-representative production trial).  [D.I. 202 at 482:1-483:4; DTX-84; DTX-85; DTX-86] Accompanying both batches was a pro forma invoice indicating that the "sample[s]" of K80 had "[n]o commercial value" and that the invoice was "[f]or customs purpose only."  [D.I. 202 at 481:9-13, 482:18-21; DTX-83; DTX-85]  Dr. Skrinska testified that he analyzed the samples from Batch No. 222 to confirm their contents, but he did not testify that he used those liquid samples in any other way or for any purpose.  [D.I. 202 at 482:25-484:6]

When Norsk Hydro provided samples of K80, it did so with the clear understanding that the recipients could not use them for any medical or test purposes.  [D.I. 203 at 669:14-670:21, 672:10-673:10, 690:23-691:13, 693:12-17]  Norsk Hydro would not have allowed anyone to perform any clinical study without a tailor-made protocol and a secrecy agreement.  [D.I. 203 at 670:16-21, 690:23-691:7, 693:12-17, 695:22-696:6; D.I. 202 at 308:2-21]  To Dr. Gulbrandsen's knowledge, Dr. Skrinska never performed any clinical study with the K80 liquid samples.  [D.I. 203 at 701:2-18]  He also explained that the samples provided to Dr. Skrinska were too small to use in any medical testing.  [D.I. 203 at 694:9-18]

In February 1988, Drs. Irene Wei and John Sheehan of Case Western University wrote to Dr. Gulbrandsen, stating they had learned from Dr. Skrinska "of the existence of your concentrated product of omega-3 fatty acids (80%) as ethyl esters" and requested a sample. [DTX-111][2] Inventor Dr. Hans Krokan responded in April 1988, explaining that present work at Norsk Hydro focused on "ethylester K85," which was undergoing clinical studies in Norway. [DTX-112] He did not provide them with the requested sample at that time [*see id.*], and there is no evidence that Dr. Wei or Dr. Sheehan ever subsequently received any Norsk Hydro sample.

Dr. Gulbrandsen also sent small liquid samples of K80 to Dr. Fran Peterson of General Mills (in February 1987) and Prof. Roger Davis of the University of Colorado (in January 1988). [DTX-99; DTX-113; DTX-114 at PRV00864095-T]   Again, the accompanying pro forma invoices indicated that the "sample[s]" had "[n]o commercial value" and that the invoice was "[f]or customs purpose only."   [DTX-99; DTX-113]   There is no evidence that those samples were ever used.   Norsk Hydro also communicated with Ira Berry of Pharmacaps about development of omega-3 concentrates.   [DTX-100; *see also* DTX-124 at PRV00412372]   There is no evidence that Pharmacaps ever received any product sample or performed any study.

In January 1988, Dr. Dahl sent K85 capsules to Dr. Arne Nordøy and his colleagues at Oregon Health Sciences University ("OHSU") for the purpose of conducting a bioavailability experiment to determine whether the ethyl ester form of the composition would be adequately absorbed into the bloodstream, the details of which were communicated to the PTO during

---

[2]      In response to a hearsay objection, Defendants represented they were "not offering DTX-111 for the truth of the matter asserted but, rather, the fact that it was sent to Mr. Gulbrandsen. He was put on notice of the information in the letter."   [D.I. 202 at 407:1-10]   They now seek to use DTX-111 for the truth of the matters asserted.   [D.I. 209 at 37]

prosecution of the '077 and '667 patents.  [*See, e.g.*, D.I. 202 at 305:19-309:7; DTX-150; PTX-9 at PRV00409076-86, PRV00409089-123, PRV00408993-9000; PTX-10 at PRV00407448-55]

### 1.    Dr. Skrinska's Deposition Testimony

Dr. Skrinska was deposed in New York City in June 2010.  [D.I. 63]  Defendants had multiple interactions with him prior to his deposition without the presence of Pronova's counsel. [D.I. 203 at 513:14-521:18]  The day before his deposition, Defendants met with him to discuss his testimony and show him selected documents, yet did not ask him to produce any documents. [D.I. 203 at 517:14-519:2]  Defendants made all arrangements and paid for his travel, hotel, and meal expenses.  [D.I. 203 at 515:3-20, 520:7-20]

By the time of Dr. Skrinska's deposition, more than twenty years had passed since his January 1987 meeting with Drs. Gulbrandsen and Krokan, and Dr. Skrinska could not recall the meeting.  [D.I. 203 at 511:11-24; DTX-124 at PRV00412367]  Indeed, Defendants' leading questions provided much of his testimony.  Significantly, Dr. Skrinska never mentioned receiving any capsules from Norsk Hydro until Defendants proposed he had:

> Question:  And did you have any meetings or communications with Norsk Hydro about having them supply you with fish oil ***capsules*** to use in the study?
>
> Answer:  I recall getting a brochure, but I can't definitely say that I remember an actual physical meeting. . . .
>
> Question:   Did Norsk Hydro, in fact, provide to you ***capsules*** containing concentrated fish oil?
>
> Answer:  I believe they did, right.

[D.I. 202 at 476:20-477:12 (emphases added)]  Dr. Skrinska further testified that he believed "around six volunteers" (including himself) then participated in a preliminary study with "maybe 500 to 1,000 capsules" to determine whether "the dietary supplement would have some effect on platelet fatty acid composition."  [D.I. 202 at 477:13-17, 484:20-485:15]

Dr. Skrinska did not recall the composition he used in the alleged study. [D.I. 202 at 484:7-13 ("I don't recall the actual data.")] Only after another leading question did he agree the fatty acid distribution was "approximately" the same as the liquid samples he received. [D.I. 202 at 484:14-19 (Q: "And by your recollection it was approximately the same distribution?" A: "Right.")] He also could not remember whether he had ever received or used fish oil capsules from any company besides Norsk Hydro [D.I. 202 at 480:8-20], even though he apparently had worked with MaxEPA and other fish oil products [DTX-104 at PRV00864319-T].

Dr. Skrinska acknowledged that the NIH never funded the grant he had applied for to conduct a fish oil study. [D.I. 202 at 491:9-12 ("No, the grant was not funded."); *see also* DTX-81A (Skrinska in May 1987 still "awaiting news from NIH" concerning his grant application)] There is no evidence he ever published the results of his alleged study.

## 2. The Absence of Any Corroboration That Dr. Skrinska Conducted a Clinical Study

Dr. Skrinska's testimony that he received "maybe 500 to 1,000 capsules" from Norsk Hydro remains uncorroborated, and there is no evidence that Dr. Skrinska ever formulated the 100 mL liquid samples he received into capsules. [*See* D.I. 204 at 806:3-808:17; D.I. 204 at 936:3-939:14; DTX-83; DTX-84; DTX-85] No documentation from the Cleveland Research Institute has been produced to corroborate Dr. Skrinska's testimony. [*See* D.I. 204 at 801:5-12, 932:18-21] Though Dr. Skrinska testified that he recorded the results of his alleged study in a notebook with "Omega-3" on the cover [D.I. 202 at 486:1-11], that notebook was never produced or offered into evidence. His publicly available NIH grant application also was never produced or offered into evidence. [D.I. 202 at 491:24-492:1]

A researcher such as Dr. Skrinska would have needed Institutional Review Board ("IRB") approval and signed consent forms before beginning a study on human volunteers. [D.I.

204 at 933:10-14; *see, e.g.*, DTX-126 at PRV00948911, PRV00948915 (exemplary protocol showing need for IRB approval and informed consent)]  Defendants have provided no such documentation to corroborate Dr. Skrinska's testimony—no protocol [D.I. 204 at 801:13-16, 932:22-25], no IRB approval [D.I. 204 at 801:17-22, 933:1-5], and no consent forms [D.I. 204 at 801:23-802:1, 933:6-9].

No other witness has corroborated Dr. Skrinska's testimony.  Though Dr. Skrinska testified that five other members of his own lab participated in the study, Defendants did not ask and Dr. Skrinska did not provide the names of those individuals, and they have not provided any testimony.  [*See* D.I. 204 at 803:8-11, 933:15-24]  Dr. Skrinska also testified that certain board members and administrators at the institute would have needed to be informed or were informed of projects taking place [D.I. 202 at 477:18-479:8], yet Defendants have provided no testimony from them.  [D.I. 204 at 803:12-806:2, 934:5-936:2; DTX-81A]

### E.    Studies Leading to the Bønaa/Dahl Declaration

#### 1.    Dr. Dahl's Safety and Tolerability Study for K85

From August to November 1987, Norsk Hydro performed a Phase I safety/tolerability study of K85 in healthy persons ("Safety and Tolerability Study for K85").  [D.I. 202 at 295:11-18, 297:12-15, 323:21-324:6, 348:3-16, 424:19-25; PTX-1096 at PRV01777724]  Dr. Dahl designed a multiple-dose rising tolerance study in which three groups received 4g, 8g, or 14g per day of K85 for two weeks.  [D.I. 202 at 296:10-297:4; PTX-1096]  The results showed that K85 "was safe and very well tolerated."  [D.I. 202 at 297:6-15; PTX-1096]

#### 2.    Dr. Dahl's Absorption Study for TG30

Dr. Kaare Bønaa, a physician, planned to carry out a Phase II study to evaluate the efficacy of K85 in lowering blood pressure.  [D.I. 202 at 297:19-298:24]  Several articles, however, had suggested that ethyl esters were poorly absorbed compared to natural triglycerides.

[D.I. 202 at 299:5-18, 300:1-6; D.I. 205 at 1049:1-7; PTX-0899; PTX-1253 at PRV00953282] Because the inventors had chosen the ethyl ester form for K85, they became concerned they had chosen the wrong formulation and may "have to reformulate" or "start all over with this project." [D.I. 202 at 294:19-295:10, 298:25-299:4, 300:7-11, 301:2-20][3]

In December 1987, Dr. Bønaa expressed his concerns to Dr. Dahl about the potential "absorption problem."   [PTX-1253 at PRV00953282; D.I. 202 at 300:7-302:14]   Dr. Dahl therefore designed a study to assess the absorption properties of TG30, a composition containing approximately 30% EPA plus DHA in the natural triglyceride form ("Absorption Study for TG30").   [DTX-1026 at PRV00950084; D.I. 202 at 302:15-23, 425:15-426:2, 429:6-11]   He formed two groups of eight volunteers who received TG30 in doses of 12g or 24g daily for two weeks.   [DTX-1026 at PRV00950083]   Dr. Dahl found that the higher dose of TG30 resulted in a higher absorption of EPA and DHA.   [DTX-1026 at PRV00950088]

### 3.   Dr. Dahl's Absorption Comparison Study for K85/TG30

In early 1988, Dr. Dahl performed a study of the raw data from the Absorption Study for TG30 and the Safety and Tolerability Study for K85 to determine whether the fatty acids from K85 were absorbed to the same extent as those from TG30 ("Absorption Comparison Study for K85/TG30")   [D.I. 202 at 303:4-10, 305:8-18, 324:9-13, 431:6-17, 432:11-19; DTX-141 at PRV01148250, PRV01148261 (citing PTX-899)]   Dr. Dahl compared K85 dosage groups from the Safety and Tolerability Study to TG30 dosage groups from the Absorption Study for TG30 that provided equivalent amounts of EPA and DHA.   [D.I. 202 at 303:18-304:1; DTX-141 at

---

[3]      In D.I. 202, page 300, line 4, and page 301, line 16, the word "purer" should read "poorer," which Pronova submits is a mistranscription from Dr. Dahl's Norwegian accent and is supported by the surrounding testimony and referenced documents PTX-899 and PTX-1253.

