## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRONOVA BIOPHARMA NORGE AS, | ) | **Contains Confidential Information** |
| | ) | **Subject to Protective Order** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 09-286-SLR-MPT |
| | ) | (CONSOLIDATED) |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| APOTEX CORP., APOTEX INC., | ) | REDACTED-PUBLIC VERSION |
| PAR PHARMACEUTICAL, INC. and | ) | |
| PAR PHARMACEUTICAL COMPANIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY POST-TRIAL BRIEF

John W. Shaw (#3362)
Karen L. Pascale(#2903)
Pilar G. Kraman (#5199)
**YOUNG CONAWAY STARGATT & TAYLOR LLP**
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600

Frederick H. Rein
Annemarie Hassett
Gregory T. Sandidge
David E. Lansky
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 813-8800

J. Anthony Downs
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, Massachusetts 02109
Telephone: (617) 570-1000

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

Frederick L. Cottrell, III (#2555)
Steven J. Fineman (#4025)
**RICHARDS LAYTON & FINGER**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700

Daniel G. Brown
Mitchell E. Epner
Jennifer R. Saionz
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Telephone: (212) 999-5800

*Attorneys for Defendants*
*Par Pharmaceutical, Inc. and*
*Par Pharmaceutical Companies, Inc.*

**[SECOND CORRECTED VERSION**
**October 17, 2011]**

September 29, 2011

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................1

II. NATURE AND STAGE OF THE PROCEEDINGS .........................................................3

III. SUMMARY OF ARGUMENT ....................................................................................3

IV. STATEMENT OF FACTS ..........................................................................................3

V. THE ASSERTED CLAIMS ARE OBVIOUS..................................................................3

    A. The Differences Between The Prior Art And The Claims Are Immaterial ............4

        1. Controlling Precedent Establishes that the Minor Components Are Legally Irrelevant to Patentability ...............................................................5

        2. Defendants' Unrebutted Evidence Shows That The Claimed Amounts Of The Minor Components Would Be Expected By Following The Prior Art.........................................................................8

    B. Pronova Fails to Address Defendants' Actual Argument Based on the NMFS Material ............................................................................................9

    C. The Art Taught A POSA To Concentrate NMFS Material By SFE.....................11

    D. Pronova's Cases On Motivation Are Irrelevant....................................................12

    E. Haagsma Does Not Teach Away From An EPA+DHA Concentrate Containing The Minor Components ...................................................................13

VI. NO SECONDARY CONSIDERATIONS REBUT DEFENDANTS' *PRIMA FACIE* SHOWING OF OBVIOUSNESS........................................................................15

    A. Lovaza® Is Not Commercially Successful...........................................................15

    B. Lovaza® Did Not Satisfy A Long-Felt But Unmet Need......................................17

VII. THE UNREBUTTED EVIDENCE PROVES INVALIDITY FOR PUBLIC USE..........17

    A. Dr. Skrinska Used K80 Without Restriction By Pronova.....................................17

        1. Dr. Skrinska's Testimony Regarding His Public Use Of The Skrinska Materials Is Corroborated And Credible....................................19

VIII. DEFENDANTS HAVE PROVEN DAHL'S INEQUITABLE CONDUCT BY CLEAR AND CONVINCING EVIDENCE ................................................................22

    A. The Undisputed Facts Regarding The Comparison Study And The July 1990 Declaration................................................................................................23

B.      Virtually All of Pronova's Inequitable Conduct Arguments Are
        Procedurally Barred ...................................................................................25

C.      Pronova's Inequitable Conduct Arguments Are Substantively Meritless .............26

        1.      Dahl's January 1990 Report Was Not The "Study" Referenced In
                the July 1990 Declaration ...........................................................26

        2.      Dahl's January 1990 Report Does Not Demonstrate Good Faith.............27

        3.      Pronova's Argument That Dahl Excluded Total Serum Lipid Data
                And Reported Only Phospholipid Data Because Of Dr. Bonaa Is
                False .......................................................................................28

        4.      Dahl's Declaration To The PTO On The Luley Article ...........................28

        5.      Pronova's Contention That Triglyceride-Lowering Efficacy Data
                Was Irrelevant Is Demonstrably False .......................................29

D.      Dahl Committed Inequitable Conduct In Attempting To Suppress, And
        Failing To Disclose, The Krokan Article................................................29

IX.     CONCLUSION ............................................................................................30

YCST01:11524592.1                                                                                          058956.1029

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">Cases</span>

*Adenta GmbH v. OrthoArm Inc.,*
 501 F.3d 1364 (Fed. Cir. 2007)..............................................................18, 19

*Allergan, Inc. v. Barr Labs., Inc.,*
 2011 WL 4000820 (D. Del. Sept. 8, 2011) ................................................9

*Am. Seating Co. v. USSC Group, Inc.,*
 514 F. 3d 1262 (Fed. Cir. 2008)................................................................18

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
 239 F.3d 1343 (Fed. Cir. 2001)................................................................17

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.,*
 499 F.3d 1293 (Fed Cir. 2007)................................................................13

*B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,*
 72 F.3d 1577 (Fed. Cir. 1996)................................................................17

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.,*
 229 F.3d 1120 (Fed. Cir. 2000) ................................................................16

*Cable Elec. Prods. Inc. v. Genmark, Inc.,*
 770 F.2d 1015 (Fed. Cir. 1985)................................................................15

*Cancer Research Tech. Ltd. v. Barr Labs., Inc.,*
 625 F.3d 724 (Fed. Cir. 2010)................................................................30

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.,*
 464 F.3d 1356 (Fed. Cir. 2006)................................................................15

*Electro Scientific Indus, Inc. v. Gen. Scanning, Inc.,*
 247 F.3d 1341 (Fed. Cir. 2001)................................................................17

*Eolas Tech., Inc. v. Microsoft Corp.,*
 399 F.3d 1325 (Fed. Cir. 2005)................................................................20

*Graham v. John Deere Co.,*
 383 U.S. 1 (1966)................................................................15

*In re EchoStar Commc'ns Corp.,*
 448 F.3d 1294 (Fed. Cir. 2006)................................................................27

YCST01:11524592.1   058956.1029

*In re Hedges,*
    783 F.2d 1038 (Fed. Cir. 1986)................................................................14

*In re Hill,*
    284 F.2d 955 (C.C.P.A. 1960) ..................................................................7

*In re Huang,*
    100 F.3d 135 (Fed. Cir. 1996)..........................................................15, 16

*Merck & Co. v. Biocraft Labs., Inc.,*
    874 F.2d 804 (Fed. Cir. 1989)..................................................................8

*Merck & Co. v. Teva Pharms. USA, Inc.,*
    395 F.3d 1364 (Fed. Cir. 2005)..............................................................16

*Midwest Industries, Inc. v. Karavan Trailers, Inc.,*
    175 F.3d 1356 (Fed. Cir. 1999)..............................................................15

*Minn. Mining & Mfg. Co. v. Chemque Inc.,*
    303 F.3d 1294 (Fed. Cir. 2002) ("*3M*")..................................................19

*Ortho-McNeil Pharma., Inc. v Teva Pharms. Indus. Ltd.,*
    2009 WL 2604919 (Fed. Cir. Aug. 26, 2009)............................................7

*Pfizer, Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007)........................................................12, 15

*Sandt Tech. Ltd. v. Resco Metal & Plastics Corp.,*
    264 F.3d 1344 (Fed Cir. 2001)........................................................20, 21

*Sanofi-Synthelabo v. Apotex, Inc.,*
    550 F.3d 1075 (Fed. Cir. 2008)..............................................................13

*Takeda Chem. Indus. Ltd. v. Alphapharm Pty., Ltd.,*
    492 F.3d 1350 (Fed. Cir. 2007)........................................................12, 13

*Therasense, Inc. v Becton, Dickinson & Co.*
    649 F.3d 1276 (Fed. Cir. 2011)..............................................................22

*Titanium Metals Corp. of Am. v. Banner,*
    778 F.2d 775 (Fed. Cir. 1985)..................................................................7

*Tokai Corp. v. Easton Enters., Inc.,*
    632 F.3d 1358 (Fed. Cir. 2011)..............................................................16

*Unigene Labs. Inc. v. Apotex, Inc.,*
    2011 WL 3715557 (Fed. Cir. Aug. 25, 2011)..........................................12

YCST01:11524592.1                                    058956.1029

*Woodland Trust v. Flowertree Nursery, Inc.*,
    148 F.3d 1368 (Fed. Cir. 1998)...................................................................................19, 20