PRV01148283].  He concluded from the raw data that "EPA/DHA absorption is similar for ethyl ester and triglyceride."  [DTX-141 at PRV01148245; D.I. 202 at 304:5-14]

The Absorption Comparison Study for K85/TG30 provided no statistical analysis of the differences in absorption (also referred to as "bioavailability").  Dr. Dahl explained that the data "are the raw data.  These are not the process data.  There's no statistical calculation from these data."  [D.I. 202 at 446:23-25]  Without conducting a statistical analysis, Dr. Dahl could not conclude there was a difference between the groups.  [D.I. 202 at 448:5-449:5, 451:20-452:4 ("I couldn't say that these data were different because there were no statistical calculations on this data.  So as I concluded in this report, it was similar.")][4]

### 4.    Dr. Bønaa's Blood Pressure Efficacy Study for K85

After Dr. Dahl obtained preliminary results for the Absorption Comparison Study for K85/TG30, Dr. Bønaa performed his study to evaluate the efficacy of K85 in reducing blood pressure ("Blood Pressure Efficacy Study for K85").    [PTX-1255 at PRV01053737, PRV01053876; D.I. 202 at 304:22-305:5, 309:23-311:13, 311:21-312:1, 324:17-325:4; D.I. 205 at 1094:20-1095:1, 1095:8-17, 1096:13-1097:18; DTX-249]  In the summer of 1988, Dr. Bønaa communicated the preliminary results to Dr. Dahl, who thought the results were "fantastic, because it showed very clearly this K85 product had the ability to reduce certain risk factors for cardiovascular disease in diseased persons.  In particular, the reduction of blood pressure."  [D.I. 202 at 312:2-8, 314:6-20]

The study concluded that K85 reduced blood pressure and that this effect depended "on the increase in plasma phospholipid n-3 fatty acids."  [PTX-1255 at PRV01053738; D.I. 202 at

---

[4]     In D.I. 202, page 449, line 4, the word "can" should read "can't," as supported by the previous sentence ("But I would not agree that this data indicated a difference.").

312:17-313:54; D.I. 205 at 1099:12-1100:65]  There was thus a direct link between the increase

of the omega-3 fatty acids in plasma phospholipids and the blood pressure-reducing effect.  [D.I.

202 at 313:1-5]  Dr. Bønaa illustrated this correlation in a graph.  [PTX-1255 at PRV01053838

(Figure 6.3); D.I. 202 at 313:6-314:5]  He also concluded that a low dose of "1.8 g per day

[EPA] may be insufficient to achieve any effect at all" on blood pressure.  [PTX-1255 at

PRV01053823-24; PRV01053828]   Dr. Bønaa's study was published in the *New England

Journal of Medicine* on March 22, 1990.  [PTX-1255 at PRV01053739-45; DTX-249]

### 5.      Dr. Dahl's Statistical Study for K85/TG30

In January 1990, Dr. Dahl conducted a statistical analysis of the phospholipid absorption

data for two groups reported in the Absorption Comparison Study ("Statistical Study for

K85/TG30").  [DTX-213]  Dr. Dahl accepted Dr. Bønaa's determination that the efficacy of K85

in lowering blood pressure was dependent on the increase in omega-3 fatty acids absorbed into

the plasma phospholipids fraction.  [DTX-213 at PRV00833051; D.I. 202 at 316:1-318:9]  He

identified two groups that provided the highest equivalent amounts of EPA and DHA:  Group 2

(8 g/day of K85 providing 4.4 g/day EPA and 2.4 g/day DHA) and Group 5 (24 g/day of TG30

providing 4.4 g/day EPA and 2.9 g/day of DHA).   [DTX-141 at PRV01148283; DTX 213 at

PRV00833052]   Dr. Dahl compared the phospholipid bioavailability for those groups by

conducting a statistical analysis on the relevant data.  [D.I. 202 at 316:5-318:9, 442:21-443:18;

DTX-213 at PRV00833051-53]   His analysis included calculating p-values between groups.

[DTX-213 at PRV00833053-55, PRV00833055-T]  In performing this analysis, Dr. Dahl found

that the increase in phospholipid EPA level after intake of K85 was larger than obtained after

intake of TG30, and that the difference between the groups was statistically significant.  [DTX-

213 at PRV00833053]  He further determined that the increase in phospholipid DHA level after

intake of K85 was also larger than obtained after intake of TG30, and that the difference between those two groups was highly statistically significant.  [DTX-213 at PRV00833053]

Dr. Dahl found that the K85 group showed a larger increase in both EPA and DHA than the TG30 group.  [DTX-213 at PRV00833054]  He therefore concluded that there was "a difference in the bioavailability of EPA and DHA from K85 and from TG30" and that "the bioavailability of EPA and DHA and thus their therapeutic effect is enhanced when they are taken as K85 rather than as the less concentrated triglyceride preparations."  [DTX-213 at PRV00833054] He wrote a report summarizing his findings.  [DTX-213]

Dr. Dahl considered the Safety and Tolerability Study for K85, the Absorption Comparison Study for K85/TG30, the Blood Pressure Efficacy Study for K85, and the first study reported in the Bønaa/Dahl Declaration (which is essentially identical to his Statistical Study for K85/TG30) to be four separate studies because they had different objectives, addressed different questions, and had different designs.  [D.I. 202 at 320:5-8, 323:20-325:11; *compare* DTX-213 *with* PTX-9 at PRV00408246-249; *see also* D.I. 202 at 458:17-22]

### F.     Prosecution History of the '077 Patent

On March 22, 1990, the PTO issued a first Office Action rejecting the pending claims over prior art patents to Sutherland, England, and Rubin.  [PTX-9 at PRV00408228-232]  The Examiner stated that Rubin and Sutherland disclosed treatments for high cholesterol while England disclosed a method of treating hypertension and therefore it would have been obvious to treat high cholesterol levels and hypertension in view of this prior art.  [*Id.*]

On July 23, 1990, Applicants responded to the Office Action in part by filing a joint declaration of Drs. Bønaa and Dahl ("Bønaa/Dahl Declaration").  [D.I. 202 at 318:12-319:1, 319:9-23; PTX-9 at PRV00408244-256]  Dr. Dahl's "Study I" was essentially identical to his January 1990 Statistical Study for K85/TG30.  [D.I. 202 at 319:24-320:15; *compare* DTX-213

*with* PTX-9 at PRV00408264-249]  Dr. Bønaa's "Study II" contained data and conclusions from his Blood Pressure Efficacy Study for K85, which he had recently published in the *New England Journal of Medicine*.  [*Compare* PTX-1255 at PRV01053739-745 *with* PTX-9 at PRV00408249-256; D.I. 202 at 319:24-320:15]

The Bønaa/Dahl Declaration concluded there was a "correlation between incorporation of EPA and DHA in plasma phospholipids and the efficacy parameter blood pressure."  [D.I. 202 at 321:11-15, 324:25-325:4; PTX-009 at PRV00408244-256]  That conclusion was based on the same data and graph that Dr. Bønaa had published.  [*Compare* PTX-9 at PRV00408252 *with* PTX-1255 at PRV01053744 (Figure 3) *with* PTX-1255 at PRV01053838 (Figure 6.3)]

Dr. Bønaa also compared the blood pressure-lowering effect of K85 to the blood pressure-lowering effect of MaxEPA (a TG30-like compound) as previously published by H. Knapp.  [PTX-9 at PRV00408253-255; DTX-221; D.I. 202 at 322:11-323:11]  He found that K85 "had a greater blood pressure-lowering effect than the unconcentrated triglyceride formula, even though the amount of [EPA] and [DHA] that was given as ethylester was one third of the amount that was given in the unconcentrated triglyceride formula."  [PTX-9 at PRV00408254]  Based on the overall data, Dr. Bønaa and Dr. Dahl jointly concluded:

> The surprisingly greater hypotensive effect observed when the high concentration of ethylester composition according to the present invention was administered compared to a low concentrate triglyceride composition (Knapp et al., New England Journal of Medicine) may therefore be related to the larger bioavailability of EPA and DHA after intake of the ethyl ester concentrate.

[PTX-9 at PRV00408256]

The Examiner found that the declaration did not overcome the rejection because it compared K85 to TG30, which had a lower concentration (30% EPA+DHA) than the Sutherland

reference (62.5% EPA+DHA).   [PTX-9 at PRV00408291, PRV00408310, PRV00408319]

Prosecution continued for five more years until the '077 patent issued in 1996.  [PTX-9]

## V.     ARGUMENT

### A.     Defendants Have Failed to Prove Obviousness

#### 1.     Legal Standards

A patent is presumed valid, and each claim enjoys that presumption.  35 U.S.C. § 282; *Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1376 (Fed. Cir. 2002).  The burden to prove obviousness rests on the patent challenger.  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242 (2011).  That burden must be met by clear and convincing evidence irrespective of whether the PTO previously considered the prior art at issue.  *Id.* at 2249-50.

Obviousness is a legal question based on underlying facts, including (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective indicia of nonobviousness.  *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1356 (Fed. Cir. 2008) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).  "While the sequence of these questions might be reordered in any particular case, the [*Graham*] factors continue to define the inquiry that controls."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007).

The prior art must provide some reason or motivation to arrive at the claimed invention.  *KSR*, 550 U.S. at 418.  The Federal Circuit has applied this principle in post-*KSR* cases involving chemical compositions.  *See, e.g., Unigene Labs., Inc. v. Apotex, Inc.*, No. 2010-1006, slip op. (Fed. Cir. Aug. 25, 2011); *Takeda Chem. Indus., Ltd. v. Alphapharm PTY., Ltd.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007); *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1089 (Fed. Cir. 2008) (holding enantiomer nonobvious over known racemate because prior art provided no motivation to separate the two enantiomers).