STATUTES

35 U.S.C. §102(b) ...................................................................................................18

35 U.S.C. § 103 .........................................................................................................8

v

## I.      INTRODUCTION

Pronova's brief fails to address the full scope of the evidence of obviousness presented at trial.  Defendants' opening brief provided clear and convincing evidence that: (1) the prior art taught that EPA and DHA were the active agents in fish oil and were effective to treat high triglycerides [DI 209 at 6-10]; (2) the prior art disclosed compositions having more than the 80% by weight EPA+DHA required by the claims here, within the claimed weight ratios [DI 209 at 14-17, 25-28]; (3) the prior art taught processes to make compositions having greater than 80% EPA+DHA, including the exact processing steps the patents-in-suit would later describe as their preferred method [DI 209 at 10-17, 29-30]; and (4) a person of ordinary skill ("POSA") would have been motivated to make those compositions because the prior art disclosed them, provided the methods to make them, and taught their usefulness to treat high triglycerides. [DI 209 at 21-22]  The motivation was explicitly noted in prior art published by one of Pronova's experts: "The theory is that more is better, and so we have seen 30% concentrates, then 50% concentrates and now 80% concentrates…" [DI 209 at 22; DTX-1276 at 714]

This evidence compels a conclusion that the claims are obvious, and Pronova's brief fails to dispute Defendants' showing on any of these points.  Pronova instead hangs its patentability position on meritless arguments that no expert or other witness supported at trial.  Pronova's argument that the exact percentages of the "minor components" set forth in the asserted claims (*e.g.*, at least 1% HPA, 1% DPA) are not specified by number in the prior art is legally irrelevant. Defendants cited controlling Federal Circuit precedent that if the prior art and the claims differ only by numerical values that are overlapping or similar, the claim is obvious unless the patentee demonstrates that the claimed numerical range or value leads to unexpected results.  [DI 209 at 31-33]  Pronova failed to meaningfully distinguish this precedent, and does not argue that the claimed numerical values for the minor components lead to unexpected results.  Defendants

presented unrebutted evidence that the minor components have no known biological effect, much less give rise to unexpected results.  [DI 203 at 542:9-24, 575:13-22]  Any minor differences between the prior art and the claims do not defeat obviousness where, as here, the differences are not critical and do not give rise to unexpected results.  Defendants' showing on this point compels a conclusion of obviousness.

Pronova's composition claims are also anticipated based on the undisputed fact that Pronova provided Dr. Skrinska in Cleveland with samples of the exact claimed composition (including all the claimed amounts of the minor components) with no restrictions on disclosure or use.  Pronova does not contest that those samples meet every claim limitation, were ready for patenting and were sent with no confidentiality restrictions.  Nor does Pronova argue that the experimental use exception applies.  These admitted facts require a finding of public use.  Further, Dr. Skrinska's corroborated testimony that he conducted a six-week clinical study using capsules of the Pronova product provides additional evidence of public use.

Finally, Pronova did not explain the disturbing facts showing that Dahl engaged in egregious acts of affirmative misconduct before the PTO.  Pronova admits that when Dahl submitted his July 1990 Declaration representing that the bioavailability of EPA and DHA was "enhanced when they are taken as K85 rather than as [TG30]," he knew that the bioavailability "was the same when you took into account all of the data" that he had collected during his 1988 Comparison Study.  Pronova does not contest that in 1993 — while prosecution was ongoing — at the behest of Pronova, Dahl attempted to suppress the publication of a journal article that threatened to expose his fraud by truthfully reporting that the bioavailability of EPA and DHA from K85 and TG30 were "essentially identical."  Pronova does not explain how Dahl's admission that he attempted to suppress that publication "for fear that publication might harm the Omacor patent" is anything other than direct evidence of intent to deceive.

2

II.     **NATURE AND STAGE OF THE PROCEEDINGS**

See Defendants' opening post-trial brief [DI 209 at 3].

III.    **SUMMARY OF ARGUMENT**

The asserted claims are obvious and anticipated and the patents-in-suit are unenforceable.

IV.     **STATEMENT OF FACTS**

See Defendants' opening post-trial brief [DI 209 at 4-17].

V.      **THE ASSERTED CLAIMS ARE OBVIOUS**

Pronova's brief fails to address the bulk of Defendants' overwhelming evidence at trial that the asserted claims are obvious.  Multiple witnesses confirmed that by August 1988 private manufacturers, researchers and the U.S. Government were actively producing fish oil concentrates with weight percentages of EPA+DHA that exceeded the 80% required by the claims.  [DI 209 at 24-28]  Defendants demonstrated that the motivation to make these concentrates was fueled by (1) clinical evidence that EPA and DHA in fish oils had beneficial medical effects (including lowering triglycerides), (2) the fact that the concentrates and the methods of making them were already known and (3) the recognition that higher EPA+DHA concentrations meant users could take fewer pills and thus ingest less fat and calories.  [DI 209 at 21-22, 30-31; DTX-1190 at PRV 856640; DI 202 at 337:8-338:17]  DeBernardi, for example, disclosed a pharmaceutical capsule with an 85% concentration of EPA+DHA in the ratio later claimed by Pronova.  The NMFS freely distributed what Pronova itself described as "high quality" fish oil concentrates at levels just below the claimed 80% EPA+DHA concentrations, in the claimed ratios, and with the claimed "minor components," and was promoting them for use by others to further experiment with and develop.  [*See* PTX-547; DTX-699; DTX-1448] Numerous references taught methods to produce those high concentrates, including the prior art

NMFS method that the patentees —after they visited the NMFS and took detailed notes— included in the patents as their preferred method of manufacture. [DI 209 at 12-17, 29-30]

Pronova's limited responses lack merit.  Pronova's complaint that no reference showed that the 80% EPA+DHA prior art compositions contained the precise amounts of the minor components specified in the asserted claims [DI 215 at 28-33] is, in the absence of unexpected results, legally irrelevant.  Next, Pronova argues that a POSA would not have been motivated to concentrate the NMFS material to arrive at the claimed invention, ignoring the evidence that DeBernardi, Krzynowek and Dahl already disclosed concentrates with more than 80% EPA+DHA, that concentrating the NMFS material was one way that a POSA was enabled to make those concentrated products [DI 215 at 33-37] and that Nilsson concentrated NMFS material. [DTX-1448 at 110]  Finally, Pronova's teaching away arguments [DI 215 at 30, 35] conflict with the trial record.

Pronova did not address the obviousness of the method of claim 9 other than to argue the nonobviousness of the compositions recited in that claim.  The Court should therefore find that claim 9 is obvious for the same reasons, regardless of whether that claim is entitled to the British priority date.  [DI 209 at 6-10 and 20-23]

### A.     The Differences Between The Prior Art And The Claims Are Immaterial

Pronova admits that DeBernardi and the NMFS material as reported in Joseph (which was not before the examiner)[1] disclose all the elements of the asserted claims except those involving specific percentages of the minor components:  claim 20 (at least 1% HPA); claim 44 (at least 3% C20, 21, and 22 ω-3 fatty acids other than EPA and DHA ("non-EPA/DHA C20-22 ω-3's")); claim 50 ((a) at least 1% HPA, (b) at least 4.5% non-EPA/DHA C20-22 ω-3's and (c)

---

[1]  Although Pronova asserts that information about the NMFS program was before the PTO [DI 215 at 34], Joseph, Nilsson and Kryznowek were not.  Moreover, the examiner's search only uncovered an August 1989 reference, which was not prior art based on the British priority date.

at least 90% long chain ω-3 fatty acids ("long chain ω-3's")).[2]  [*See* DI 215 at 14-16]  Pronova's

entire argument for patentability hangs on these supposed minor differences, and it ultimately

fails.  First, Defendants demonstrated that any minor differences between the amounts of the

minor components in the prior art and the claims cannot defeat obviousness as a matter of law.

Second, Defendants introduced unrebutted testimony that the claimed amounts of the minor

components would have been expected by making the prior art concentrated products, including

DeBernardi and Krzynowek, following known prior art methods.