Hindsight cannot replace motivation in the prior art to make the claimed invention.  *KSR*, 550 U.S. at 421 (cautioning against "the distortion caused by hindsight bias" and "arguments reliant upon *ex post* reasoning" in determining obviousness); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,* 520 F.3d 1358, 1364-65 (Fed. Cir. 2008) (holding that defendants' expert did nothing but "retrace the path of the inventor with hindsight").

Objective evidence of nonobviousness such as commercial success must also be considered and "is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness." *Ortho-McNeil*, 520 F.3d at 1365.

### 2.  Defendants Fail to Address the Claimed Inventions as a Whole

Defendants argue that the asserted claims are invalid for obviousness under § 103 over the prior art.  [D.I. 209 at 6-33]  They assert that "Pronova did not invent using EPA and DHA to treat hypertriglyceridemia, nor did it invent pharmaceutical compositions containing more than [] 80% by weight of those two compounds."  [D.I. 209 at 1]  But that does not fairly describe the asserted *claims*, which are directed to unique mixed-fatty-acid compositions that include, among other limitations, a specific combination of omega-3 and omega-6 fatty acids, other than just EPA and DHA, in particular amounts.  [PTX-1; PTX-2; *see* D.I. 208 at 12-16]

Tellingly, Defendants do not identify all the claim elements in their discussion of "The Asserted Patents and Claims."  [D.I. 209 at 4-5]  Instead, they inaccurately summarize the composition of the method claims as ">80% EPA EE + DHA EE in a 2:1 to 1:2 ratio," and the composition claims as including concentrated amounts of EPA and DHA "among other things." [D.I. 209 at 4]  In addition, Defendants never present any detailed comparison of the prior art compositions to the full scope of the claimed compositions.  [*See* D.I. 209 at 6-33]  By glossing over the claim elements and deficiencies of the prior art, Defendants avoid highlighting what claim elements are *missing* from the prior art.  [*See id.*; *see also supra* at IV.C]

Defendants' experts likewise focused their opinions on fragments of the claimed inventions. Dr. Ganem admitted his claim chart did not even refer to the claim limitations directed to at least 1% HPA, at least 1% DPA, and least 1% AA. [D.I. 204 at 813:19-814:14]

Defendants have thus failed to address the claimed inventions as a whole, including the specific combination of features required by each asserted claim. *See W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1547-48, 1550 (Fed. Cir. 1983) (holding that restricting claims to a "thrust" of the invention constitutes error, overturning district court's obviousness rulings). In addition, Defendants have failed to prove obviousness on a claim-by-claim basis as required. *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 942 (Fed. Cir. 1992) (holding that all grounds of invalidity must be evaluated against individual claims as required by § 282). Thus, Defendants' obviousness contentions are legally flawed from the outset.

### 3. No Prior Art Suggests the Desirability of the Specific Mixtures of Fatty Acids Required by the Asserted Claims

As detailed above, the prior art fails to suggest the claimed compositions. [*Supra* at IV.C] Indeed, there are significant differences between the claimed compositions and the compositions of the prior art. [*Id.*] No prior art reference describes or suggests the claimed compositions or provides any reason or suggestion to make them. [*Id.*]

Defendants' assertion that it was known to treat hypertriglyceridemia with EPA and DHA fails to prove that the prior art suggests the mixed-fatty-acid *compositions* required by all the claims (including method claims 9/6 and 9/7). Likewise, Defendants' contention that certain prior art references describe concentrated omega-3 fatty acid compositions also does not establish obviousness because those references fail to suggest several *additional* claim limitations beyond the requirement for at least 80% by weight EPA plus DHA. [*Supra* at IV.C] For example, no prior art publication suggests the combination of EPA, DHA, HPA, DPA, and

AA (claim 20/18) or at least 4.5% C20, C21, and C22 omega-3 fatty acids besides EPA and DHA (claim 50). [*Supra* at IV.C.16] Moreover, nothing in the prior art suggests that any of the previously known fish oil compositions should be *modified* in the specific ways needed to arrive at the claimed compositions. Thus, the prior art fails to suggest the claimed compositions, which precludes any conclusion of obviousness. *See, e.g., Unigene Labs.*, slip op. at 12-20 (affirming summary judgment of nonobviousness with respect to claimed pharmaceutical formulation); *Takeda Chem.*, 492 F.3d at 1357; *Sanofi-Synthelabo*, 550 F.3d at 1089.

Moreover, the prior art teaches *away from* the claimed compositions. Haagsma states that an omega-3 concentrate is preferred in part because "other fatty acids, which might be physiologically active, are then present only in small amounts or are completely absent." [DTX-1328 at 117] Defendants' medical expert, Dr. Sacks, agreed that Haagsma recognizes that fatty acids other than EPA and DHA could be biologically active and therefore Haagsma suggests it would be desirable to reduce or eliminate them. [D.I. 203 at 617:12-618:10; DTX-1328 at 117]. The claimed compositions, however, *require*, for example, 4.5% C20, C21, and C22 omega-3 fatty acids other than EPA and DHA. [*Supra* IV.C; *see also* PTX-1 at col. 3, ll. 48-50 (referring to "the special and odd-numbered" HPA)] Thus, contrary to Haagsma's suggestion to reduce or eliminate fatty acids other than EPA and DHA, the claimed compositions require the presence of other fatty acids such as HPA, AA, and DPA, supporting nonobviousness. [PTX-1; PTX-2; D.I. 208 at 12-16] *See, e.g., In re Hedges,* 783 F.2d 1038, 1040-41 (Fed. Cir. 1986) (holding claimed process at high temperatures nonobvious where prior art taught lower temperatures were desired for optimum results and that high temperatures were problematic).

### 4.    Defendants' "Implicit Disclosure" Argument Is Unsupported

Defendants suggest that one of ordinary skill would have understood that the "minor components" of the claims are "implicitly disclosed" in the prior art. [D.I. 209 at 26-27]

Defendants, however, cite no case in which a court based a conclusion of obviousness on such a theory of "implicit disclosure." Thus, Defendants' obviousness theory is legally unsupported.

Defendants have not attempted to make an *inherency* argument. [D.I. 209 at 6-33 (failing to argue inherency or cite inherency case law)] To show inherency, Defendants would have had to prove that the missing claim elements are "necessarily present" in the prior art. *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Given the substantial variability in the compositions of processed fish oils, Defendants cannot establish that the missing claim elements, including the so-called "minor components" HPA, AA, and DPA, are necessarily present in the prior art compositions. [*Supra* at IV.B] In fact, the prior art shows that DPA (C22:5 ω3) can be removed via urea fractionation, and that AA (C20:4 ω6) can be reduced instead of concentrated. [D.I. 204 at 855:16-857:15, 950:18-953:17; *see* DTX-1460 at Table II] Thus, in addition to the fact that crude fish oils may lack HPA, AA, or DPA, the presence of any or all of these in the claimed amounts after processing is far from certain or predictable.

Moreover, the prior art provides detailed information about the compositions of many previously known processed fish oils. [*Supra* at IV.C] Those prior art compositions vary widely in their fatty acid profiles and differ significantly from the claimed compositions. [*Id.*] There is no evidence that the missing claim elements were present but undetected in the prior art. [*Id.*] Thus, Defendants' speculative "implicit disclosure" argument is refuted by the prior art itself.

Defendants' position also is not supported by the evidence they cite. Defendants argue that the claimed compositions "having the minor components" are not novel in view of Dr. Ganem's testimony. [D.I. 209 at 24 (citing D.I. 204 at 734:10-735:14)] The cited portion of his testimony, however, does not even refer to the so-called "minor components" such as HPA, AA, or DPA. [D.I. 204 at 734:10-735:14] Similarly, Defendants argue that the De Bernardi

reference "implicitly disclosed" the minor components. [D.I. 209 at 26 (citing D.I. 204 at 751:3-12)] In that portion of Dr. Ganem's testimony, he stated only that "the other 15 percent [of De Bernardi's composition] would very likely be other polyunsaturated fatty acids, long chain polyunsaturated fatty acids." [D.I. 204 at 751:3-12] He did not specifically identify *which* other fatty acids would be present or in *what amounts*, and certainly never testified that De Bernardi's composition (or any other prior art composition) would have included at least 1% HPA, at least 1% AA, at least 1% DPA, and the other requirements of claim 20/18, or at least 4.5% C20, C21, and C22 omega-3 fatty acids as required by claim 50. [*See id.*] Further, Dr. Ganem's testimony should be given little consideration as he admittedly is not an expert in marine oils. [D.I. 204 at 798:23-799:20] In fact, he was unfamiliar with some of the nomenclature used to describe the very fatty acids he suggested would be "implicit."[5] [*See* D.I. 204 at 810:4-13, 857:3-9]

In addition, such unsupported and conclusory expert testimony concerning alleged "implicit disclosures" in the prior art is insufficient to establish invalidity by clear and convincing evidence, particularly where, as here, it conflicts with the documentary evidence. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1369-70 (Fed. Cir. 2003) (reversing summary judgment of anticipation where expert offered unsupported and equivocal statement that reference inherently possessed claim element); *Upjohn Co. Mova Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000) (reversing jury verdict of obviousness because expert's

---

[5]     Although Defendants assert that Dr. Ganem's and Dr. Rizvi's testimony was "unrebutted" [D.I. 209 at 24-25], neither Dr. Ganem nor Dr. Rizvi was qualified as an expert in marine oils. [D.I. 204 at 719:22-720:7, 882:12-18] Pronova therefore had no need to call any technical expert to rebut their testimony, especially given their testimony on cross-examination and the other evidence rebutting their unsupported opinions. Moreover, it is axiomatic that one need not present a rebuttal expert on validity when the patent challenger has failed to meet its burden of proving a *prima facie* case of obviousness by clear and convincing evidence.

testimony was conclusory and unsupported); *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997).