### 1.   Controlling Precedent Establishes that the Minor Components Are Legally Irrelevant to Patentability

Pronova does not dispute that a POSA would have understood, as Dr. Sacks testified, that

the minor components play no role, positive or negative.  [DI 203 at 542:9-24, 575:13-22]  Even

if making the DeBernardi or Krzynowek products by the prior art methods resulted in minor

variations from the specified amounts of the minor components, the claimed compositions would

still be obvious.  It is beyond question that *some* amounts of the minor components were present

in prior art compositions.  Joseph [PTX-547 at PAR00030522] disclosed a detectable amount of

HPA [DI 204 at 911: 3-24] and at least 2.0% non-EPA/DHA C20-22 ω-3's.[3]  Pronova's attorney

argument that Joseph did not report HPA [DI 215 at 36] ignores Dr. Rizvi's testimony that the

gas chromatogram in Joseph shows the presence of HPA.[4]  [DI 204 at 911:17-912:2]  PUFA 2 in

Nilsson [DTX-1448 at 110 tbl.1], which was material supplied by the NMFS, contained 1.3%

---

[2]  Pronova has not disputed that one of the claimed minor components, AA, is present in the
NMFS material as evidenced by both Joseph and Nilsson's PUFA2.  [DI 215 at 14]
[3]  This reflects the sum of a detectable amount of HPA and the 2.0% DPA in Joseph.
[4]  Pronova calls Dr. Rizvi's testimony based on the gas chromatogram speculation [DI 215 at
10], ignoring Dr. Rizvi's testimony that he has performed gas chromatographic analysis.  [DI
204 at 928:19-22]  Pronova offered no contrary expert testimony, and Dr. Rizvi's testimony is
corroborated by the disclosure of HPA in PUFA2 which the NMFS supplied to Nilsson.  [DTX-
1448 at 110 tbl.1 (disclosing 1.3% of HPA)]

058956.1029

HPA and at least 1.5% non-EPA/DHA C20-22 ω-3's.[5]  PUFA 1 in Nilsson [DTX-1448 at tbl.1] exemplifies the pervasiveness and natural variability of the amounts of the minor components in concentrated EPA+DPA compositions, containing 2.3% HPA and at least 7.7% non-EPA/DHA C20-22 ω-3's.[6]  All of these compositions contained (a) HPA ranging from a detectable amount to 2.3% and (b) non-EPA/DHA C20-22 ω-3's ranging from at least 1.5% to 7.7%.

Pronova's case for non-obviousness of the composition claims is a numbers game based on supposed differences between the amounts of (a) HPA, (b) non-EPA/DHA C20-22 ω-3's and (c) total long chain ω-3's in the prior art and the claimed compositions.  But Federal Circuit cases have repeatedly held that if the prior art and the claims differ only by a numerical range or value, that difference does not confer patentability unless the claimed numerical value is critical and confers an unexpected result.  [DI 209 at 31-33]  Pronova's suggestion that these cases are "inapposite" [DI 215 at 37-38] is wrong.  As shown above, prior art references alone or in combination disclosed claimed elements, including overlapping amounts of AA, HPA and DPA, as well overlapping sums of the non-EPA/DHA C20-22 ω-3's.[7]

The Federal Circuit has rejected the type of numbers game that Pronova wants to play here, repeatedly holding that obviousness exists when the claimed range and the prior art range may not overlap but are close enough that a POSA would have expected them to have the same properties.  In *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 782-83 (Fed. Cir. 1985),

---

[5]  This reflects the sum of 1.3% HPA and a detectable amount of DPA and C20:4 ω-3 in PUFA2 (based on a conservative assumption of a 0.1% detection limit, the lowest expected value).

[6]  This is the sum of 2.3% HPA, 2.6% C20:4 ω-3 and 2.8% DPA in PUFA 1.

[7]  At least one NMFS reference identifies all the components of the claimed compositions.  The Joseph NMFS material [PTX-547] discloses a 74.4% EPA+DHA ethyl ester composition (a 1.72:1 ratio) that contains 1.7% of AA (an ω-6 component), a detectable amount of HPA, 2.0% of DPA, at least 2.0% of non-EPA/DHA C20-22 ω-3's and at least 76.4% total long chain ω-3's.  The NMFS material was available encapsulated with an antioxidant. [DTX-1447 at 1]  Pronova has failed to show any unexpected results over the NMFS material.

the court considered the patentability of a claim to a particular titanium alloy.  The prior art disclosed an alloy having a composition close to, but not precisely the same as, the composition specified by the claim.  The Federal Circuit reversed the trial court and held that, because of the small differences between the prior art alloy composition and the claimed alloy composition, a POSA would have expected them to have the same properties.  *Id.* at 783.  The claimed alloy was obvious, in the absence of unexpected results.  *Id*. at 783; *Ortho-McNeil Pharma., Inc. v. Teva Pharms. Indus. Ltd.*, 2009 WL 2604919, at *4-5 (Fed. Cir. Aug. 26, 2009) (affirming summary judgment of obviousness where the difference between the ratio for tramadol to acetaminophen in the prior art composition and the claim was small and there were no unexpected results or teaching away from the claimed ratio); *In re Hill*, 284 F.2d 955, 956-59 (C.C.P.A. 1960) (finding claims to a process for making a silver catalyst by use of a solution containing "about 0.1% to about 1.5% of the alkaline-earth metal" were obvious because the prior art disclosed the use of very small amounts of alkaline earth metal compounds and, as the amounts claimed did not appear to be critical, that feature did not constitute a patentable distinction).

The rule set forth in *Titanium Metals* and related cases applies here.  The NMFS material, as reported in Joseph, contained HPA, DPA and at least 2.0% non-EPA/DHA C20-22 $\omega$-3's. Defendants introduced testimony that making the 85% EPA+DHA product of DeBernardi or the 88% product of Krzynowek using the processes described in the prior art would result in proportionate increases to those small amounts.  [DI 209 at 28-29]  Pronova does not assert that the claimed amounts of the minor components are critical or result in any unexpected results over the prior art, including DeBernardi or the NMFS material (either Joseph or Krzynowek). Thus, the claimed percentages of the minor components do not confer patentability.

7

2.     **Defendants' Unrebutted Evidence Shows That The Claimed Amounts Of The Minor Components Would Be Expected By Following The Prior Art**

Although the exact amounts do not confer patentability, Defendants at trial introduced unrebutted testimony that if the compositions identified in, *e.g.*, De Bernardi (85% EPA+DHA) or Krzynowek (88% EPA+DHA), were manufactured using the prevailing prior art methods for concentrating EPA and DHA, a POSA would have expected the minor components to be present in the claimed amounts.  [DI 209 at 28-29]  Pronova neither introduced any rebuttal testimony nor explained what the remaining 12-15% of the Krzynowek or DeBernardi compositions would supposedly contain if not the minor components.  Contrary to Pronova's arguments, Dr. Ganem testified [tracking DTX-1573] that every claim element requiring a specific percentage of a minor component was disclosed by a series of references, including DeBernardi [DTX-1429] and Krzynowek [DTX-699 at 75 tbl.2].  *See Merck & Co. v. Biocraft Labs., Inc.,* 874 F.2d 804, 807-08 (Fed. Cir. 1989) ("the question under 35 U.S.C. § 103 is not merely what the references expressly teach but what they would have suggested" to a POSA).  [DI 204 at 739:9-743:12, 775:24-776:15]  Dr. Ganem explained the scientific basis for his opinion that utilization of the known techniques would result in amounts of the minor components as specified in the claim. [DI 204 at 766:18-771:2]  Further, since Joseph disclosed that the NMFS material contained at least 2.0% non-EPA/DHA C20-22 $\omega$-3's, there is no reason to doubt that the more concentrated NMFS material Krzynowek described would contain at least 2.0% non-EPA/DHA C20-22 $\omega$-3's along with 88% EPA+DHA for a sum total of least 90% total long chain $\omega$-3's.  Dr. Rizvi testified that applying supercritical fluid extraction ("SFE") after urea fractionation to concentrate EPA and DHA would also concentrate the minor components (ranging from 20 to 22 carbons in length).  [DI 204 at 898:5-13, 921:7-18, 957:19-958:15]

8

Instead of supplying evidence to challenge Dr. Rizvi's and Dr. Ganem's testimony, Pronova criticizes their credentials.[8]  *See Allergan, Inc. v. Barr Labs., Inc.*, 2011 WL 4000820 at *35 n.21 (D. Del. Sept. 8, 2011) ("The court has not located any authority instructing it to review the prior art references and weigh their import absent the guidance of an expert").  But their testimony is credible and confirms what the patents admit: the minor components are a by-product of the prior art processes used to make ω-3 concentrates. [DI 204 at 770:5-771:2; PTX-1 Col. 3:44-51, Col. 4:55-61]  Pronova does not dispute that the patents' preferred method for making the claimed compositions is identical to the methods described in the prior art, including the NMFS art.  [DI 209 at 29-30]  The Court should, accordingly, credit Defendants' expert testimony that the identical methods would produce the same amounts of the minor components.