Further, Defendants refer to DTX-137A as "the Dahl Abstract" and assert it is a prior art publication that Dr. Dahl displayed at a 1988 conference in Italy.   [D.I. 209 at 17, 27-28] However, Dr. Dahl presented a *handwritten poster* at the conference [D.I. 202 at 433:4-10], and therefore DTX-137A, which is typed, cannot be the poster.   Other than Dr. Dahl's poster being "about" the information in DTX-137A [D.I. 202 at 433:14-21], there is no evidence that DTX-137A itself was ever published or distributed, and therefore it is not a printed publication under § 102(b).   DTX-1572, which is the actual *published* abstract, was not published until 1989 and is not prior art.   [DTX-1572]   Dr. Dahl's handwritten poster is not in evidence.   There also is no evidence regarding distribution of poster copies, the length of time the poster was displayed, or the complexity or legibility of the poster.   Thus, the 1988 poster (even if it were in evidence) would not qualify as prior art.   *In re Klopfenstein*, 380 F.3d 1345, 1350-52 (Fed. Cir. 2004).

### 5.   Defendants' NMFS Arguments Lack Merit

As an alternative to their "implicit disclosure" theory, Defendants argue that one of ordinary skill allegedly motivated to achieve high EPA plus DHA concentrates would have used material from the NMFS Fish Oil Test Materials Program (having ~70-73% EPA+DHA) as a starting material and further concentrated it.   [D.I. 209 at 24-25, 28-31; DTX-1276]   Defendants assert that such a person would have had "a reasonable expectation that the resulting concentrate would meet all of the claim limitations, including the limitations relating to the minor components."   [D.I. 209 at 24-25, 28-30]   This argument is legally and factually unsupported.

### a) Defendants Misapply the "Reasonable Expectation of Success" Standard

The "reasonable expectation of success" standard concerns whether the prior art provides a reasonable expectation that the prior art, if combined or modified, will work for its intended purpose. *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 996 (Fed. Cir. 2009) ("there was no reasonable expectation that risedronate would be a successful compound"); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) ("the skilled artisan would have had that reasonable expectation of success that an acid addition salt of besylate would form and would work for its intended purpose"). The standard is not, as Defendants recast it, whether one of ordinary skill would have had a reasonable expectation that the prior art, if combined or modified, would possess all the claim limitations. *See id.* Thus, Defendants' "reasonable expectation of success" argument (like their "implicit disclosure" argument) is legally flawed.

### b) A Person of Ordinary Skill Would Not Have Further Concentrated the NMFS Test Materials

The NMFS Fish Oil Test Materials Program was established to provide researchers with test material of "consistent quality" to evaluate "the role that omega-3 fatty acids play in health and disease." [DTX-1446 at 1; DTX-1447 at 1] Information about the NMFS program was before the PTO during prosecution. [PTX-9 at PRV00408840-41] Because NMFS test materials were to be directly administered to humans or animals in medical studies, they were intended as *final* test materials, not starting materials. [*See* DTX-1447] Moreover, Defendants cite no patient compliance issues or other problems with the NMFS test materials that would have led one of ordinary skill to further concentrate them. Defendants' medical expert, Dr. Sacks, never testified that the patient compliance and other issues that existed for lower concentrated fish oil products (~30%) existed for the higher concentrated NMFS test materials. [*See* D.I. 203 at 570:22-574:9] In fact, Dr. Sacks indicated that any need in the art was already satisfied by the

NMFS materials.  [D.I. 203 at 576:6-20]  Concentrating the NMFS test materials also would have been contrary to concerns publicly expressed by Dr. Sacks and others at the time about potential detrimental effects of fish oils, including adverse increases in LDL cholesterol levels. [D.I. 203 at 600:7-607:3; PTX-1083; PTX-1080; PTX-1078; D.I. 204 at 955:6-956:6, 956:20-23; DTX-938-R]  Thus, there is no basis to conclude that one of ordinary skill would have sought to modify the NMFS test materials in any way.

Defendants' entire motivation to concentrate EPA and DHA rests on comparisons to whole fish, not, for example, an already concentrated NMFS test material.  [*See* D.I. 209 at 22 (citing Haagsma (comparison to "whole fish"), Bronsgeest-Schoute (comparison to fish), DTX-938-R (comparison to "whole" fish))]  In addition, Defendants' reasoning regarding the need for fewer capsules fails with respect to the NMFS test materials because there is no evidence that fewer capsules are necessary for a concentrated product.

Not surprisingly, Defendants identify no evidence that any researcher ever increased the total EPA plus DHA concentration of any NMFS test material or considered doing so.  Indeed, NMFS researchers attempted only to further *separate*—but not concentrate—EPA from DHA in those materials, consistent with the use of SFE in the prior art to make compositions of pure EPA or pure DHA.  [*See* DTX-1448; DTX-699; *see* DTX-938-R at 101 & 104 ("better separation" and "better EPA and DHA purity")]  Indeed, even though Dr. Rizvi suggested the combination of urea fractionation and SFE [*see* DTX-938-R at 98; D.I. 204 at 895:25-896:9], he himself never carried out that two-step process to obtain a mixed EPA plus DHA composition, and no prior art reference indicates that anyone else did.  [D.I. 204 at 927:22-928:2, 944:23-945:2]  Thus, Defendants' suggestion that NMFS's final test materials (prepared via urea fractionation) would have been an appropriate starting point for a person of ordinary skill to arrive at the claimed

compositions is illogical and unsupported. *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (reasoning that "mere fact that prior art could be so modified" fails to establish obviousness absent some prior art suggestion for the proposed modification).

c)      **A Person of Ordinary Skill Would Not Have Achieved The Claimed Compositions by Concentrating the NMFS Test Materials**

Defendants also have failed to prove that further concentrating the NMFS test materials would have achieved the claimed inventions.  The "PUFA 2" composition (from Nilsson) cited by Defendants had an EPA:DHA ratio of about 2.2, which falls outside the required ratios of all the asserted claims.   [D.I. 209 at 28-29 (citing DTX-1448 at Table 1); PTX-1; PTX-2] Defendants cite no evidence that further concentrating PUFA 2 would have caused the EPA:DHA ratio to meet the claimed ranges.  Defendants' attempt to supplement the deficiencies of the prior art by citing *internal* Pronova documents [*see* D.I. 209 at 30] is misplaced because these documents are not prior art [D.I. 204 at 834:20-836:6; DTX-162], and do not disclose the claimed fatty acid compositions [D.I.  204 at 836:7-842:5; DTX-652; DTX-1412].

Similarly, the NMFS test material from the Joseph Handout (written by the same Dr. Joseph who submitted a declaration on behalf of Norsk Hydro during prosecution) is not reported to contain HPA, nor is there any evidence that further concentrating it would have created a concentrate having at least 1% HPA as required by claim 20/18.  [PTX-547; PTX-2]  Defendants also have not shown that the other limitations of the asserted claims would have been met by their hypothetical modified NMFS material.

Dr. Rizvi's conclusory testimony, which was based largely on leading questions, should be given little weight.  [*See, e.g.*, D.I. 204 at 926:20-927:3 ("Q.  So is it your conclusion, then if you took the NMFS starting material and you increased it by using the urea fractionation and supercritical fluid extraction -- I'm sorry.  It is already urea fractionated.  You applied the

36

supercritical fluid extraction.  Would it be obvious to get the compositions of the claims if you used the target provided by DeBernardi, Dahl and Krzynowek?  A.  That's correct.")]  Moreover, Dr. Rizvi and Dr. Ganem both acknowledged that several process variables in SFE, such as solvent composition, flow rate, and extraction rate, may affect the final composition.  [D.I. 204 at 941:24-942:7, 945:7-946:1, 852:4-853:6]  Dr. Rizvi never explained, however, *what* specific process conditions would have yielded the claimed mixed-fatty-acid concentrates if one of ordinary skill had applied SFE techniques to the NMFS test materials.  [D.I. 204 at 893:20-898:17]  Nor did he perform any testing of his own to provide scientific support for his opinions.  [D.I. 204 at 927:22-928:2, 944:23-945:2]  In fact, Dr. Rizvi's own work with SFE never produced greater than 51.48% EPA plus DHA.  [*See* D.I. 204 at 946:19-947:18; PTX-1072]  Thus, his vague testimony provides no basis for a conclusion of obviousness.

In reality, without hindsight knowledge of the specifically claimed mixed-fatty-acid compositions, one of ordinary skill would not have known what SFE process parameters to apply in any effort to modify the NMFS materials.  Defendants' NMFS arguments therefore seek to reconstruct the claimed inventions from the prior art using hindsight, which is legally impermissible.  *KSR*, 550 U.S. at 421; *Ortho-McNeil*, 520 F.3d at 1364-65.

### 6.     The "Overlapping Range" Cases Are Inapposite

Defendants assert that "[w]here, as here, the claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness."  [D.I. 209 at 32]  It is unclear what "claimed range" Defendants are referring to.  In any event, the "overlapping range" cases they cite are inapposite.  *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1331 (Fed. Cir. 2008) (claims requiring recording speeds of 5-28 m/s presumed obvious in view of prior art disclosing overlapping recording speeds of 2.4-5.6 m/s); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1310-11 (Fed. Cir. 2006) (claimed method involving replacing appliances every 2-20

37

days presumed obvious in view of prior art method involving replacing appliances every 14-21 days); *Iron Grip Barbell, Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1321-22 (Fed. Cir. 2004) (claimed barbell with three handles obvious in view of prior art barbells having one, two, or four handles); *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) (claim to nickel-base superalloy *prima facie* obviousness where each range of claim fell within corresponding range of prior art reference); *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1577 (Fed. Cir. 1993) (claim to alloy with 20-24% chromium *prima facie* obvious in view of prior art alloy with 14-26% chromium); *In re Geisler*, 116 F.3d 1465, 1467-69 (Fed. Cir. 1997) (claim to reflective article with layer 50-100 Angstroms thick *prima facie* obvious over prior art reflective article with layer 100-600 Angstroms thick).   In these cases the prior art references described all the claim elements, which is not true here.  For example, the prior art cited by Defendants wholly fails to suggest, among other limitations, the specific combination of EPA, DHA, HPA, DPA, and AA required by claim 20/18 or the presence of 4.5% C20, C21, and C22 omega-3 fatty acids other than EPA and DHA required by claim 50. [*Supra* at IV.C]   Thus, Defendants have not established a *prima facie* case of obviousness.

### 7.   Secondary Considerations Support a Conclusion of Nonobviousness

Defendants have not established a *prima facie* case of obviousness.  Even if they had, compelling objective evidence of nonobviousness would overcome such a *prima facie* case.