**B.     Pronova Fails to Address Defendants' Actual Argument Based on the NMFS Material**

Defendants' opening brief clearly set forth Defendants' obviousness position based on the NMFS material.  [DI 209 at 21-26, 28-33]  Specifically, since DeBernardi, Krzynowek and Dahl had already disclosed compositions containing more than 80% EPA+DHA, those references would have motivated a POSA to make the target compositions they disclosed.  [DI 209 at 21, 25]  A POSA was enabled to make those compositions because, among other reasons, the exact process the patents would later describe as preferred was disclosed by the NMFS, the product of the NMFS process was freely available to the public, and if any further processing was required to make the DeBernardi or Krzynowek compositions, SFE would have enabled the POSA to achieve the concentrations those references disclosed.  [DI 209 at 24-26, 29-30]  Based

---

[8]  Pronova claims that it did not offer rebuttal testimony because Drs. Rizvi and Ganem were not qualified at trial as "marine oil" experts.  [DI 215 at 32 n.5]  But the asserted claims do not claim "marine oil." Moreover, Dr. Ganem's expertise in organic chemistry and methods of purifying and concentrating pharmaceutical compositions and Dr. Rizvi's expertise in using SFE to concentrate ω-3's are well supported.  [DI 214 at 7-9]

on the POSA's knowledge of PUFAs and the processes, a POSA would have expected that the resulting composition would include amounts of the minor components corresponding to the amounts specified in the asserted claims. [ DI 209 at 28-29]

Pronova fails to address this position.  Instead, Pronova recasts Defendants' argument, asserting that a POSA would not have been motivated to start with the NMFS product and concentrate it using SFE, but making no reference to the prior art target compositions of DeBernardi and Krzynowek.  [DI 215 at 33-37]  Pronova never disputes that a POSA would have been motivated to make DeBernardi's 85% "new drug" composition, or the 88% Krzynowek composition, and never argues that a POSA would have been unable to do so.  As Defendants clearly demonstrated [DI 209 at 24-31], by August 1988, a POSA would have been motivated and enabled to make the 85% composition of DeBernardi [DTX-1429],[9] including by concentrating the U.S. Government's NMFS material, which contained minor components such as HPA and DPA (see Joseph [PTX-547] and Nilsson [DTX-1448]).  The resulting compositions would have been patentably indistinct from the claimed compositions.

Further, there is no merit to Pronova's assertion that a POSA would not have concentrated the NMFS material because it was a "final test material" intended "to be directly administered to humans or animals in medical studies" and not a starting material.  [DI 215 at 34]  The Feb. 12, 1988 NIH Notice offered the NMFS material in two forms: capsules and "n-3 ethyl ester concentrate … packaged in quantities suitable to the investigators' needs."  [DTX-1447 at 1]  Although capsules might have been intended for administration, the n-3 ethyl ester

---

[9] Similarly, the Dahl Abstract [DTX-137A] disclosed an 85% EPA+DHA ethyl ester composition.  Dahl admitted at trial that he "brought a poster" to the NATO conference in Belgirate that was attended by "people from the industry and people from research" and that the poster "was about the information in this abstract" [i.e., DTX-137A].  [DI 202 at 433:4-434:14] The Dahl Abstract was also cited in an article specifically as the 1988 abstract as opposed to a page from the 1989 book of abstracts from the conference.  [Luley, et. al., DTX-210]

10

concentrate would reasonably have been used as a starting material for further concentration. Nilsson concentrated NMFS material. [DTX-1448 at 110]

Pronova incorrectly contends that Defendants' "entire motivation" for a POSA to concentrate the NMFS material rests on prior art comparisons to whole fish.  [DI 215 at 35] Pronova ignores Defendants' repeated showing that motivation would also be provided by the fact that "compositions having >80% EPA+DHA were already known in the art," including DeBernardi and Krzynowek, which provided "target percentages" of EPA and DHA, and that the POSA would be "aiming at" the >80% EPA+DHA compositions already disclosed in that prior art.  [DI 209 at 21, 24-25, 30-31]  Pronova also ignores the motivation recognized in 1987 by its own expert, Mr. Bimbo, that "a recent trend has been toward higher concentrations of n-3 fatty acids.  The theory is that more is better... ."  [DTX-1276 at 714]

## C.     The Art Taught A POSA To Concentrate NMFS Material By SFE

While Pronova does not dispute that a POSA could concentrate to 85% EPA+DHA using SFE, it nevertheless contends that neither Dr. Rizvi nor any prior art reference actually combined urea fractionation (which was used to make the NMFS material) and SFE to "obtain a mixed EPA plus DHA composition." [DI 215 at 35]  Pronova is incorrect.  By August 1988, Dr. Rizvi had disclosed that urea fractionation combined with SFE was an advantageous method for concentrating fish oil.  [DTX-938R at 98, 104]  Second, Nilsson also disclosed that using SFE on material that, like the NMFS material, had been urea fractionated, increases the EPA, DHA and the minor components:  urea fractionation removes saturated and less unsaturated fatty acid ethyl esters, and SFE removes shorter chain length fatty acid ethyl esters. [DTX-1448 at 109, 115; *see also* DI 204 at 889:18-890:15, 895:25-898:23]  Third, the Breivik PCT [DTX-177] disclosed the use of urea fractionation followed by use of SFE for further concentration.  [DI 204 at 752:23-

755:21]  The patents-in-suit disclose that this procedure produces the claimed compositions.  [DI 204 at 753:20-755:8, 758:12-759:8; PTX-1 Col. 3:13-16]

Pronova cites *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) for the proposition that "[t]he standard is not, as Defendants recast it, whether one of ordinary skill would have had a reasonable expectation that the prior art, if combined or modified, would possess all the claim limitations."  [D.I. 215 at 34]  Pronova misapprehends both Defendants' argument and the import of *Pfizer*.  Defendants' point is that a POSA would reasonably expect that concentrating the NMFS material to the DeBernardi target would also concentrate the minor components in that material, *i.e.*, a POSA would expect or predict the presence of the minor components in the resulting composition.  This is consistent with *Pfizer*, in which the Federal Circuit discusses the reasonable expectation of success standard as a matter of predictability and notes that only an expectation of success, rather than a guarantee, is required.  *Pfizer*, 480 F.3d at 1364-65.

### D.      Pronova's Cases On Motivation Are Irrelevant

Pronova's case law on motivation [DI 215 at 27] is irrelevant.  First, in *Unigene Labs., Inc. v. Apotex, Inc.*, 2011 WL 3715557 (Fed. Cir. Aug. 25, 2011), the Federal Circuit concluded that Apotex did not establish obviousness because a POSA would not "replace BZK in Miacalcin® [one piece of prior art termed a "reference composition"] with 20 mM of citric acid [taught in another prior art reference]."  *Id.* at *9.  Here, unlike in *Unigene*, there is no issue of substituting one excipient for another.  Rather, all the ingredients (EPA, DHA and the minor components) were already present in the NMFS material and no "swapping out" of one component in the NMFS material for another component present in other prior art is needed.

Second, in *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350 (Fed. Cir. 2007), the Federal Circuit concluded that Alphapharm did not establish obviousness of the

12

chemical compound pioglitazone, because it "failed to adduce evidence that compound b would have been selected as the lead compound" and then "failed to show that there existed a reason, based on what was known at the time of the invention, to perform the chemical modifications necessary to achieve the claimed compounds." *Takeda,* 492 F.3d at 1362-63.  Here, unlike in +, there is no issue of "structural obviousness" involving chemical changes to a lead compound. Rather, a POSA had ample reason to use the NMFS material, which the U.S. Government was giving away, and which already contained all the components of the asserted claims (EPA, DHA and the minor components (HPA, DPA and non-EPA/DHA C20-22 ω-3's [which include HPA and DPA]) without the need to chemically modify the existing components.

Finally, in *Sanofi-Synthelabo v. Apotex, Inc.,* 550 F.3d 1075 (Fed. Cir. 2008), the Federal Circuit concluded that Apotex did not establish obviousness of a salt of an enantiomer (*i.e.,* clopidogrel bisulfate) in view of a racemate based on the district court's "extensive findings in this case on the unexpected and unpredictable properties of clopidogrel." *Sanofi*, 550 F.3d at 1089-90.  Here, unlike the situation in *Sanofi-Synthelabo*, there are no unexpected and unpredictable properties of the claimed compositions based on the minor components.

In contrast, Defendants' opening brief discussed the Federal Circuit case of *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.,* 499 F.3d 1293, 1302 (Fed Cir. 2007), which found that purifying desirable compounds was an obvious "mainstay of a chemist's art."  [DI 209 at 22-23]  Though that case closely parallels the present facts, Pronova did not address it in its brief.