### a)   Commercial Success

A finding of commercial success requires a sufficient relationship between the commercial success and the patented invention.  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).  Here, Lovaza® has achieved a great deal of commercial success directly tied to the inventions of the '667 and '077 patents.  [D.I. 205 at 1162:24-1163:5]  The asserted claims cover pharmaceutical compositions and methods of using

38

them to treat or prevent hypertriglyceridemia.  [D.I. 205 at 1157:25-1158:6; PTX-1; PTX-2]  The claimed compositions comprise the active ingredient in Lovaza®, which received FDA approval as an adjunct to diet to reduce triglyceride levels in adults with severe hypertriglyceridemia. [D.I. 205 at 1158:7-1159:2; PTX-43]

 Lovaza® has been enormously successful.  Dollar sales of Lovaza® have dramatically increased each year since its introduction in late 2005, totaling over $2.3 billion as of August 2010.   [D.I. 205 at 1166:12-1167:7; PTX-759; PTX-760; PTX-1200]   Total and refill prescriptions have also increased every year, resulting in over 16 million prescriptions and almost 10 million refill prescriptions in the U.S. as of August 2010.  [PTX-761 through PTX-766]  GSK's 2007 acquisition of Reliant Pharmaceuticals for $1.65 billion further demonstrates Lovaza®'s marketplace value and success because the primary factor driving that acquisition was the future prospects of Lovaza®.  [D.I. 205 at 1181:3-1182:17; PTX-569]

 Lovaza®'s performance compared to its competitors has been strong.  Lovaza® primarily competes in the non-statin dyslipidemia ("NSD") market with its primary competitors being TriCor® and Niaspan® (and more recently Trilipix®) with secondary competition from generic fenofibrates and gemfibrozil.[6]   [See e.g., D.I. 205 at 1167:11-1174:24; D.I. 206 at 1339:7-1340:12; PTX-563; PTX-569; PTX-746; PTX-844]   Although total yearly prescriptions for Lovaza® had not yet surpassed those of TriCor®, Niaspan®, or generic gemfibrozil by the time of trial, Lovaza® entered the market much later than those products [D.I. 205 at 1177:6-1178:13; PTX-762], and its share of prescription volume and revenue volume in the NSD market has risen

---

[6] Statins and omega-3 dietary supplements are generally not considered to be competitors of Lovaza®, which is instead often prescribed as an add-on to statins in the treatment of patients with mixed dyslipidemias.  [D.I. 206 at 1303:10-18, 1322:4-8, 1340:19-1341:2; D.I. 205 at 1174:25-1176:8; PTX-563 at LOVAZA24872]

continuously since its entry, in contrast to the falling shares of each of those products over the same period.  [D.I. 205 at 1176:23-1177:5, 1179:8-18; PTX-759; PTX-761]  When compared over the first 32 months in each of their respective lifecycles, Lovaza® actually performed substantially better in terms of both new and total prescriptions than each of TriCor® and Niaspan®.  [D.I. 205 at 1178:14-1179:4; PTX-563]

Not only has Lovaza® achieved significant marketplace success, that success has been due in large part to the benefits and advantages of the inventions of the '667 and '077 patents, which cover the active ingredient of Lovaza® and its use to treat hypertriglyceridemia.  [D.I. 205 at 1161:3-9]  Those advantages include Lovaza®'s 1) effectiveness in treating and preventing hypertriglyceridemia, 2) excellent safety and tolerability profiles, and 3) minimal interactions with other drugs that may be co-administered.  [D.I. 201 at 159:9-161:19; PTX-43; D.I. 205 at 1159:3-1160:3]  Physicians and third-party analysts view these benefits as primary drivers of Lovaza®'s success.  [D.I. 205 at 1188:8-1193:13; PTX-696; PTX-701; PTX-565; PTX-563 at LOVAZA24906; PTX-812 at PRV920188; PTX-710 at LOVAZA25288; D.I. 206 at 1323:5-1324:8]  These benefits also form the core of Lovaza®'s marketing and promotional messages.  [D.I. 205 at 1184:14-1188:7; PTX-710; PTX-860; PTX-697 at LOVAZA599354-55; PTX-701 at LOVAZA639863-69; D.I. 206 at 1362:21-1363:15]  All but a relatively small number of payers have now adopted Lovaza®.  [D.I. 206 at 1357:23-1358:1]

Marketing efforts used to promote Lovaza® are common for pharmaceuticals and do not explain its success.  [D.I. 205 at 1195:17-1200:6, 1202:16-1203:1; D.I. 206 at 1325:15-23, 1365:15-19; PTX-721]  Growth in revenue and total prescriptions for Lovaza® have far outpaced any increases in promotional spending.  [D.I. 206 at 1453:10-1454:12; PTX-759; PTX-767]  Moreover, Lovaza® has gained in market share compared to its two primary branded

competitors, TriCor® and Niaspan®, even with marketing efforts that have been comparable to or lower than those competitors.  [D.I. 205 at 1200:7-1202:12; PTX-563 at LOVAZA24886-90] The refill prescription performance of Lovaza® further confirms that marketing is not the reason for its success.  [D.I. 205 at 1199:3-19; PTX-765; PTX-766]

Although Defendants' expert, Mr. Boghigian, asserted that Lovaza® has encountered barriers to success, Lovaza® has achieved significant market success despite those barriers. Lovaza® has differentiated itself from its competitors based on its favorable efficacy, safety, tolerability, and drug interaction profiles.  [*See, e.g.*, D.I. 201 at 159:22-24; PTX-813 at PRV920302]  There also are significant differences between Lovaza® and omega-3 dietary supplements, which are available without prescription.  [D.I. 206 at 1370:3-1371:2, 1318:6-14, 1322:4-1323:2; PTX-710 at LOVAZA25256-88]  If the market did not view Lovaza® to have advantages compared to its competitors or the dietary supplements, the market would have adjusted itself accordingly with decreased, or at least flat, sales and prescriptions.  [D.I. 205 at 1197:6-7, 1199:3-15]  Instead, Lovaza® has experienced nothing but strong, continued growth. [*See supra*]  The substantial commercial success of Lovaza® therefore supports a conclusion of nonobviousness.  *Graham*, 383 U.S. at 17-18.

### b)  Long-Felt but Unmet Need

Lovaza® has filled a long-felt but unmet need in the treatment of hypertriglyceridemia. Prior drugs suffered from poor side-effect, tolerability, and/or drug-to-drug interaction profiles, and Lovaza® provides an effective drug without those problems.  [D.I. 201 at 159:22-24; PTX-813 at PRV920302 ("There are a number of classes of drugs that lower triglycerides.  However, all are associated with side effects, unlike Lovaza/Omacor.  In our opinion, there is nothing obvious in drug pipelines that offers the same combination of efficacy and side effects that could replace Lovaza/Omacor."); D.I. 206 at 1323:5-1324:4; PTX-565 at PRV1604797; PTX-812 at

PRV920188; PTX-710 at LOVAZA25288; PTX-701 at LOVAZA639856; PTX-563 at LOVAZA24906]  This factor also supports a conclusion of nonobviousness.  *Graham*, 383 U.S. at 17-18; *Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*, 456 F. Supp. 2d 644, 670 (D.N.J. 2006), *aff'd*, 233 Fed. Appx. 999 (Fed. Cir. 2007).

### c)      Copying

Despite the several existing products for the treatment of hypertriglyceridemia (including generic drugs and dietary supplements), Defendants have chosen to seek FDA approval to sell generic Lovaza® products, and have sought to copy the unique and complex fatty acid profile of Lovaza®, including the several specific omega-3 and omega-6 fatty acids required by the asserted claims.  [PTX-164; PTX-338; DTX-517; D.I. 205 at 1176:12-19, 1202:16-1203:1]  Their attempt to copy Lovaza® further supports a conclusion of nonobviousness.  *Graham*, 383 U.S. at 17-18.

### B.      Defendants Have Failed to Prove Public Use

Defendants allege that Dr. Skrinska publicly used what they call "the Skrinska material" by testing it to confirm its contents and administering capsules of it to himself and others.   [D.I. 209 at 34]  By using this terminology, Defendants seek to evade the fact that Dr. Skrinska only received small *liquid samples* of K80, which he never used for any purpose, hoping the Court fails to appreciate that no evidence corroborates Dr. Skrinska's unreliable testimony.

### 1.      Legal Standards

Whether acts constitute an invalidating public use under § 102(b) presents a question of law based on underlying facts.  *Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1267 (Fed. Cir. 2008).  Defendants had to prove public use of a product meeting all the claim limitations by clear and convincing evidence.  *Finnigan Corp. v. U.S. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999); *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed. Cir. 2002).  Moreover, public use under § 102(b) requires "actual use by someone at some point."

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1307 (Fed. Cir. 2002).  Distribution of samples, without evidence that someone actually used them, does not establish a use.  *Id.* ("Although there is evidence in the record that samples of Ricoseal were sent to various corporations, there is no evidence of their use.").

When oral testimony is offered to prove an invalidating public use, the Supreme Court has long recognized the need for corroborating evidence.  *Deering v. Winona Harvester Works*, 155 U.S. 286, 300-301 (1984); *The Barbed Wire Patent*, 143 U.S. 275, 284-85 (1892).  Courts view uncorroborated oral testimony to prove public use with "grave suspicion."  *Deering*, 155 U.S. at 300; *see also Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998).  Further, corroboration "is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest."  *Finnigan*, 180 F.3d at 1369.

### 2.      Dr. Skrinska Did Not Publicly Use the Claimed Inventions

#### a)      Contemporaneous Documents Show That Dr. Skrinska Received Only Small Liquid Samples of K80 and There Is No Evidence That He Publicly Used Them

The documents tell the story here.  Dr. Skrinska received small liquid samples of K80 in July and September of 1987.  [DTX-82; DTX-83; DTX-84; DTX-85; DTX-86]  There is no evidence that Dr. Skrinska ever used those samples for any purpose.  [*Supra* at IV.D]  No documentation shows that Dr. Skrinska ever formulated the small liquid samples into capsules, or tested their contents.  [D.I. 204 at 806:3-809:3, 936:3-939:14]  Likewise, there is no evidence that other recipients of K80 samples, such as Dr. Peterson or Prof. Davis, ever used their samples for any purpose.  [*See* DTX-99; DTX-113; DTX-114]  Because public use requires an actual use by someone at some point, and Defendants have failed to establish that Dr. Skrinska ever used the K80 liquid samples he received, Defendants have not proven that Dr. Skrinska publicly used

the claimed inventions.  *Minn. Mining*, 303 F.3d at 1307 (absence of evidence that product samples were used precluded finding of public use).