E.     **Haagsma Does Not Teach Away From An EPA+DHA Concentrate Containing The Minor Components**

Pronova's teaching away arguments [DI 215 at 30, 35] fail.  First, Pronova fundamentally misrepresents Haagsma [DTX-1434] as "teaching away" from the concentration of the minor components when, to the contrary, Haagsma disclosed the concentration of the minor

13

components.  Haagsma disclosed the concentration of 20:4 ω3 from "—" to "1.6%" and of DPA (20:5 ω3) from "—" to "1.2%."  [DTX-1434 at 118 tbl.1]  In total, Haagsma disclosed the concentration of non-EPA/DHA C20-22 ω-3's from 0.1% to 3.5%.  [DTX-1434 at 118 tbl.1] The "other fatty acids" language in Haagsma that Pronova seizes upon refers to saturated fatty acids, such as 18:1 (reduced from "24.9%" to "2.0%") and 20:1 (reduced from "12.0%" to "—"). [DTX-1434 at 118 tbl.1] Haagsma does not teach away.

Accordingly, Pronova's reliance on *In re Hedges,* 783 F.2d 1038 (Fed. Cir. 1986) is unfounded.  The *In re Hedges* Court found that *the whole of the art* taught away from the invention, and that the patentee provided data showing "significant advantages of the claimed invention."  783 F.2d at 1041.  Neither is the case here.  No art suggests that other non-EPA/DHA C20-22 ω-3's have negative biological activity.  The composition disclosed in Haagsma contained at least 3.5% non-EPA/DHA C20-22 ω-3's [DTX-1434 at 118 tbl.1] and was used in successful human trials with no mention of any deleterious side effects.  [*Compare* DTX-1434 (Haagsma) at 118 tbl.1 *with* DTX-1567 (Bronsgeest-Schoute) at 1754 tbl.3; DI 215 at 9] Furthermore, subsequent prior art, such as the NMFS material, shows that compositions containing non-EPA/DHA C20-22 ω-3's were being used and distributed without concern.

Pronova's suggestion that a POSA would have been dissuaded by reports of adverse effects of fish oil compositions on LDL ("bad") cholesterol [DI 215 at 35] ignores the undisputed fact that, despite the effect on LDL cholesterol, EPA and DHA were reported by prior art researchers as the "drug of choice" with the best risk/benefit ratio for hypertriglyceridemia. [DTX-122 at 801; DI 209 at 10; DI 203 at 645:8-646:24]

## VI.   NO SECONDARY CONSIDERATIONS REBUT DEFENDANTS' *PRIMA FACIE* SHOWING OF OBVIOUSNESS

Pronova bears the burden to prove that secondary considerations of non-obviousness rebut Defendants' *prima facie* case of obviousness.  *See Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966).  Moreover, secondary considerations do not outweigh a strong showing of *prima facie* obviousness such as established in this case.  *See DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1371 (Fed. Cir. 2006); *Pfizer*, 480 F.3d at 1372.

### A.    Lovaza® Is Not Commercially Successful

Lovaza® sales do not show commercial success because they do not represent a substantial share of the relevant market.[10]  First, Pronova focuses on the wrong market.  It dismissed statins and "omega-3 dietary supplements" as competitors and characterized Lovaza® as competing in a "non-statin dyslipidemia ('NSD') market" with primary competitors TriCor®, Niaspan® and Trilipix®, and secondary competition from generic fenofibrates and gemfibrozil.  [DI 215 at 39 and n.6]  But Pronova's 30(b)(6) witness testified that Lovaza® competes against statins, including Lipitor®, Crestor® and Zocor®.  [DI 206 at 1457:11-1458:2, 1420:11-1421:8, 1414:2-1415:13; DTX-1579]  Pronova's internal marketing documents also state that Lovaza® competes directly with statins.  [DI 206 at 1421:15-1422:18; DTX-307 at PRV01203112; DTX-309 at PRV01210180]  This Court should reject the opinion of Mr. Jarosz, Pronova's expert, who based his opinion on an incorrect market analysis.  [DI 205 at 1176:12-19]

---

[10]   Sales alone, whether units or dollars, are not evidence of commercial success – rather, the patentee must show that the sales represent a substantial share of the relevant market.  *Cable Elec. Prods. Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1026-27 (Fed. Cir. 1985) *overruled on other grounds* by *Midwest Industries, Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999; *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

Lovaza® is not a commercial success even in Pronova's self serving NSD market.  When the NSD market is evaluated by total prescriptions of active ingredient, Lovaza® comes in *last* behind the fibrates, niacin and generic gemfibrozil.  [DI 206 at 1419:15-1420:7; DTX-1579]  Including just one statin in the market (*e.g.*, Lipitor®) would dwarf the sales and prescriptions of Lovaza®.  [DI 206 at 1416:10-25; 1424:7-15]

Furthermore, Pronova has not demonstrated that any purported commercial success is due to a novel claimed feature specifically recited in the asserted claims, *i.e.*, a "nexus."  *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1129-30 (Fed. Cir. 2000); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005).  "If commercial success is due to an element in the prior art, no nexus exists."  *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011); *see also In re Huang*, 100 F.3d at 140.

Pronova attributes Lovaza® sales to "the benefits and advantages of the inventions of the '667 and '077 patents … includ[ing] Lovaza®'s 1) effectiveness in treating and preventing hypertriglyceridemia, 2) excellent safety and tolerability profiles, and 3) minimal interactions with other drugs that may be co-administered."  [DI 215 at 40]  First, Lovaza®'s effectiveness vis-à-vis hypertriglyceridemia is not novel in view of the prior art ω-3 compositions used to reduce triglycerides in hypertriglyceridemic patients.  In fact, before launching Lovaza® Pronova sold its OTC division because it could not distinguish between the effectiveness of its OTC ω-3 product EPAX® and Lovaza®.  [DI 206 at 1433:15-1438:1; DTX-583; DTX-601; DTX-600 at PRV931385]  Second, Lovaza®'s safety and tolerability profile is not recited in any of the claims.  Further, prior art ω-3 compositions were known to be safe and tolerable in patients with hypertriglyceridemia.  [DI 203 at 548:13-551:24; DI 205 at 1067:1-2; DTX-122 at PRV01123446_T ("ω-3 fatty acids have been put forward by leading clinicians as the 'drug of choice' for hypertriglyceridemia")]  Third, Lovaza®'s minimal interactions with co-administered

drugs is also not a claimed feature. These three purported advantages were disclaimed by Pronova's expert Mr. Jarosz as caused by any claimed feature of the patents [DI 206 at 1276:13-1283:12], who also admitted that the marketing of Lovaza® did not cite the claim limitations as advantages of the product. [DI 206 at 1284:13-1288:23] Lovaza® sales are due to promotion of its FDA-approved status. [DI 206 at 1262:3-1263:12, 1342:11-18]

## B.  Lovaza® Did Not Satisfy A Long-Felt But Unmet Need

Pronova cites no evidence that Lovaza® satisfied a long-felt but unmet need in treating hypertriglyceridemia by having a better efficacy, side-effect or tolerability profile than the prior art ω-3 compositions. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001). The unrebutted testimony establishes that there was no such long-felt but unmet need. [DI 203 at 575:23-576:23; DI 206 at 1426:5-1427:9, 1431:1-17; DTX-1579 at 14] Pronova cannot show, as it must, that prior art products were ineffective for treating hypertriglyceridemia. *See Electro Scientific Indus., Inc. v. Gen. Scanning Inc.*, 247 F.3d 1341, 1352 (Fed. Cir. 2001). Prior art ω-3 compositions were available and effective in reducing triglycerides in patients with hypertriglyceridemia. [DTX-1431; DTX-1436; DTX-1453; DI 203 at 548:2-12, 560:15-19, 646:6-24] There can be no long-felt but unmet need where, as here, the alleged invention is very similar to the prior art and has no unexpected results, (*see B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 72 F.3d 1577, 1583 (Fed. Cir. 1996)), and has also failed to displace other drugs that Pronova claims suffered from severe defects. *See Electro Scientific*, 247 F.3d at 1352.