> **b)**   **Dr. Skrinska's Deposition Testimony Concerning an Alleged Clinical Trial Is Uncorroborated**

Dr. Skrinska's testimony that he received and used "maybe 500 to 1,000 capsules" from Norsk Hydro remains completely uncorroborated.  No documentation shows that he received capsules of any material from Norsk Hydro or ever formulated the small liquid samples of K80 he received into capsules.  [D.I. 204 at 806:3-809:3, 936:3-939:14]  No protocol, IRB approval, or consent forms establish that he ever carried out a clinical study using a product meeting every limitation of the asserted claims.  [D.I. 204 at 932:22-933:14, 801:13-802:1]  The notebook and grant application he mentioned at his deposition have not been produced [D.I. 202 at 486:1-11, 491:24-492:1], nor have any documents from the Cleveland Research Institute [D.I. 204 at 801:5-12, 932:18-21].  Likewise, no one has provided any corroborating testimony—not the unnamed members of Dr. Skrinska's lab who allegedly participated in the study, nor the board members and administrators who he claimed would have been informed of any projects taking place.  [D.I. 204 at 803:8-806:2, 933:15-936:1]  Further, Dr. Skrinska's testimony about receiving capsules is not supported by the testimony of Dr. Gulbrandsen or any other Norsk Hydro employee.  [*See, e.g.*, D.I. 203 at 695:22-696:6, 701:2-18, 669:14-670:21, 693:12-17] The lack of corroboration here is striking in view of the extensive documentation required for clinical studies to protect human volunteers and verify safety and efficacy results.  *Woodland Trust*, 148 F.3d at 1373 ("It is rare indeed that some physical record (*e.g.*, a written document such as notes, letters, invoices, notebooks, or a sketch or drawing or photograph showing the device, a model, or some other contemporaneous record) does not exist.").

Defendants offer as alleged corroboration letters between Drs. Wei and Sheehan and Drs. Gulbrandsen and Krokan. [D.I. 209 at 37-38; DTX-111; DTX-112]. But they mischaracterize the letter from Wei and Sheehan as allegedly referring to capsules received by Dr. Skrinska. [D.I. 209 at 37] The letter does not refer to capsules, nor to any use by Dr. Skrinska, only that Wei and Sheehan "learned of the existence of your concentrated product of omega-3 fatty acids (80%) as ethyl esters." [DTX-111] Again, the documents tell the story—Dr. Skrinska received only small liquid samples of K80, and there is no evidence that he used those samples.

Defendants also point to the liquid samples of K80 sent to Dr. Peterson and Prof. Davis [D.I. 209 at 38-39; DTX-99; DTX-113; DTX-114], and Dr. Nordøy's bioavailability experiment at OHSU [D.I. 209 at 38-39; DTX-150]. However, because Defendants have not established *any* relationship between Dr. Skrinska and those other individuals, this evidence does not corroborate his testimony. *See, e.g., Lacks Indus. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1350-51 (Fed. Cir. 2003) (documents failed to corroborate oral testimony in part because they were insufficiently connected to the alleged prior public use).

### c)      Dr. Skrinska's Testimony Is Unreliable

The unreliability of Dr. Skrinska's testimony is manifest. Defendants met with Dr. Skrinska to discuss his testimony prior to his deposition without Pronova counsel's presence, and paid for all his travel expenses. [D.I. 202 at 468:22-469:1; D.I. 203 at 513:14-521:18] Then only after a leading question from Defendants ("Did Norsk Hydro, in fact, provide to you capsules containing concentrated fish oil?") did Dr. Skrinska testify that he believed it did. [D.I. 202 at 476:20-477:12] Lacking corroboration, this testimony remains wholly unreliable. *See Barbed Wire*, 143 U.S. at 284 ("Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information.").

45

Dr. Skrinska's testimony also fails to establish that his alleged capsules met every claim limitation. Defendants dodge this inquiry by pointing to Dr. Skrinska's response ("[r]ight") to yet another leading question ("And by your recollection it was approximately the same distribution?"). [D.I. 209 at 35; D.I. 202 at 484:7-19] The unreliability of Dr. Skrinska's testimony is emphasized by his not recalling using capsules from another source even though he appears to have worked with MaxEPA and other fish oil products. [D.I. 202 at 480:8-20; DTX-104 at PRV00864319_T] This casts further doubt on the source and composition of his alleged capsules. *See Deering*, 155 U.S. at 301 (discussing "the possibility of [the witness] being mistaken as to the exact device used, which, though bearing a general resemblance to the one patented, may differ from it in the very particular which makes it patentable").

Dr. Skrinska's inability to recall events that occurred over 20 years ago further erodes the reliability of his testimony. Drs. Skrinska, Gulbrandsen and Krokan met in January 1987, yet Dr. Skrinska did not recall the meeting. [D.I. 203 at 511:11-24; DTX-124] He was also unclear regarding the timing of his alleged study, whether his NIH grant application contained data from the study and, indeed, whether he actually performed a study with concentrated fish oil, as opposed to MaxEPA, despite the fact the NIH *never approved* his grant. [*See* D.I. 202 at 474:18-24, 486:15-22, 491:9-12; DTX 124; DTX-81A] With no documentary support, Dr. Skrinska's hazy memory provides no basis to conclude that a study ever took place, much less with Norsk Hydro capsules.

Because a sole witness's testimony regarding his own alleged public use cannot invalidate a patent without corroborating evidence, and Defendants have provided no evidence to corroborate Dr. Skrinska's unreliable testimony, Defendants have not proven an invalidating public use. *Deering*, 155 U.S. at 300-301; *Minn. Mining*, 303 F.3d at 1307.

46

Finally, to the extent Defendants allege now, and for the first time, that Dr. Nordøy's study with K85 was itself an invalidating public use [*see* D.I. 209 at 3], the evidence does not support that contention.  This experiment was conducted to evaluate whether K85 exhibited sufficient bioavailability such that it might have potential as a pharmaceutical, and, if so, could be further evaluated for such a use.  *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1380-81 (Fed. Cir. 2006) (finding clinical study an experimental use).  The experimental nature of this study was described in detail to the PTO during prosecution of the '077 and '667 patents.   [*See, e.g.*, D.I. 202 at 305:19-309:7; DTX-150; PTX-9 at PRV00409076-86, PRV00409089-123, PRV00408993-9000; PTX-10 at PRV00407448-55]   Moreover, the experimental nature of the bioavailability study and its role in reducing the claimed inventions to practice went unchallenged by Defendants until their post-trial brief.  Defendants did not raise this issue in discovery or in the joint pretrial order and thus have waived it.  [D.I. 180; D.I. 181] *CPC Int'l Inc. v. Archer Daniels Midland Co.*, 831 F. Supp. 1091, 1102-03 (D. Del. 1993) (defense not raised in interrogatory responses and proposed pretrial order waived).

### C.   Defendants Have Failed to Prove Improper Dependency or Indefiniteness

#### 1.   Defendants' Improper Dependency Argument Is Based on an Incorrect Proposed Claim Construction

Defendants argue that, if the Court adopts their proposed construction of the term "fatty acids" as excluding ethyl esters, claim 9 of the '077 patent and claims 44/31 and 50 of the '667 patent, which refer to ethyl ester forms of fatty acids, are invalid for improper dependency.  [D.I. 209 at 43-44]  Their proposed construction of "fatty acids," however, is legally incorrect for the reasons detailed in Pronova's claim construction briefs.  [D.I. 109; D.I. 120]  Consistent with Pronova's position, Defendants' expert Dr. Sacks agreed that the term "fatty acid" is used rather generally in the art to refer to different forms of fatty acids, including ethyl ester and triglyceride

forms.  [D.I. 203 at 599:19-600:6]  His testimony thus refutes Defendants' claim construction, which provides the basis for their improper dependency argument.  Defendants fail to address Dr. Sacks's testimony.  [D.I. 209 at 43-44]

### 2.    Defendants' Indefiniteness Argument Is Factually and Legally Unsupported

Defendants argue that, if the Court adopts Pronova's construction of the term "fatty acids," claim 20/18 of the '667 patent would cover free fatty acids and all derivatives thereof.  [D.I. 209 at 44]  Citing Dr. Curtis's testimony, Defendants assert that the range of possible chemical species would be so broad that a skilled practitioner would be unable to determine what compounds fall within the scope of "fatty acids," rendering claim 20/18 indefinite.  [*Id.*]

First, Defendants' proposed construction of "fatty acids" is incorrect and conflicts with Dr. Sacks's testimony.  [D.I. 203 at 599:19-600:6]  Second, Dr. Curtis's testimony does not support Defendants' position.  Dr. Curtis explained that fatty acids can vary in their chain lengths, number of double bonds, and degree of branching.  [D.I. 201 at 144:6-16]  He never suggested that a skilled practitioner would be unable to determine which compounds are "fatty acids" under Pronova's construction.  [*See* D.I. 201 at 142:16-144:16]  Thus, Defendants provide no evidence to support their position.  Third, the allegedly broad scope of the term "fatty acids" does not render claim 20/18 indefinite.  *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011).  "Merely claiming broadly does not render a claim insolubly ambiguous, nor does it prevent the public from understanding the scope of the patent."  *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1350-52 (Fed. Cir. 2009) (claim covering over 5000 compositions not indefinite where chemical formula sufficiently notified public of claim scope).  Defendants cite no legal support for their indefiniteness argument.  [D.I. 209 at 44]

### D.     Defendants Have Failed to Prove Inequitable Conduct

#### 1.     Legal Standards

To prove inequitable conduct, an accused infringer must prove by clear and convincing evidence that an applicant misrepresented or omitted material information with specific intent to deceive the PTO.  *Therasense*, *Inc. v. Becton, Dickinson & Co.*, 2011 WL 2028255, at *6 (Fed. Cir. May 25, 2011).  The required materiality is, in general, but-for materiality.  *Id.*  at *11. Further, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence.  *Id*. at *10. Therefore, "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found."  *Id.*  The patentee need not offer any good-faith explanation unless the accused infringer first proves a threshold level of deceptive intent by clear and convincing evidence.  *Id.*

#### 2.     Dr. Dahl Did Not Mischaracterize the Design of His January 1990 Statistical Study Included in the Bønaa/Dahl Declaration

Defendants first argue that the Bønaa/Dahl Declaration allegedly was false and misleading because Dr. Dahl stated that he conducted a study that consisted of two dosage groups when the Absorption Comparison Study for K85/TG30 consisted of five dosage groups. [D.I. 209 at 44-45, 48-49 and 52-55]  The Absorption Comparison Study for K85/TG30, however, was *not* the study that Dr. Dahl relied on in the Bønaa/Dahl Declaration.  Rather, Dr. Dahl relied on his January 1990 Statistical Study for K85/TG30.  [DTX-213]