## VII.  The Unrebutted Evidence Proves Invalidity For Public Use

## A.  Dr. Skrinska Used K80 Without Restriction By Pronova

The unrebutted trial evidence clearly and convincingly establishes that Pronova and Dr. Skrinska made public use of the claimed composition before August 4, 1988, rendering each of

the composition claims invalid under 35 U.S.C. §102(b).[11]  "An invention is in public use if *it is shown to* or used by an individual other than the inventor under no limitation, restriction, or obligation of confidentiality."  *Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1267 (Fed. Cir. 2008) (emphasis added).  Pronova does not contest that (1) it provided Dr. Skrinska with samples of K-80 before the statutory bar date [DTX-84; DTX-85]; (2) the K-80 sample met every limitation of the asserted composition claims [DTX-86]; (3) none of the named inventors exercised any control or supervision over Dr. Skrinska's use of the materials; (4) Pronova contemporaneously distributed K-80 samples without confidentiality to, *inter alia*, Travenol Laboratories, Inc., Pharmacaps, Inc, Warner-Lambert, General Mills, Sandoz Nutrition, and Squibb [DTX-124; DTX-1399; DTX-99][12]; (5) the samples were "ready for patenting"; (6) Pronova distributed the K-80 samples for marketing purposes; and (7) the materials distributed by Pronova do not fall within the "experimental use" exception to the public use bar.  [DI 215 at 42-47]

Pronova's admitted distribution of samples of K-80/Batch 222 to Dr. Skrinska and others are invalidating public uses that anticipate the composition claims and render obvious all of the claims.  The certificate of analysis ("COA") disclosed the composition of K-80 [DTX-86], and Pronova placed no restriction on disclosure or use of that information.  As a researcher in the area of ω-3 biology, Dr. Skrinska understood the features of K-80 upon seeing the vials and reading the composition in the COA.  *See Adenta GmbH v. OrthoArm, Inc.,* 501 F.3d 1364, 1371

---

[11] In addition to his public use of the K80 vials, Dr. Skrinska also made public use of the 500 – 1000 capsules of K-80 that he received from Norsk Hydro in 1987.  [DI 209 at 35-36]  Each individual in the study received a "complete summary of what was in the capsules."  [DI 203 at 502:2-6]  Dr. Skrinska specifically recalled the results from the preliminary study – "the concentration of EPA and DHA increased in the platelet membranes and in particular the ratio between the EPA and the arachidonic acid changed . . . ."  [DI 203 at 503:16-24]
[12]  Pronova also provided the claimed product to Nordoy without confidentiality.  [DI 209 at 38]

(Fed. Cir. 2007) (finding that public display of the claimed invention, an orthodonture device, at a trade show was public use). Pronova incorrectly asserts that *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1306-07 (Fed. Cir. 2002) ("*3M*") holds that distribution of samples does not constitute public use. *Id.* The *3M* court found no public use because the unassembled samples that were distributed did not meet all of the claimed limitations. *Id.* at 1307. Here, the K-80 samples that Pronova provided to Dr. Skrinska (and others) were complete compositions that met all of the claimed limitations.

Pronova's contention that Dr. Skrinska never used, for any purpose, the vials of K-80/Batch 222 that he received [DI 215 at 43] is demonstrably wrong. Dr. Skrinska analyzed their contents to determine if the fatty acid composition matched that listed in Pronova's documentation. [DI 202 at 483:24-484:6; DTX-86] His analysis of the composition in those vials was a public use of that composition.

### 1.   Dr. Skrinska's Testimony Regarding His Public Use Of The Skrinska Materials Is Corroborated And Credible

This Court has ample corroboration of Dr. Skrinska's testimony regarding his public use of the claimed invention. Corroboration of a witness' testimony concerning public use is analyzed under a "rule of reason" test that involves "an assessment of the totality of the circumstances including an evaluation of all pertinent evidence." *Adenta*, 501 F.3d at 1372 (citing *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998)). In *Woodland Trust*, the Federal Circuit set forth the factors to consider when assessing corroboration: (1) the relationship between the corroborating witness and the alleged prior user, (2) the time period between the event and trial, (3) the interest of the corroborating witness in the subject matter in suit, (4) contradiction or impeachment of the witness' testimony, (5) the extent and details of the corroborating testimony, (6) the witness' familiarity with the subject matter of

058956.1029

the patented invention and the prior use, (7) probability that a prior use could occur considering the state of the art at the time, (8) impact of the invention on the industry, and the commercial value of its practice. *Woodland Trust*, 148 F.3d at 1371. Corroboration must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive. *Sandt Tech. Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). Circumstantial evidence may corroborate. *Id.* at 1351. For example, in *Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1329 (Fed. Cir. 2005) the Federal Circuit held that a witness' testimony that he publicly demonstrated a computer program to Sun Microsystems engineers on a particular date was adequately corroborated even though the only corroborating evidence was an archived copy of the program dated two weeks after the public use, and no document corroborated the date of the actual demonstration.

Applying the *Woodland Trust* factors to this case clearly demonstrates that Dr. Skrinska's testimony is highly corroborated. The volume of the corroborating Norsk Hydro documents is substantial and varied, consisting of (a) correspondence between Pronova and Dr. Skrinska [DTX-81 (letter from Dr. Skrinska stating that he was interested in "clinical studies using the mixtures which you described during your visit"), DTX-82 and DTX-84]; (b) Norsk Hydro invoices to Dr. Skrinska for samples [DTX-83 and DTX-85]; (c) the COA [DTX-86] for the K-80 that Dr. Skrinska received from Norsk Hydro; and (d) internal memoranda recording its interactions with Dr. Skrinska. [DTX-104 at PRV00864320-T (Dr. Skrinska "favors a capsule product") and DTX-124 at PRV00412367 (Norsk Hydro "ha[s] a copy of [Dr. Skrinska' NIH] application documents")] *See Woodland Trust*, 148 F.3d at 1373. Norsk Hydro documents confirm that during the same period of time Norsk Hydro sent 1000 capsules of the claimed composition to Dr. Nordoy [DTX-150; DI 209 at 38] and offered capsules to two colleagues of Dr. Skrinska. [DTX-112 (letter to Drs. Wei and Sheehan: "it is likely we can supply you with

capsules")]  Dr. Skrinska's CV [DTX-80, funded grant entries 12, 13 & 14] corroborates his

research on ω-3 compositions at precisely the time he received the K-80 samples from Norsk

Hydro.  Pronova internal documents describe Dr. Skrinska as "among the most omega-3

knowledgeable researchers interviewed" and his institution's research capabilities as "the most

intensive, concentrated – and professionally credible – omega-3 clinic research potential

anywhere in the world."  [DTX-104 at PRV00864320-T]  All this corroborating evidence is

contemporaneous with the use and thus reliable.  *See Sandt*, 264 F.3d at 1350-51.

Dr. Skrinska was also a very credible witness.  He vividly recalled important details of

his prior use and clearly differentiated during his testimony between what he remembered and

what he did not.  [*See* DI 202 at 486:1-22]  His testimony was not impeached or contradicted

when Pronova examined Dr. Skrinska at deposition.  Dr. Skrinska has no financial interest in the

subject matter of the suit, receiving only his deposition travel expenses.  [DI 203 at 520:7-15]

Pronova's attacks on Dr. Skrinska's credibility mischaracterize the evidence.  Pronova

inaccurately contends that Dr. Skrinska was unclear "whether he actually performed a study with

concentrated fish oil, as opposed to MaxEPA, despite the fact that the NIH *never approved* his

grant."  [DI 215 at 46]  But Dr. Skrinska was never asked whether he performed a study with

MaxEPA.  [DI 202 at 474:18-24; 486:15-22]  And Dr. Skrinska clearly recalled that his grant

proposal to the NIH was never funded.  [DI 202 at 491:9-12]  The absence of documents

produced from the Cleveland Research Institute is irrelevant because it closed in 1990.  [DI 202

at 471:4-8]  Dr. Skrinska testified that he had kept a laboratory notebook (and described its

cover), which was not readily available due to the 20 years and several relocations since the

events at issue.  [DI 203 at 517:14-518:22]  Pronova asks this Court to reject Dr. Skrinska's

testimony because "extensive documentation" is required for clinical studies "to protect human

volunteers and verify safety and efficacy results."  [DI 215 at 44]  But Pronova never asked Dr.