Defendants assume that the Absorption Comparison Study is the study that Dr. Dahl referred to in the Bønaa/Dahl Declaration because it contains some of the same raw data.  That assumption is incorrect.  Even though the two studies contain some of the same raw data, Dr. Dahl considered the Absorption Comparison Study for K85/TG30 [DTX-141] and the Statistical Study for K85/TG30 [DTX-213] to be different studies because they were designed to answer

different questions.  [D.I. 202 at 323:21-325:11, 458:13-22]  The Absorption Comparison Study was designed to determine whether the fatty acids in the ethyl ester form (K85) would be absorbed to the same extent as the triglyceride form (TG30).  [D.I. 202 at 303:4-10, 305:8-18, 324:9-13; DTX-141 at PRV01148261 (citing PTX-899)]  In contrast, Dr. Dahl's Statistical Study for K85/TG30 was designed to statistically analyze the uptake of EPA and DHA in the phospholipids fraction at a high dose in order to offer a possible biological explanation for why K85 was more effective than TG30 in lowering blood pressure.  [*Supra* at IV.E.5]

Dr. Dahl's use of the term "study" broadly encompassed both original clinical work as well as his reanalysis of existing data under a different design.  For example, in the Absorption Comparison Study for K85/TG30 (a 1988 internal report), Dr. Dahl repeatedly referred to "this study" even though it involved consideration of existing data from two prior clinical studies rather than any new clinical research.  [*See, e.g.*, DTX-141 at PRV01148250, PRV01148261] This illustrates that his use of the term "study" included reanalysis of previously generated clinical data.  Dr. Dahl continued the same practice in his January 1990 Statistical Study for K85/TG30 by describing a statistical "study" with two dosage groups, and he accurately reported those two dosage groups to the PTO in the Bønaa/Dahl Declaration.  [*Compare* DTX-213 at PRV00833051-52 *with* PTX-9 at PRV00408246-247]  Thus, Defendants' assertion that he misdescribed the number of groups lacks merit.

### 3.   Dr. Dahl Did Not Omit Any Relevant Information from His January 1990 Statistical Study Included in the Bønaa/Dahl Declaration

Defendants next argue that the Bønaa/Dahl Declaration was false and misleading because Dr. Dahl's Absorption Comparison Study for K85/TG30 and related references allegedly were inconsistent with the data and conclusions in the declaration.  [D.I. 209 at 45-50, 52-56]  This assertion is misguided for several reasons.

### a)       Defendants Ignore Dr. Bønaa's Portion of the Declaration

Defendants never even mention Dr. Bønaa's portion of the joint Bønaa/Dahl Declaration.

[D.I. 209]   Dr. Dahl's portion of the declaration, however, must be read in context with Dr.

Bønaa's related portion.   As Dr. Dahl explained, the data submitted in the declaration must be

considered together because this was "one declaration," and his and Dr. Bønaa's data confirmed

each other.   [D.I. 202 at 319:17-23]   In proper context, it was entirely appropriate for Dr. Dahl to

consider, in his part of the joint declaration, the particular absorption data that correlated to the

data in Dr. Bønaa's portion of the declaration relating to efficacy in lowering blood pressure.

More specifically, Dr. Bønaa measured the uptake of EPA and DHA in the plasma

phospholipids fraction, not in total serum lipids, and found that subjects with a large increase of

omega-3 fatty acids in plasma phospholipids experienced a greater lowering of blood pressure.

[PTX-9 at PRV00408252-53]   Dr. Dahl used Dr. Bønaa's conclusion that phospholipid

absorption of EPA/DHA correlated to a greater hypotensive effect when designing his study that

evaluated phospholipid data.   [*See* PTX-9 at PRV00408246]   Defendants simply ignore this fact

because it undermines their inequitable conduct arguments.   [D.I. 203 at 638:12-639:7]   Their

failure to address the *entire* Bønaa/Dahl Declaration shows the fallacy of their arguments.

### b)       Total Lipid Absorption Data Were Not Relevant to Dr. Bønaa's Reliance on Phospholipid Absorption Data

Defendants incorrectly argue that "there was no plausible scientific basis to omit the total

lipid data and submit only the phospholipid data."   [D.I. 209 at 55]   The total lipid absorption

data were not relevant to Dr. Bønaa's reliance on phospholipid absorption data in his Blood

Pressure Efficacy Study for K85.   As discussed above, Dr. Bønaa correlated the blood pressure-

lowering effect of K85 to absorption of EPA/DHA in the phospholipids fraction, *not* total lipids.

[*Supra* at IV.E.4]   Based on Dr. Bønaa's conclusion that the blood pressure-lowering effect was

dependent on the increase in plasma phospholipid omega-3 fatty acids, Dr. Dahl assumed that the relative content of EPA and DHA in plasma phospholipids, rather than total lipids, would depict the efficacy of K85 and TG30 in lowering blood pressure in his Statistical Study for K85/TG30. [DTX-213 at PRV00833051; PTX-9 at PRV00408246]   Defendants' only witness on this issue, Dr. Sacks, admitted he did not even consider the Bønaa portion of the Bønaa/Dahl Declaration in forming his opinions.  [D.I. 203 at 638:12-639:7]

Dr. Dahl also published the disputed total lipid data in 1989 during prosecution [DTX-1572], which is inconsistent with any deceptive intent.  *See Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 734 (Fed. Cir. 2010).

### c) Additional DHA Phospholipid Data Would Have Further Supported a Conclusion of Increased Bioavailability for K85

Defendants assert that "[t]here is no dispute that Dahl cherry-picked part of the data from 'two groups' out of the five and reported those results to the PTO as if they were the entire study."  [D.I. 209 at 54]   That is simply untrue.  Defendants' suggestion that Dr. Dahl deceptively omitted results from Groups 1 and 4 of the Absorption Comparison Study makes no sense because the DHA phospholipid absorption for K85 in Group 1 (a value of 4.1) was *higher* than the DHA phospholipid absorption for TG30 in Group 4 (a value of 2.2).  [DTX-141 at PRV01148283]  Thus, even under Defendants' theory that one can simply look at the raw data, a comparison of those data actually would have further *supported* Dr. Dahl's conclusion of increased bioavailability for K85.  [*Id.*]  Accordingly, Defendants' theory that Dr. Dahl "cherry picked" data is factually unsupported.[7]

---

[7]      In addition, despite representing to the Court that they were admitting DTX-212 for "identification" purposes only, Defendants continue to cite it as alleged substantive evidence. [D.I. 202 at 452:16-453:9; D.I. 209 at 47, 53]   This exhibit (an excerpt from DTX-141) is

(continued on next page)

### d) K85 Group 3 Had No Corresponding TG30 Group

There was no corresponding TG30 dosage group for K85 Group 3, which administered 14 g/day of K85.  [DTX-141 at PRV01148283]  Thus, the absorption data for K85 Group 3 could not have been compared to absorption data for a corresponding TG30 group because such data *did not exist*.  Again, Defendants' assertion that Dr. Dahl "cherry-picked" data is baseless.

### e) Dr. Dahl's Analysis of the Highest Comparable Dosage Groups Was Consistent with Dr. Bønaa's Blood Pressure Results

Dr. Dahl's analysis of the higher dose comparison (Groups 2 and 5, administering 4.4 g/day of EPA) rather than the lower dose comparison (Groups 1 and 4, administering 2.2 g/day of EPA) was scientifically reasonable in view of Dr. Bønaa's conclusion, reflected in his *New England Journal of Medicine* publication, that lower doses, such as those of 1.8g EPA/day, may be insufficient to have any effect on blood pressure.  [DTX-141 at PRV01148283; PTX-1255 at PRV01053824; DTX-249 at PRV00894487]  Defendants cite no contrary evidence.  Although Dr. Sacks asserted there was no plausible scientific basis to withhold the lower dose data [D.I. 203 at 590:23-591:6; *see also* D.I. 209 at 55], he admitted he did not even consider Dr. Bønaa's portion of the Bønaa/Dahl Declaration, which refers to the *New England Journal of Medicine* publication.  [D.I. 203 at 638:12-639:7]  Therefore, Dr. Sacks's testimony provides no basis to question Dr. Dahl's analysis of the data.

### f) Triglyceride Lowering Data Were Not Relevant to the Results of Dr. Bønaa's Blood Pressure Study

Defendants contend that the data and conclusions in the Bønaa/Dahl Declaration were inconsistent with data from Dr. Dahl's Absorption Comparison Study for K85/TG30 and related

---

(continued from previous page)
misleading because it contains extensive handwriting and highlighting *by Defendants' counsel*.  [*Id.*]  Pronova has asked Defendants to withdraw this exhibit, but they have refused.

references, which had reported that K85 was no more effective than TG30 in lowering triglyceride levels.  [D.I. 209 at 45-50, 52-53]  Yet again, Defendants take the Dahl portion of the declaration out of context.

The Bønaa/Dahl Declaration was *not* concerned with assessing triglyceride-lowering effects; it only evaluated the efficacy of K85 to TG30 in lowering *blood pressure* in hypertensive patients and correlated that hypotensive effect to the uptake of omega-3 fatty acids in plasma phospholipids.  [PTX-9 at PRV00408243-56]  Moreover, the Examiner's rejection focused on prior art concerning treating hypertension or high cholesterol levels, not high triglyceride levels.  [PTX-9 at PRV00408230]  Thus, triglyceride-lowering data were irrelevant to the declaration or the issues raised by the Examiner and certainly were not "but-for" material to patentability.  Contrary to Defendants' assertion [D.I. 209 at 53], in subsequent prosecution, the Examiner found that any comparison to a prior art composition *lower* in EPA/DHA than Sutherland (62.5%) did not establish patentability and, therefore, triglyceride-lowering data for TG30 (30%) would have been unpersuasive.  [PTX-9 at PRV00408291, PRV00408310, PRV00408319]

### 4.    There Is No Evidence of Deceptive Intent

Not only have Defendants not shown there was anything false about the Bønaa/Dahl Declaration, they have produced no evidence that Dr. Dahl sought to deceive the PTO.