058956.1029

Skrinska whether he sought or needed approval for his preliminary study from an institutional review board.  [DI 203 at 522:8-13; DTX-81-A]

## VIII.   DEFENDANTS HAVE PROVEN DAHL'S INEQUITABLE CONDUCT BY CLEAR AND CONVINCING EVIDENCE

The clear and convincing evidence before this Court leads to only one reasonable conclusion:  inventor Dahl committed inequitable conduct during prosecution of the patents in suit.  Dahl submitted his July 1990 Declaration [DTX-9] to the PTO knowing it misrepresented the design, data and conclusions of the Comparison Study [DTX-141] that Dahl had conducted in 1987-88.  The Comparison Study answered precisely the same question that Dahl purported to answer in the July 1990 Declaration—whether there was any difference in the bioavailability of EPA and DHA from a highly-concentrated ethyl ester (K85) compared to a lower-concentrated triglyceride (TG30).  The submission of this "unmistakably false affidavit" was an "affirmative act[] of egregious misconduct" that is *per se* material.  *Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1292 (Fed. Cir. 2011) ("[A] patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect issuance of the patent.").  It is also "but-for" material.  [DI 209 at 53]

Dahl's knowledge that his July 1990 Declaration was a fraud is shown by his subsequent attempt to suppress the publication of a peer-reviewed journal article [DTX-217 (the "Krokan article")] that accurately disclosed the data and conclusions that had been misrepresented in the July 1990 Declaration.  Dahl's attempts to suppress the Krokan article had "nothing to do with the scientific soundness of the paper" [DTX-216 at PRV01765074] but rather were "for fear that the publication might harm the Omacor patent."  [DTX-1577 at PRV01832203]  When the Krokan article was published, Dahl (knowing it was highly material) did not disclose it to the

PTO.  In 2007, Dahl acknowledged his inequitable conduct in a letter to Pronova's CEO demanding additional compensation for his efforts to obtain the patent.  [DTX-1577]

Pronova's defense of Dahl's inequitable conduct is based upon arguments that are procedurally barred and substantively meritless.  The procedural bar arises because Pronova invoked privilege at Dahl's deposition and he refused to answer Defendants' questions on the inaccuracies and omissions in his July 1990 Declaration.  Pronova now goes far beyond Dahl's deposition testimony and purports to respond to the very questions that Dahl refused to answer. This Court ruled, however, at the March 15, 2011 Pre-Trial Conference that Pronova would be "narrowly circumscribed to what [Dahl] gave at his deposition . . . He cannot go beyond that." [Pre-Trial Hrg Tr. at 65:15-20, 67:7-8]  Even if this Court considers Pronova's arguments on the merits — and it should not — they are mere contrivances that are contradicted by the evidence.

### A.    The Undisputed Facts Regarding The Comparison Study And The July 1990 Declaration

The undisputed facts establish that Dahl misrepresented the design, data and conclusions from his study of the comparative bioavailability of EPA and DHA from K85 and TG30.  Dahl knew that he had performed a five-group study that demonstrated equal bioavailability, but his July 1990 Declaration falsely stated that he conducted a "two group" study showing that bioavailability of EPA and DHA was "enhanced when they are taken as K85 rather than as the less concentrated triglyceride preparations."  [DTX-9 at PRV408249]

Pronova does not dispute the central facts:  (1) Dahl conducted the Comparison Study in 1987 and 1988 which compared "the absorption of ω-3 fatty acids as ethylesters or as triglycerides" [DTX-141 at PRV01148245]; (2) Dahl constructed the Comparison Study to "enable a comparison [of] the serum lipid lowering effect of [K85 and TG30]" [DTX-1026 at PRV00950103]; (3) the Comparison Study included five groups of eight individuals: three of the

groups received K85 (in amounts of 2.2, 4.4 and 7.7 g/day of EPA) and two of the groups

received TG30 (in amounts of 2.2 and 4.4 g/day of EPA) [DTX-141 at PRV01148251]; (4) Dahl

collected fasting data on the concentrations of EPA and DHA found in both total serum lipids

and phospholipids for all five groups; (5) all of the data for each of the five groups in the

Comparison Study (including the total serum lipid data and phospholipid data) was scientifically

valid [DI 202 at 449:25-451:23]; (6) Dahl's conclusion after completing the Comparison Study

in March 1988 was "[t]he present study demonstrates that after a two week intake of an ω-3

concentrate, the same percentage of EPA and DHA is recovered in the serum lipids and

phospholipids regardless if the oil is a triglyceride or an ethylester" [DTX-141 at

PRV01148261]; (7) throughout 1988, before the patent application was filed, Dahl and his co-

authors repeatedly reported this conclusion of equal bioavailability to the scientific community

[DTX-150 (Jan. 1988 letter from Dahl) ("After two weeks intake, the same amounts of EPA and

DHA are found in total serum lipid when the same amounts of EPA/DHA are taken in either in

the form of triglyceride or an ethyl ester"); DTX-137A ("EPA-ethylester is absorbed with the

same efficacy as an EPA-triglyceride"); DTX-101 (June 1988 letter from Krokan) ("As is now

completely evident to us (and other workers in Norway presently engaged in this area), there is

no difference in absorption between the two forms"); DTX-95 (October 1988 Rome Abstract)

("statistically no significant differences" between the K85 and TG30 groups in (i) phospholipid

or (ii) total serum lipid concentrations of EPA or DHA)]; (8) the comparative efficacy data from

the Comparison Study showed that TG30 lowered triglycerides better than K85 [DTX-1026 at

PRV00950087-98; DTX-1574 at PRV00010882, 10893, 10896-901]; (9) the July 1990

Declaration represented that Dahl's study was composed of "two groups" [DTX-9]; (10) the July

1990 Declaration entirely excluded the groups that received K85 corresponding to 2.2 daily

grams of EPA (Group 1), K85 corresponding to 7.7 daily grams of EPA (Group 3), and TG30

24

corresponding to 2.2 daily grams of EPA (Group 4); (11) the July 1990 Declaration excluded all of the absorption data for total lipids, reporting only the phospholipid data for Groups 2 and 5; and (12) "absorption was the same when you took into account all of the data for EPA." [DI 202 at 451:20-23] These facts establish that Dahl knew that his July 1990 Declaration was false and materially misleading and had been carefully crafted to avoid any hint to the PTO that Dahl had conducted his study on five groups, not merely two groups, and concluded that the full data set demonstrated that there was no difference in absorption.

**B.      Virtually All of Pronova's Inequitable Conduct Arguments Are Procedurally Barred**

In its answering brief, Pronova conjures up explanations for the misrepresentations and omissions in the July 1990 Declaration as if this Court had not previously ruled that it was limited to the answers provided by Dahl at his deposition. For example, Pronova attempts to explain the failure of the July 1990 Declaration to accurately describe the number of groups in the Comparison Study by contending that the "study" described in the July 1990 Declaration was not the Comparison Study, but rather a January 1990 Report on a subset of the data from the Comparison Study that Pronova's patent counsel asked Dahl to prepare. [DTX-213; DI 202 at 456:9-14, 457:5-21] But when Dahl was asked at his deposition to explain why he had asserted in the July 1990 Declaration that there were two groups, not five groups, in his study, he did not state that the "study" was the January 1990 Report, nor did he assert that there were only two groups in his study; he asserted privilege and refused to answer. [DI 180 at Ex. C, 140 (Dep. Tr. at 197:18-198:14)] Dahl similarly invoked privilege and refused to answer questions at his deposition on the following topics: (1) why Dahl prepared the January 1990 Report [DI 180 at Ex. C, 140 (Dep. Tr. 156:16-157:1)]; (2) why Dahl did not include the data from Group 1, Group 3, and Group 4 in the July 1990 Declaration [DI 180 at Ex. C, 140 (Dep. Tr. 200:7-18)]; (3) why

Dahl did not report the data from Tables 1-5 of the Comparison Study, which included the total serum lipids concentrations and phospholipids concentrations for all five groups [DI 180 at Ex. C, 140 (Dep. Tr. 200:20-202:20)]; (4) why Dahl did not disclose in the July 1990 Declaration the conclusion from the Comparison Report that "the differences observed between the two forms of EPA (ethyl esters and triglycerides) are concluded to be within individual and experimental variation [DI 180 at Ex. C, 141 (Dep. Tr. 204:15-205:4)]; (5) why Dahl did not mention the Dahl Abstract [DTX-137A] in the July 1990 Declaration [DI 180 at Ex. C, 141 (Dep. Tr. 205:10-18)]; (6) why Dahl did not include the data regarding total serum lipid concentrations and phospholipid concentrations of EPA set forth in the Dahl Abstract [DTX-137A] in the July 1990 Declaration [DI 180 at Ex. C, 141 (Dep. Tr. 205:20-206:6)]; and (7) why Dahl withdrew as an author of the Krokan Article [DTX-217] [DI 180 at Ex. C, 142 (Dep. Tr. 354-367)].

Dahl's testimony on subjects that he refused to address at his deposition is the only testimonial support for Pronova's arguments in DI 215 Sections V.D.2, D.3.a, D.3.b, D.3.d, D.3.e., D.3.f. D.4.a (to the second line on page 56), D.4.b and D.4.c. Accordingly, these arguments are all procedurally barred and should not be considered by the Court.