#### a)    Dr. Dahl Had Not Carried Out His January 1990 Statistical Study at the Time of His Earlier Abstracts and Reports

Defendants attach great significance to Dr. Dahl's testimony that "absorption was the same when you took into account all of the data for EPA."  [D.I. 209 at 47, 49, 54]  Yet Dr. Dahl has never asserted otherwise.  Instead, he has consistently maintained that, without conducting a statistical analysis, he could not conclude that the raw data showed any difference in absorption.  [D.I. 202 at 448:5-449:5, 451:20-452:4]

At the time of Dr. Dahl's Absorption Comparison Study for K85/TG30 and the related documents cited by Defendants, he had not conducted a statistical analysis of the raw absorption data. [*See* D.I. 202 at 446:21-25]   Thus, he concluded *at that time* that the absorption was similar. [*Supra* at IV.E.3; D.I. 202 at 448:5-14, 451:20-452:4 ("I couldn't say that these data were different because there were no statistical calculations on this data.  So as I concluded in this report, it was similar.")]   It was not until his January 1990 Statistical Study for K85/TG30 that Dr. Dahl conducted a statistical analysis and a between-group comparison for the uptake of EPA and DHA in total phospholipids at the higher dose level. [*Supra* at IV.E.5]   His analysis showed that the increase in phospholipid EPA level after intake of the 85% EPA and DHA ethyl ester composition was larger than obtained after intake of the 30% EPA and DHA triglyceride composition, and that the difference between the two groups was statistically significant. [DTX-213 at PRV00833051-53]   Similarly, Dr. Dahl showed that the increase in phospholipid DHA level after intake of the 85% EPA and DHA ethyl ester composition was larger than obtained after intake of the 30% EPA and DHA triglyceride composition, and that the difference between those two groups was highly statistically significant.   [DTX-213 at PRV00833051-053] Defendants have not challenged his statistical analysis, nor have they presented any evidence that he conducted any statistical analysis other than the one he reported to the PTO. [D.I. 209]

Based on this statistical analysis, Dr. Dahl concluded in January 1990—for the first time—that the bioavailability of EPA and DHA and thus their therapeutic effect was enhanced when they were taken as K85 rather than as TG30. [DTX-213 at PRV00833054]   Thus, Dr. Dahl's earlier reports and abstracts concluding that absorption was similar do not contradict his later conclusion that K85 had a greater bioavailability compared to TG30. *Oakwood Labs., L.L.C. v. Tap Pharm. Prods., Inc.*, 2003 WL 22400759 at *8 (N.D. Ill. Oct. 21, 2003) (finding no

inequitable conduct where conclusions based on evaporation experiments performed *at that time* did not contradict different conclusions reached in later evaporation experiments).

Defendants' assertion that Dr. Dahl never submitted any documentation showing equal absorption to the PTO [D.I. 209 at 48] is also incorrect.  He provided the Examiner with a study published by Luley that addressed that issue. [PTX-1256; D.I. 202 at 309:11-22; DTX-210 at PRV00917741; PTX-9 at PRV00408513-22]  Dr. Sacks did not consider the submission of the Luley reference in forming his opinions.  [D.I. 203 at 640:5-642:1]

With respect to the "Rome Abstract" cited by Defendants [D.I. 209 at 47], Dr. Dahl was not provided a copy of that abstract before it was submitted by Kristian Bjerve, and the data presented contain factual errors.  [DTX-95, *see also* DTX-101; D.I. 202 at 453:14-455:3]  For example, the number of subjects in each dosage group does not match the number of subjects reported in the corresponding dosage groups of the Absorption Comparison Study for K85/TG30.  [*Compare* DTX-141 at PRV01148245 *with* DTX-95]  Nor is there any evidence that the Absorption Comparison Study measured the total phospholipid fatty acids as "mg/l serum using diheptadecanoyl-lecithin as an internal standard" as reported in the Rome Abstract. [*Compare* DTX-141 *with* DTX-95]  Thus, Dr. Dahl did not conduct the statistical analysis reported in the Rome Abstract and did not agree with it.  [D.I. 202 at 454:4-455:3]

### b)   Dr. Dahl Conducted His January 1990 Statistical Study Two Months Before Any Office Action Issued

Dr. Dahl conducted his Statistical Study for K85/TG30 in January 1990, two months before a first Office Action was received from the PTO.  [*Supra* at IV.E, IV.F]  This January 1990 study was the only statistical analysis that Dr. Dahl ever performed on the data in the Absorption Comparison Study for K85/TG30.  [*Id.*]  The language that he used in his statistical study is essentially identical to the language that ultimately appeared in the Bønaa/Dahl

Declaration.   [*Id.*]   Because Dr. Dahl conducted his statistical analysis before a first Office Action had issued, he could not have intended to deceive the PTO.

Dr. Sacks did not even consider Dr. Dahl's Statistical Study for K85/TG30 in forming his opinions. [D.I. 203 at 633:10-634:14, 637:22-24]   Nonetheless, on cross-examination, he acknowledged it contains the same data and language with respect to Table I as the declaration. [D.I. 203 at 635:20-637:1, 637:10-17]   He further acknowledged that the March 1990 Office Action did not exist when Dr. Dahl completed his statistical study in January 1990.  [D.I. 203 at 637:18-21, 638:6-8]  Defendants never explain how Dr. Dahl could have intended to deceive the PTO under these circumstances.  They cite no case where the required specific intent to deceive the PTO was formed before a first Office Action had even issued.

Lacking evidence of deceptive intent, Defendants suggest that, because Dr. Dahl conducted his statistical study in connection with work for the patent department, he must have intended to deceive the PTO.  [D.I. 209 at 58-59]  That argument is illogical.  Simply because the study was completed in connection with the patent department does not establish that the declaration was false or that Dr. Dahl intended to deceive the PTO.

### c)   Dr. Dahl's Withdrawal from the Krokan Paper Shows a Good-Faith Belief in His January 1990 Statistical Study

Defendants argue that "Dahl subsequently participated in a scheme to suppress the publication of a journal article that threatened to expose his July 1990 Declaration as a fraud." [D.I. 209 at 49]  Their assertion, however, is refuted by the chronology of events.  In 1988, at the time of his Absorption Comparison Study for K85/TG30, Dr. Dahl believed that absorption was the same based on his preliminary analysis of the raw data.  [DTX-141]  In January 1990, after conducting a statistical analysis of the relevant data to correlate absorption to efficacy and before an Office Action had even issued, Dr. Dahl concluded that K85 actually absorbed to a greater

extent than TG30.  [DTX-213]  In July 1990, Dr. Dahl submitted to the PTO a study that was essentially identical to his January 1990 statistical study as part of the Bønaa/Dahl Declaration. [PTX-9 at PRV00408244-256]  In 1993, Dr. Dahl's withdrawal as an author from the Krokan paper shows a good-faith belief in his Statistical Study for K85/TG30.  [D.I. 202 at 461:16-21] Moreover, Dr. Krokan, one of the authors on the publication, stated that "there can be different ways of doing statistical analysis" on the data contained in the Absorption Comparison Study. [D.I. 205 at 1058:17-24]  For example, the publication contained no statistical calculation between the groups, as Dr. Dahl had performed in his January 1990 statistical study.  [*Compare* DTX-213 *with* DTX-143 at PRV00861549]

Defendants also cite a letter written by Dr. Krokan characterizing Dr. Dahl's removal as having "nothing to do with the soundness of the paper."  [D.I. 209 at 50]  That was Dr. Krokan's statement, not Dr. Dahl's.  [D.I. 202 at 465:9-13]  Moreover, it was not unreasonable for Dr. Dahl to disagree with the manuscript given the statistical analysis he had conducted.  [D.I. 202 at 461:16-21]  Indeed, after Dr. Dahl withdrew (but before publication), the remaining authors changed the final sentence of the abstract to be more consistent with Dr. Dahl's statistical analysis.    [DTX-216; *compare* DTX-143 at PRV00861549 (draft) *with* DTX-217 at PRV00917658 (published version)]

Defendants also incorrectly argue that Dr. Dahl's 2007 letter regarding the Krokan paper shows an intent to deceive the PTO.  [D.I. 209 at 59; DTX-1577]  Dr. Dahl explained that he did not agree with the draft manuscript because, at the time, he knew more given his analysis in the Bønaa/Dahl Declaration.  [D.I. 202 at 461:16-21]  Defendants never asked Dr. Dahl about his 2007 letter.  Instead, they chose to admit the letter into evidence during cross-examination of Pronova's commercial success expert.  [D.I. 205 at 1221:4-1223:21]  Moreover, Dr. Dahl's

statement in the letter that he withdrew as an author "for fear that the publication might harm the Omacor  patent" was consistent with his belief that his January 1990 statistical analysis was correct and the draft manuscript was incorrect.   [D.I. 202 at 461:16-21; DTX-1577 at PRV01832203]  Nothing in the letter suggests that the Bønaa/Dahl Declaration was false or that Dr. Dahl intended to deceive the PTO.  [DTX-1577]

### d)   Defendants Inaccurately Characterize Dr. Dahl's Testimony

Defendants erroneously contend that Dr. Dahl "strongly implied" that he chose the data for the Bønaa/Dahl declaration because he lacked comparative efficacy data between TG30 and K85.  [D.I. 209 at 55-56]  Dr. Dahl testified that he was not aware of being involved in any efficacy studies involving TG30.  [DTX-221; D.I. 202 at 315:3-8]  His testimony was consistent with his belief that the early studies from which Defendants cite triglyceride-lowering "efficacy data" were safety/tolerability and absorption studies, not efficacy studies.  [D.I. 202 at 297:12-15, 323:21-324:13, 348:3-9, 424:19-25, 426:15-17, 426:24-427:7, 428:15-16, 429:10-11; DTX-1026; PTX-1096]  Thus, Dr. Dahl's testimony does not conflict with the evidence.  It was Defendants on cross-examination who focused on triglyceride-lowering data.  Their reason for doing so is unknown to Pronova since the declaration discusses lowering blood pressure, *not* triglycerides.  Thus, Defendants inaccurately characterize Dr. Dahl's trial testimony.

Defendants also allege that "Pronova" committed inequitable conduct.  [D.I. 209 at 44, 52-53, 59]  However, this assertion is legally deficient because the duty of candor and good faith applies only to individuals, not corporate entities or organizations.  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1329 (Fed. Cir. 2009).

Defendants have failed to prove that the Bønaa/Dahl Declaration was false or misleading, let alone "but-for" material, or that Dr. Dahl acted with the specific intent to deceive the PTO. Thus, they have not proven inequitable conduct.  *Therasense*, 2011 WL 2028255, at **6-11.

## VI.    CONCLUSION

For these reasons, Defendants have failed to establish that the asserted patent claims are invalid or unenforceable.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Pronova BioPharma Norge AS*

*Of Counsel:*
James B. Monroe
Michael J. Flibbert
Jennifer H. Roscetti
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

Dated:  August 30, 2011