### C.    Pronova's Inequitable Conduct Arguments Are Substantively Meritless

#### 1.    Dahl's January 1990 Report Was Not The "Study" Referenced In the July 1990 Declaration

Pronova's contention that the "study" referenced in the July 1990 Declaration was not the Comparison Study but rather the January 1990 Report is meritless. If Dahl were referring to the January 1990 Report in his June 1990 Declaration, then he had no basis to assert privilege over why he selectively disclosed only two groups from the Comparison Study. Moreover, Dahl's declaration on its face contradicts Dahl's newly-minted trial story. Dahl's declaration states that the study "was designed as follows: Two groups (each of eight persons) were given either K85 or

058956.1029

TG30 twice daily for two weeks." [DTX-9 at PRV00408246]  Accordingly, Dahl told the PTO that the study design included **giving the K85 and TG30 to two groups of subjects, when he gave those products to five groups**.  Similarly, the statement in the July 1990 Declaration that "[a]ll volunteers completed the study according to the design" [DTX-9 at PRV00408247] cannot apply to the January 1990 Report, which was not "design[ed]" until two years after the volunteers completed the study in 1988.  Dahl's trial story that by "study design", he meant the attorney-directed January 1990 reanalysis of the data cannot be reconciled with this evidence.

### 2.      Dahl's January 1990 Report Does Not Demonstrate Good Faith

Pronova's contention that "[b]ecause Dr. Dahl conducted his statistical analysis before a first Office Action had issued, he could not have intended to deceive the PTO" [DI 215 at 57] does not withstand scrutiny.  At his deposition, Pronova asserted privilege and refused to allow Dahl to testify (1) why he prepared the January 1990 Report [DTX-213] and (2) why the January 1990 Report omitted data from the five groups of the Comparison Study, which showed that EPA was equally absorbed from K85 and TG30.  [DI 202 at 457:5-25]  At trial, Dahl grudgingly admitted (after an initial denial) that his January 1990 Report was prepared at the instruction of Norsk Hydro's patent counsel.  [DI 202 at 457:5-18]  Dahl further admitted that his January 1990 Report was only used for patent prosecution purposes, and was not submitted to the FDA for approval of the drug.  [DI 202 at 459:11-14]  Having elected to shroud the creation of the January 1990 Report in privilege, Pronova forfeited any argument that the timing or wording of the January 1990 Report demonstrates good faith.  *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (party may not use privilege as both a "sword" and a "shield").

058956.1029

### 3.   Pronova's Argument That Dahl Excluded Total Serum Lipid Data And Reported Only Phospholipid Data Because Of Dr. Bonaa Is False

It is not credible that Dahl included only the phospholipid data in the July 1990 Declaration and excluded the total serum lipid data because Dr. Bonaa had determined that phospholipid data was more useful.  First, if Dahl had excluded total serum lipid data because of Dr. Bonaa's work, then there would have been no reason for him to have claimed privilege at his deposition when he was asked why he had failed to provide the total serum lipid data.  Moreover, Dr. Bonaa testified that "he was unaware whether there was any benefit to measuring EPA and DHA in plasma total lipids versus plasma phospholipids" and that he was unaware of "any scientific reason for preferring the measurements of EPA and/or DHA in phospholipids as opposed to measurement of EPA and/or DHA in total lipids." [DI 205 at 1101:14-1102:3] Further, Dr. Bonaa did not participate in the conduct of the Comparison Study and had no involvement in selecting or analyzing the data. [DTX-9; DI 205 at 1103:25-1104:6]

### 4.   Dahl's Declaration To The PTO On The Luley Article

Pronova responds to Defendants' point that "Dahl never submitted any documentation showing equal absorption to the PTO" by contending that Dahl "provided the Examiner with a study published by Luley that addressed that issue." [DI 215 at 56]  But Dahl's April 1991 Declaration submitted to the PTO that purported to describe the Luley article [PTX-9 at PRV00408513-522] did not state that Luley demonstrated equal absorption, but, to the contrary, stated "the ethylester containing 85% EPA and DHA [K-85] is superior to the other two."[13] [PTX-9 at PRV00408522]  Dahl's April 1991 Declaration further states that "[t]he parameter most relevant to compare when judging bioavailability of omega-3 fatty acids is considered to be increase in serum [EPA+DHA]/g [EPA+DHA] taken per day" [PTX-9 at PRV00408522], which

---

[13] This is in contradiction to Luley's conclusions regarding bioavailability. [DTX-210]

contradicts Pronova's contention that Dahl believed phospholipid data was superior to total

serum lipid data in determining the bioavailability of ω-3 fatty acids.

> **5.     Pronova's Contention That Triglyceride-Lowering Efficacy Data Was
> Irrelevant Is Demonstrably False**

As Defendants have shown, the statement in Dahl's July 1990 Declaration that "[i]t is our

conclusion the bioavailability of EPA and DHA and thus their therapeutic effect is enhanced

when they are taken as K85 rather than as the less concentrated triglyceride preparations" was

false because the Comparison Study demonstrated both equal bioavailability and that TG30 was

more effective than K85 in reducing triglyceride levels.  [DI 209 at 44-50, 52-53]  Pronova's

response that triglyceride-lowering data was irrelevant to the July 1990 Declaration [DI 215 at

53-54] is wrong.  When the July 1990 Declaration was submitted, the pending claims recited

"the treatment or prophylaxis of multiple risk factors for cardiovascular disease" [PTX-9 at

PRV00408156 (claims 13 - 15)] and the amendment forwarding the July 1990 Declaration

repeatedly discussed treatment of hypertriglyceridemia.  [PTX-9 at PRV00408238, 41-2]

> **D.     Dahl Committed Inequitable Conduct In Attempting To Suppress, And
> Failing To Disclose, The Krokan Article**

Pronova's arguments that Dahl did not commit inequitable conduct in withdrawing as an

author of the Krokan article and seeking to suppress its publication are procedurally barred and

substantively meritless.  Dahl invoked privilege at his deposition and refused to answer when he

was asked why he withdrew from the manuscript.  [DI 180 at Ex. C, 142 (Dep. Tr. 354-367)]

Accordingly, as this Court held on March 15, 2011, Dahl cannot testify and Pronova cannot

argue as to the reasons for his withdrawal.  [Pre-Trial Hrg Tr. at 67:2-8]

Even if this Court were to consider the substance of Dahl's trial testimony, the contention

that Dahl withdrew as an author because he substantively disagreed with the Krokan article [DI

215 at 58] is demonstrably false.  First, Dahl's letter to the publisher withdrawing as an author

identified no substantive disagreement with the article.  [DTX-215 at PRV01765071]  Dr. Krokan's contemporaneous letter to the publisher reported that Dahl's decision to withdraw his authorship had *"nothing to do with the scientific soundness of the paper*."  [DTX-216 at PRV01765074]  At trial, Dahl admitted he discussed with Krokan why he withdrew as an author and that Krokan wrote his letter to the publisher "after he spoke with [Dahl]."  [DI 202 at 463:17-19, 465:9-13]  Pronova misrepresents Dr. Krokan's testimony by stripping the phrase "there can be different ways of doing statistical analysis" from its context when it cites purported evidence that Dr. Krokan recalled Dahl objecting.  [DI 215 at 58]  The complete quote makes it clear that Dahl raised no objection to the publication.  [DI 205 at 1058:12-24]

Pronova's citation to *Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 734 (Fed. Cir. 2010) [DI 215 at 52] is to no avail.  In *Cancer Research*, the patentee repeatedly throughout prosecution published the data it failed to disclose to the PTO, *Cancer*, 625 F. 3d at 728, 733-34, but here Dahl sought to suppress publication.  Dahl's 2007 letter to Pronova's CEO shows explicitly that Pronova asked him to withdraw his name as an author, and that he did so for fear that publication would harm the "Omacor patent."[14]  [DTX-1577 at PRV01832203] These admissions directly demonstrate that Dahl understood the materiality of the information in the Krokan article, but withheld it from the PTO precisely because he knew that it would preclude patentability.  That is inequitable conduct.

## IX.    CONCLUSION

Defendants respectfully request the relief requested herein and in their opening brief.

---

[14] Lovaza® was previously known as Omacor.  [PTX-9 at PRV00409234]

DATED:  September 29, 2011 **[SECOND CORRECTED VERSION October 17, 2011]**

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

_____

John W. Shaw (#3362)
Karen L. Pascale(#2903)
Pilar G. Kraman (#5199)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
kpascale@ycst.com

Frederick H. Rein
Annemarie Hassett
Gregory T. Sandidge
David E. Lansky
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 813-8800

J. Anthony Downs
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts  02109
Telephone: (617) 570-1000

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

RICHARDS LAYTON & FINGER, P.A.

*/s/ Steven J. Fineman*

_____

Frederick L. Cottrell, III (#2555)
Steven J. Fineman (#4025)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone: (302) 651-7700
fineman@rlf.com

Daniel G. Brown
Mitchell E. Epner
Jennifer R. Saionz
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Telephone: (212) 999-5800

*Attorneys for Defendants*
*Par Pharmaceutical, Inc. and*
*Par Pharmaceutical Companies, Inc.*

058956.1029